1 │ ROBERT P. GOE – State Bar No. 219977
MARC C. FORSYTHE – State Bar No. 153854
2 │ ELIZABETH A. LAROCQUE – State Bar No. 219977
**GOE & FORSYTHE, LLP**
3 │ 660 Newport Center Drive, Suite 320
Newport Beach, CA 92660
4 │ rgoe@goeforlaw.com
mforsythe@goeforlaw.com
5 │ elarocque@goeforlaw.com

**FILED**

**JUL 2 7 2007**

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy

**ORIGINAL**

6 │ Telephone:  (949) 467-3780
Facsimile:  (949) 721-0409

7 │ Attorneys for Defendant/Counter-Claimant
8 │ Coastal Employers, Inc., a California corporation

9

10 │ **UNITED STATES BANKRUTPCY COURT**

11 │ **CENTRAL DISTRICT OF CALIFORNIA**

12 │ **SANTA ANA DIVISION**

13

| | |
|---|---|
| In re: | Case No. 8:07-bk-10992 RK |
| CONSOLIDATED EMPLOYER MANAGEMENT SOLUTIONS, a California corporation | (Jointly administered with Case Nos.: 8:07-bk-10994 and 8:07-bk-10995) |
| Debtor and Debtor-in-Possession. | Chapter 11 Proceeding |
| REAL TIME STAFFING, INC., a California corporation, KOOSHAREM CORPORATION, a California corporation, NEW STAFF, INC., a California corporation, KT, INC., a California corporation, PAY SERVICES, INC., a California corporation, PBT, INC. a California corporation, and D. STEPHEN SORENSEN, an individual, | Adv. No. 07-01105 RK |
| Plaintiffs, | **COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM** |
| vs. | |
| COASTAL EMPLOYERS, INC. a California corporation, ROBERT J. ANDERSON, an individual, and Does 1 through 100, inclusive, | |
| Defendants. | |

1

| | |
|---|---|
| COASTAL EMPLOYERS, INC., a California corporation, | |
| Counter-Claimant, | |
| vs. | |
| KOOSHAREM CORPORATION, PROFESSIONAL BUSINESS TECHNOLOGIES, INC., aka PBT, INC.; NEW STAFF, INC., K.T., INC., PAY SERVICES CORP., and REAL TIME STAFFING SERVICES, INC., and ROES 1 through 100, inclusive, | |
| Counter-Defendants. | |

**TO THE HONORABLE ROBERT N. KWAN, UNITED STATES BANKRUPTCY JUDGE, AND INTERESTED PARTIES:**

Counter-Claimant, Coastal Employers, Inc., by and through their attorneys, Goe & Forsythe, LLP, hereby set forth as their Counter-Claim against Counter-Defendants, Koosharem Corporation (hereinafter "Koosharem"); Professional Business Technologies, Inc., a/k/a PBT, Inc. (hereinafter "PBT"); New Staff, Inc. (hereinafter "New Staff"); K.T., Inc. (hereinafter "K.T."); Pay Services Corp (hereinafter "Pay Services"); and Real Time Staffing Services, Inc. (hereinafter "Real Time").

1. At all times hereinafter mentioned, Coastal Employers, Inc. (hereinafter "Coastal") was and is a corporation organized under the laws of the State of California, which at all times relevant herein maintained its California office at 265 South Anita Drive, Suite 201, Orange, California 92868.

2. At all times hereinbefore mentioned, and at the time of commencement of this action, Coastal maintains offices located at 8580 State Route 69, Oriskany, Oneida County, New York 13424.

3. The offices which Coastal maintains and operates in Oriskany, New York serve as the headquarters for this entity and served as headquarters during all relevant times.

1    4.    Upon information and belief, Counter-Defendant, Koosharem, was and is a
2    corporation organized under the laws of the State of California with its principal office located
3    at 3820 State Street, Santa Barbara, California 93105.

4    5.    Upon information and belief, Counter-Defendant, PBT, was and is a corporation
5    organized under the laws of the State of California with its principal office located at 3820 State
6    Street, Santa Barbara, California 93105.

7    6.    Upon information and belief, Counter-Defendant, New Staff, was and is a
8    corporation organized under the laws of the State of California with its principal office located
9    at 3820 State Street, Santa Barbara, California 93105.

10    7.    Upon information and belief, Counter-Defendant, K.T., was and is a corporation
11    organized under the laws of the State of California with its principal office located at 3820 State
12    Street, Suite A, Santa Barbara, California 93105.

13    8.    Upon information and belief, Counter-Defendant, Pay Services, was and is a
14    corporation organized under the laws of the State of California with its principal office located
15    at 3820 State Street, Santa Barbara, California 93105.

16    9.    Upon information and belief, Counter-Defendant, Real Time, was and is a
17    corporation organized under the laws of the State of California with its principal office located
18    at 3820 State Street, Santa Barbara, California 93105.

19    10.    Upon information and belief, Counter-Defendants which are related to each other
20    acted as a "joint venture" and a single enterprise to participate in the various agreements.

21    11.    Venue and jurisdiction are proper for this Court for the same reasons venue and
22    jurisdiction are appropriate in the underlying action. This Counter-Claim stems from facts and
23    activities related to the underlying Complaint of Plaintiffs herein.

24    12.    In addition to jurisdiction being proper in this Court, jurisdiction was proper in
25    the state district where the underlying Complaint was originally filed before being removed to
26    this bankruptcy action.

27    13.    The true names and capacities whether individual(s), corporate. associate, or
28    otherwise of Counter-Defendant(s) sued herein as ROES 1 through 100, inclusive, are unknown

3

1  to Counter-Claimant who, therefore, sues said Counter-Defendants by fictitious names.

2  Counter-Claimant will amend this Counter-Claim to show the true names and capacities when

3  the same have been ascertained

4      14.    Coastal is qualified to provide staffing services to companies and sometimes is

5  also referred to as a "staffing company."

6      15.    Upon information and belief, in the context of the relationship in question,

7  Counter-Defendants are considered staffing subcontractor companies.

8      16.    Upon information and belief, Counter-Defendants are and were staffing

9  subcontracting companies and, at one time, client companies of Coastal.

10     17.    On June 14, 2004, Coastal and Counter-Defendants executed a Staff

11  Subcontracting Agreement (hereafter the "2004 Agreement"); a copy of which is attached hereto

12  as **Exhibit A**.

13     18.    Coastal provides staffing services to client companies and specifically to

14  Counter-Defendants, including, but not limited to:

15         a.  consulting assistance in obtaining, preparing and filing of all forms required

16             to be filed by client companies, including Counter-Defendants, with the

17             United States Internal Revenue Service and the United States Immigration

18             and Naturalization Service;

19         b.  consulting assistance regarding preparing withholding and payment of all

20             required federal income and related taxes to client companies, including

21             Counter-Defendants;

22         c.  consulting assistance in preparing and filing of required Form 940, 941 and

23             similar federal tax forms for client companies, including Counter-Defendants;

24         d.  consulting assistance and preparing and filing all required state and federal

25             Unemployment Insurance Reports and payments of all sums due and

26             indicated thereon to client companies, including Counter-Defendants;

27         e.  continual maintenance of the workers' compensation insurance with respect

28             to all of the workers and in connection therewith, provision to client

4

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1    companies, including Counter-Defendants of certificates evidencing such

2    insurance coverage;

3        f.  consulting assistance in preparing and implementing safety programs for

4    workers on behalf of client companies, including Counter-Defendants.

5        19.  In addition to those services as provided above, Coastal also maintained

6    ownership of all payroll accounts used to pay employees of client companies including Counter-

7    Defendants, however, in an effort to create a productive environment, client companies were

8    allowed to access the payroll accounts for the issuance of payroll under all reasonable controls

9    and procedures implemented by Coastal.

10        20.  Additionally, pursuant to Section 8 of 2004 Agreement, Counter-Claimant was

11    required to provide workers' compensation coverage for the employees subcontracted by

12    Counter-Defendants.  The same was provided to Counter-Defendants under Policy Number

13    WC0610040100001 (hereinafter the "2004 Policy") effective June 14, 2004 and continuing to

14    April 30, 2005 which was procured through Reinsurance Company of America, who maintained

15    offices in Oriskany, New York.

16        21.  Under the 2004 Agreement, Counter-Defendants also agreed, pursuant to Section

17    3 of said 2004 Agreement, to pay 4% of gross payroll representing a fixed payroll fee. The 2004

18    Agreement states in pertinent part:

19    …in that Client Companies [Counter-Defendants] warrant and represent to CEI

20    [Coastal] that Client Companies [Counter-Defendants] will provide CEI [Coastal] with

21    at least $50,000,000 in gross employee earnings over the course of the year commencing

22    June 14, 2004….In such instance, Client Companies [Counter-Defendants] will be

23    entitled to recover any excess portion of the minimum program fee from the program fee

24    due for a subsequent month when and as the monthly payroll target is exceeded.

25        22.  The original invoices and estimates forwarded to Counter-Defendants on behalf

26    of Coastal and ultimately paid by Counter-Defendants were based on the referenced

27    $50,000,000 payroll figure as contained in Section 3 of 2004 Agreement.

28        23.  However, at the conclusion of the contract, it has been determined, in accordance

1    and pursuant to Counter-Defendants' own records, that Counter-Defendants ran a total of

2    approximately $77,000,000 in payroll in connection with the 2004 Agreement.

3         24.    On or around December 14, 2006, Counter-Defendants were advised in

4    correspondence directed to President, D. Stephen Sorensen, from Robert J. Anderson Jr. that in

5    accordance with this provision, Counter-Defendants were required to pay an additional

6    $362,651 to Coastal for the additional payroll in excess of the $50,000,000 agreed to pursuant to

7    2004 Agreement.   Attached hereto labeled as **Exhibit B** is a true and correct copy of the

8    December 14, 2006 correspondence.

9         25.    Section 8 of 2004 Agreement also sets forth certain requirements of Counter-

10   Defendants in connection with Counter-Claimant providing the same Workers Compensation

11   Insurance previously referenced herein.  In pertinent part, the 2004 Agreement states:

12        CEI [Coastal] agrees to furnish Client Companies [Counter-Defendants] with certificates

13        of insurance indicating compliance with ten (10) days of each such request by Client

14        Companies [Counter-Defendants].   Client Companies [Counter-Defendants] agrees to

15        have a $500,000 per claim deductible with no aggregate limit and a Loss Fund as defined

16        in paragraph 15.  Client Companies [Counter-Defendants] shall pay towards the loss

17        deductible on a monthly basis, based on claims and claims expenses paid by the

18        insurance company and/or CEI [Coastal].

19        26.    Section 14 of 2004 Agreement requires Counter-Defendants to pay $2,000,000

20   (or 4% of total annual gross employee earnings) into a Loss Fund to collateralize Counter-

21   Defendants' obligations to Coastal.  This section also sets forth the manner in which that

22   $2,000,000 was to be paid.  Additionally, and of importance, this provision also states in

23   pertinent part that:

24        If the cumulative total of monthly collateral payments is less than 4% of cumulative

25        actual reported payroll, **Client Companies [Counter-Defendants] agree to pay CEI**

26        **[Coastal] the additional collateral in accordance with paragraph 5 above.  CEI**

27        **[Coastal] shall have the exclusive right to determine the amount of money that shall**

28        **be paid to the Loss Fund by Client Companies [Counter-Defendants] to adequately**

1  **collateralize Client Companies' [Counter-Defendants] obligations under the Staff**

2  **Subcontracting Agreement.** Client Companies [Counter-Defendants] agree to pay CEI

3  [Coastal] the additional Loss Fund payments within five days of receiving notice of CEI

4  [Coastal]. The collateral obligation under this agreement is based on annual payroll of

5  $50,000,000 and initial submission of Client Companies [Counter-Defendants]. The

6  collateral requirements will be adjusted monthly above the initial amount based

7  proportionately on payroll and/or class code changes from the initial submission.

8  27.    Of importance, Section 14 additionally states:

9  **Client Companies [Counter-Defendants] further agree to pay losses as the claim**

10  **payments are made by CEI [Coastal] in addition to the collateral obligation.** These

11  losses will either be paid directly by the Client Companies [Counter-Defendants] or paid

12  by the Client Companies [Counter-Defendants] into a funding account used by the

13  insurance carrier or a licensed third-party administrator within ten days of invoicing for

14  reimbursement.

15  28.    Select prepaid collateral in the amount of $2,000,000 and as of mid-December,

16  2006, Counter-Defendants had paid an additional $660,206.66 towards Counter-Defendants'

17  deductible position. However, the total payments made by Coastal on behalf of Counter-

18  Defendants as of mid-December amounted to $4,669,480.15. Even with crediting Select with

19  the $2,660,206.66 that has been paid thus far, there is a short fall due of $2,039,273.49 in

20  connection with claims reimbursement and the Collateral Fund.

21  29.    On or around May 1, 2005, Coastal and Counter-Defendants executed a second

22  Staff Servicing Agreement (hereinafter referred to as "2005 Agreement"), a copy of which is

23  attached hereto as **Exhibit C.**

24  30.    According to the 2005 Agreement, Coastal provides staffing services to Counter-

25  Defendants also known as client companies, including, but not limited to:

26  a.  consulting assistance in obtaining, preparing and filing of all forms required

27  to be filed by client companies, including Counter-Defendants, with the

28  United States Internal Revenue Service and the United States Immigration

7

and Naturalization Service;

b. consulting assistance regarding preparing withholding and payment of all required federal income and related taxes to client companies, including Counter-Defendants;

c. consulting assistance in preparing and filing of required Form 940, 941 and similar federal tax forms for client companies, including Counter-Defendants;

d. consulting assistance and preparing and filing all required state and federal Unemployment Insurance Reports and payments of all sums due and indicated thereon to client companies, including Counter-Defendants;

e. continual maintenance of the workers' compensation insurance with respect to all of the workers and in connection therewith, provision to client companies, including Counter-Defendants of certificates evidencing such insurance coverage;

f. consulting assistance in preparing and implementing safety programs for workers on behalf of client companies, including Counter-Defendants.

31. In addition to those services as provided above, Coastal also maintained ownership of all payroll accounts used to pay employees of client companies including Counter-Defendants, however, in an effort to create a productive environment, Counter-Defendants were allowed to access the payroll accounts for the issuance of payroll under all reasonable controls and procedures implemented by Coastal in connection with the 2005 Agreement.

32. Under 2005 Agreement, Coastal also agreed to obtain and provide workers' compensation insurance for the employees subcontracted by Counter-Defendants.

33. Pursuant to the 2005 Agreement and in reliance thereon, Coastal provided workers' compensation coverage to Counter-Defendants under Policy Number WC1242444 (hereinafter the "2005-2006 Policy") effective April 30, 2005 and continuing until April 30, 2006 which was procured through AIG who maintains its headquarter office in New York, New York.

8

34.     The 2005 Agreement contains a comparable provision to that of 2004 Agreement with respect to the fixed cost the Counter-Defendants were responsible for.

35.     In pertinent part, Section 3 of 2005 Agreement states:

For purposes of calculating program fees, collateral and other costs, Client Companies [Counter-Defendants] has estimated and agree to be charged a minimum of at least $104,000,000 and workers' comp ratable payroll ("Payroll") that shall be provided CEI [Coastal] over the course of the year commencing May 1, 2005.  Client Companies [Counter-Defendants] shall be charged at the rate of 7.5% of this amount of payroll, or $7.8 Million for the year, broken down as follows:  1.75% ($1,820,000) shall be a minimum program fee payable to CEI [Coastal] for providing staffing services…**should Client Companies [Counter-Defendants] surpass the original estimated minimum payroll amount, Client Companies [Counter-Defendants] agree to pay additional program fees and collateral consistent with the rates per hundred dollars of payroll stated above.**  The 7.5% blended amount being charged to the Client Companies [Counter-Defendants] pursuant to this paragraph is based on Client Companies' [Counter-Defendants] original underwriting submission to CEI [Coastal].

36.     As of mid-December, 2006, it has been determined that for the 2005-2006 policy year, additional payroll has been produced beyond the agreed to minimum of $104,000,000. The payroll actually produced for this contract period is $160,781,376, or $56,781,376 in excess of what was originally estimated.

37.     Counter-Claimant concedes that Counter-Defendants made the original payments in accordance with the 2005 Agreement, however, due to the additional payroll beyond the $104,000,000 minimum, there is an additional $993,674 due and owing from Counter-Defendants to Coastal to cover the policy fixed cost. This amount was demanded from Counter-Defendants at least as early as December 14, 2006.

38.     Counter-Defendants also failed to comply with the collateral fund provision of Section 3 of the 2005 Agreement. Based upon the payroll that was produced during the contract period and according to the plain words of Section 3 as set forth above, Counter-Defendants

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1    were required to forward a total of $9,244,929 for the collateral fund.    To date, Counter-

2    Defendants have forwarded only $5,980,000 in connection with the collateral fund.

3        39.    Of particular importance, on or about December 7, 2006, Counter-Claimant, via

4    President, Robert J. Anderson Jr., received its first notice of a collateral call from AIG with

5    respect to the Workers Compensation policy issued during the 2005 contract period.. Attached

6    hereto as **Exhibit D** is a true and correct copy of said e-mail attaching collateral call

7    information.

8        40.    As you will note, although the original correspondence from American

9    International Group was dated November 28, 2006, Mr. Anderson did not receive same until

10    December 7th via e-mail transmission.

11        41.    At that time, AIG made a request for $7.8 Million to be paid in full on or before

12    December 28, 2006.

13        42.    Within days, President of Coastal, Robert J. Anderson Jr., as a follow up to a

14    telephone conference, sent an e-mail to Richard Hulme and Fred Pachon, both of Select

15    Personnel Services, to inform Counter-Defendants of the collateral call that was made by AIG

16    and the fact that said call would require action on both the part of Counter-Claimant and

17    Counter-Defendants. Attached hereto as **Exhibit E** is a true and correct copy of said e-mail as

18    well as attachments forwarded at that juncture.

19        43.    Upon information and belief, President, Robert J. Anderson Jr., requested that D.

20    Stephen Sorensen participate in a conference call to discuss AIG's collateral call and the

21    subsequent ramifications of same.  It was agreed that the parties would participate in a telephone

22    conference at that time.

23        44.    Upon information and belief, prior to said conversation, President, Robert J.

24    Anderson Jr. transmitted an e-mail to D. Stephen Sorensen setting forth the amounts due and

25    owing to Coastal as well as an explanation of how the numbers were arrived upon and  also

26    requesting immediate payment of all amounts due and owing.

27        45.    Counter-Defendants forwarded a reply to Counter-Claimant's request on

28    December 15, 2006. A copy of said correspondence is attached hereto as **Exhibit F**.

10

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

46.   In essence, the December 15, 2006 correspondence provided by Counter-Defendants simply rejected Counter-Claimant's analysis and offered very minimal dollars to resolve the matters despite contending that no such monies were due and owing.

47.   Upon information and belief, on or around December 17, 2006, a letter was transmitted to Counter-Defendants by Robert J. Anderson Jr., President of Counter-Claimant, further explaining Counter-Claimant's position and thus disputing Counter-Defendants' position as set forth in their December 15, 2006 correspondence.  Attached hereto as **Exhibit G** is a true and correct copy of said transmission from Mr. Anderson to Counter-Defendants.

48.   In the meantime, as evidenced by Robert J. Anderson Jr.'s December 26, 2006 correspondence directed to AIG's Jim Hennessy, Coastal was making efforts to resolve the collateral and coverage issues with AIG.  A copy of the letter is attached hereto as **Exhibit H**.

49.   To further evidence Counter-Claimant's attempt to rectify the current policy with AIG and the upcoming potential renewal with AIG, as evidenced by the December 21, 2006 correspondence from Ronald Askew, Counter-Claimant was exploring outside options in an attempt to comply with the collateral call made by AIG.  A copy of said letter is attached hereto as **Exhibit I**.

50.   In the midst of Counter-Claimant's conversations with AIG, a settlement was thought to have been reached with Counter-Defendants with respect to the controversy set forth herein.

51.   A Confidential Settlement Agreement and General Release (hereinafter "Settlement Agreement") was entered into between Counter-Defendants and Counter-Claimant on or around January 2, 2007.  A copy of said agreement is attached hereto as **Exhibit J**.

52.   Counter-Claimant continued to dispute AIG's position as set forth in Mr. Anderson's January 11, 2007 correspondence to AIG's James Hennessy.

53.   Upon information and belief, in the midst of settlement negotiations which Counter-Claimant believed would be fruitful, AIG forwarded a cancellation notice with respect to the 2006-2007 policy period dated January 18, 2007.  A copy is attached hereto as **Exhibit K**.

54.   Upon information and belief, even despite having received said notice, Counter-

1  Claimant continued to make efforts to salvage the relationship with AIG to no avail.  AIG's

2  collateral requirements were simply impossible for Counter-Claimant to fulfill.

3      55.    Upon information and belief, in light of the difficulties that Counter-Claimant

4  was experiencing with AIG, Counter-Claimant made a proactive decision on or around January

5  10, 2007 to at least seek other workers' compensation insurance quotes for the Coastal business.

6      56.    On or around January 11, 2007, at which point it became crystal clear that the

7  relationship between AIG and Counter-Claimant could not be preserved, Counter-Claimant

8  authorized the drafting of a Temporary Restraining Order (hereinafter "TRO") to be filed

9  against AIG requesting that the Court restrain AIG from canceling the policy in question.

10     57.    Upon information and belief, the required statutory notice was provided to AIG

11  of the filing of the TRO and at that juncture AIG requested additional time to resolve the matter.

12     58.    When negotiations once again stalled and eventually failed, Counter-Claimant

13  made an executive decision to seek workers' compensation coverage through ACE American

14  Insurance Company (hereinafter "ACE") rather than AIG.  Further, it was determined that the

15  TRO would be a less than fruitful avenue to pursue at that juncture in light of the ACE quote

16  that existed.  There was a 50% chance that the court would not issue the requested TRO which

17  would leave Coastal's employees without insurance coverage and Coastal's clients without the

18  much needed labor provided by Coastal.  Simply put, the replacement coverage offered by ACE

19  was a sure thing and AIG was not.

20     59.    Upon information and belief, an unfortunate element of the ACE policy is that

21  Counter-Claimant was unable to include the business produced by Counter-Defendants within

22  the ACE quote, primarily due to the fact that Counter-Defendants were obviously not willing to

23  properly remit payment within the terms of the previous contracts.

24     60.    Upon information and belief, upon gaining the knowledge that Counter-Claimant

25  would switch carriers and that the Counter-Defendants' business would no longer be included,

26  Counter-Claimant attempted to contact Counter-Defendants immediately to no avail.

27     61.    Of particular importance, Section 3 of the Settlement Agreement, states that: "In

28  resolution of the above-described claims by Coastal against Select for obligations or its claims

as described above, Select will pay Coastal the sum of $2,625,000 payable as follows:   by electronic wire transfer and no later than 4:00 p.m. on January 2, 2007.  $1,625,000.  The remaining $1,000,000 is payable by 4:00 p.m. on January 22, 2007."

62.     Upon information and belief, Counter-Defendants complied with the first transfer deadline.

63.     Upon information and belief, in light of subsequent developments and Counter-Defendants' interpretation of the same, Counter-Defendants refuse to pay the remaining $1,000,000 they agreed to pay pursuant to the Settlement Agreement.

64.     Pursuant to Section 4(b) of the Settlement Agreement, "should Select fail to issue the second payment after three (3) days' written notice to cure, Coastal at its option may retain the first payment and declare null and void its release and waiver of its claims against Select related to the disputes described in subparagraphs 2(a) and 2(b) above, and bring claim against and seek further monies owed by Select, giving Select credit for the receipt of the first payment. In such an event, Select shall not be permitted to assert the agreement as a bar or defense against such claims.

65.     On or around January 23, 2007, then attorneys for Coastal, the law firm of Petrone & Petrone, P.C., forwarded to Counter-Defendants a 3-day Notice to Cure in accordance with the Settlement Agreement.  To date, Counter-Claimant has yet to receive the remaining monies due and owing under the Settlement Agreement and thus the same has been deemed null and void by Counter-Claimant.  A copy of the 3-day Notice to Cure served upon D. Stephen Sorenson via certified mail on January 23, 2007 is attached hereto as **Exhibit L,** and a copy of the correspondence deeming the Settlement Agreement null and void is attached hereto as **Exhibit M**.

66.     Upon information and belief, despite Counter-Claimant's many notices of Counter-Defendants delinquencies, the only attempt to resolve the matters are reflected in Settlement Agreement. Based upon Counter-Defendants' breach of said Settlement Agreement, Counter-Claimant is now entitled to seek recovery for all damages in connection with the circumstances which give rise to the underlying disputes.   However, Counter-Claimant

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1   acknowledges that the one payment made under the Settlement Agreement will serve as an

2   offset to the total amounts due and owing pursuant to the contracts which form the basis for the

3   breaches in question.

### AS AND FOR A FIRST CLAIM FOR RELIEF

### FOR BREACH OF CONTRACT

6       67.    Counter-Claimant repeats, reiterates and re-alleges each and every allegation set

7   forth in paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

8       68.    Since the inception of the 2004 Agreement, Coastal has complied with the terms

9   of the 2004 Agreement.

10      69.    Counter-Defendants were required to pay program fee charges to Coastal in

11  connection with the business in question.

12      70.    Specifically, Section 3 of the 2004 Agreement requires the Counter-Defendants

13  to be charged and pay a program fee of 4% of the total gross employee earnings for each

14  calendar month to induce Counter-Claimant into providing staff subcontracting services.  The

15  same 4% was to be honored when and if the payroll exceeded $50,000,000.

16      71.    Counter-Defendants paid the necessary fees up to the $50,000,000 worth of

17  payroll.

18      72.    Upon information and belief, the payroll produced in connection with 2004

19  Agreement was approximately $77,000,000.

20      73.    Counter-Defendants have failed to pay all of the additional monies due and

21  owing to Counter-Claimant as fees as a result of payroll coming in over $50,000,000 in

22  connection with the 2004 Agreement.

23      74.    Beginning in or around December, 2006, several requests were made of Counter-

24  Defendants to forward the fees in connection with the 2004 Agreement.

25      75.    As a result of those correspondence and subsequent negotiations, a Settlement

26  Agreement was entered into which covered the fees in question.

27      76.    Pursuant to said Settlement Agreement, Counter-Defendants were required to

28  forward two separate payments in full satisfaction of any outstanding dispute with respect to the

2004 Agreement and 2005 Agreement.

77.    Upon information and belief, Counter-Defendants forwarded the first payment of $1,625,000 in a timely fashion. Pursuant to the Settlement Agreement, this amount will serve as a credit toward Counter-Defendants' outstanding debt to Counter-Claimant.

78.    Counter-Defendants have failed to forward the second installment of $1,000,000.

79.    As a result of said default, Counter-Claimant's then counsel forwarded a 3-day Notice to Cure to Counter-Defendants in an attempt to remedy the default. To date, Counter-Defendants have yet to forward the $1,000,000 in accordance with said contract.

80.    Up to and including the time of Counter-Defendants' refusal to pay the outstanding obligation, Coastal complied with all obligations under the 2004 Agreement.

81.    By reason of the foregoing, Coastal has been and will continue to be damaged in the amount of $362,651.

**AS AND FOR A SECOND CLAIM FOR RELIEF**

**FOR BREACH OF CONTRACT**

82.    Counter-Claimant repeats, reiterates and re-alleges each and every allegation set forth in paragraphs 1-81 above with the same force and effect as if fully set forth hereafter.

83.    According to Section 14 of the 2004 Agreement, Counter-Defendants were required to pay $2,000,000 into a Loss Fund to collateralize Counter-Defendants' obligations.

84.    Counter-Defendants remitted the $2,000,000 in six equal installments.

85.    Since that time, additional losses have accrued with respect to the 2004-2005 contract period.

86.    Counter-Defendants have forwarded additional monies to satisfy some claim reimbursements in the total of $660,206.66.

87.    Since that time, additional claims have been paid by Coastal in the amount of $2,039,273.

88.    Upon information and belief, beginning in December, 2006 and continuing up until the present, Counter-Claimant has made several requests for Counter-Defendants to forward the remaining claim/collateral monies.

89. Based upon said negotiations, a Settlement Agreement was entered into between the parties on or around January 2, 2007.

90. Pursuant to said Settlement Agreement, Counter-Defendants were required to make two separate payments in full satisfaction of this as well as other debts.

91. Counter-Defendants made the first payment in a timely fashion. Pursuant to the Settlement Agreement, this amount will serve as a credit toward Counter-Defendants' outstanding debt to Counter-Claimant.

92. Counter-Defendants have failed to adhere to the requirements of the Settlement Agreement by failing to forward the second payment amounting to $1,000,000.

93. Since having defaulted, this office has contacted Counter-Defendants and served a 3-day Notice to Cure requesting immediate payment of the $1,000,000.

94. Upon information and belief, to date, Counter-Defendants have failed to pay the remaining $1,000,000 to Counter-Claimant.

95. The Settlement Agreement is now null and void as set forth in Counter-Claimant's January 23, 2007 correspondence. Counter-Claimant had the right to exercise said option when and if Counter-Defendants chose to default on the second payment requirement pursuant to Section 3 of the Settlement Agreement.

96. To date, Coastal has neither received the additional monies requested for the claim/collateral fund nor have they received the second payment as set forth in the Settlement Agreement.

97. Up to and including the time of Counter-Defendants' refusal to pay the outstanding monies to the collateral fund, claims reimbursements and/or the second payment as required by the Settlement Agreement, Coastal has complied with all obligations under the 2005 Agreement.

98. By reason of the foregoing, Coastal has been and will continue to be damaged in the amount of $2,039,273.

99. Coastal requests that the remaining monies requested in connection with the collateral fund and claims reimbursements be required to be paid immediately.

## AS AND FOR A THIRD CLAIM FOR RELIEF

## FOR BREACH OF CONTRACT

100.    Counter-Claimant repeats, reiterates and re-alleges each and every allegation set forth in paragraphs 1-99 above with the same force and effect as if fully set forth hereafter.

101.    Since the inception of the 2005 Agreement, Coastal has complied with the terms of the 2004 Agreement.

102.    Counter-Defendants were required to pay program fee charges to Coastal in connection with the business in question.

103.    In pertinent part, Section 3 of 2005 Agreement states:

For purposes of calculating program fees, collateral and other costs, Client Companies [Counter-Defendants] has estimated and agree to be charged a minimum of at least $104,000,000 and workers' comp ratable payroll ("Payroll") that shall be provided CEI [Coastal] over the course of the year commencing May 1, 2005. Client Companies [Counter-Defendants] shall be charged at the rate of 7.5% of this amount of payroll, or $7.8 Million for the year, broken down as follows:  1.75% ($1,820,000) shall be a minimum program fee payable to CEI [Coastal] for providing staffing services…**should Client Companies [Counter-Defendants] surpass the original estimated minimum payroll amount, Client Companies [Counter-Defendants] agree to pay additional program fees and collateral consistent with the rates per hundred dollars of payroll stated above.** The 7.5% blended amount being charged to the Client Companies [Counter-Defendants] pursuant to this paragraph is based on a Client Companies' [Counter-Defendants] original underwriting submission to CEI [Coastal].

104.    Counter-Defendants paid the necessary fees up to cover $104,000,000. worth of payroll.

105.    Upon information and belief, Counter-Defendants have failed to pay the additional monies due and owing to Counter-Claimant as fees as a result of payroll coming in over $104,000,000.

106.    Based upon the $160,781,376 of payroll produced in connection with the 2005

1   Agreement, Counter-Defendants owes Coastal an additional $993,674 to cover the agreed upon

2   fees.

3       107.    Beginning in or around December, 2006, several requests were made of Counter-

4   Defendants to forward the fees in connection with the 2005 Agreement.

5       108.    As a result of those correspondence and subsequent negotiations, a Settlement

6   Agreement was entered into which covered the fees in question.

7       109.    Pursuant to said Settlement Agreement, Counter-Defendants were required to

8   forward two separate payments in full satisfaction of any outstanding dispute with respect to the

9   2004 Agreement and 2005 Agreement.

10      110.    Upon information and belief, Counter-Defendants forwarded the first payment of

11  $1,625,000 in a timely fashion. Pursuant to the Settlement Agreement, this amount will serve as

12  a credit toward Counter-Defendants' total outstanding debt to Counter-Claimant.

13      111.    Counter-Defendants have failed to forward the second installment of $1,000,000.

14      112.    As a result of said default, Counter-Claimant's counsel forwarded a 3-day Notice

15  to Cure to Counter-Defendants in an attempt to remedy the default.    To date, Counter-

16  Defendants have yet to forward the remaining $1,000,000 in accordance with said contract.

17      113.    Up to and including the time of Counter-Defendants' refusal to pay the

18  outstanding obligation, Coastal complied with all obligations under the 2005 Agreement.

19      114.    By reason of the foregoing, Coastal has been and will continue to be damaged in

20  the amount of $993,674.

21                **AS AND FOR A FOURTH CLAIM FOR RELIEF**

22                      **FOR BREACH OF CONTRACT**

23      115.    Counter-Claimant repeats, reiterates and re-alleges each and every allegation set

24  forth in paragraphs 1-114 above with the same force and effect as if fully set forth hereafter.

25      116.    Counter-Defendants also failed to comply with the collateral fund provision of

26  Section 3 of the 2005 Agreement. Based upon the payroll that was produced during the contract

27  period and according to the plain words of Section 3 as set forth above, Counter-Defendants

28  were required to forward a total of $9,244,929 for the collateral fund.

117. To date, Counter-Defendants have forwarded only $5,980,000 in connection with the collateral fund

118. Upon information and belief, beginning in December, 2006 and continuing up until the present, Counter-Claimant has made several requests for Counter-Defendants to forward the remaining collateral monies in connection with the 2005 Agreement.

119. Based upon said negotiations, a Settlement Agreement was entered into between the parties on or around January 2, 2007.

120. Pursuant to said Settlement Agreement, Counter-Defendants were required to make two separate payments in full satisfaction of this as well as other debts in question.

121. Counter-Defendants made the first payment in a timely fashion. Pursuant to the Settlement Agreement, this amount will serve as a credit toward Counter-Defendants' outstanding debt to Counter-Claimant.

122. Counter-Defendants have failed to adhere to the requirements of the Settlement Agreement and failed to forward the second payment amounting to $1,000,000.

123. Since having defaulted, this office has contacted Counter-Defendants and served a 3-day Notice to Cure requesting immediate payment of the $1,000,000.

124. Upon information and belief, to date, Counter-Defendants have failed to pay the remaining $1,000,000 to Counter-Claimant.

125. The Settlement Agreement is now null and void based upon Counter-Claimant's January 23, 2007 correspondence. Counter-Claimant had the right to exercise said option when and if Counter-Defendants chose to default on the second payment requirement.

126. To date, Coastal has neither received the additional monies requested for the claim/collateral fund nor have they received the second payment as set forth in the Settlement Agreement.

127. Up to and including the time of Counter-Defendants' refusal to pay the outstanding monies to the collateral fund and/or the second payment as required by the Settlement Agreement, Coastal has complied with all obligations under the 2005 Agreement.

128. By reason of the foregoing, Coastal has been and will continue to be damaged in

1    the amount of $3,624,929.

2    129.    Coastal requests that the remaining monies requested in connection with the

3    collateral fund be required to be paid immediately.

### AS AND FOR A FIFTH CLAIM FOR RELIEF

### FOR BREACH OF CONTRACT

6    130.    Counter-Claimant repeats, reiterates and re-alleges each and every allegation set

7    forth in paragraphs 1-129 above with the same force and effect as if fully set forth hereafter.

8    131.    On or around May 1, 2006, Coastal and Counter-Defendants executed a third

9    consecutive Staffing Servicing Agreement (hereinafter referred to as "2006 Agreement"), a copy

10    of which is attached hereto as **Exhibit N**.  According to the 2006 Agreement, Coastal provided

11    staffing services to Counter-Defendants also known as client companies, including, but not

12    limited to:

    a.    consulting assistance in obtaining, preparing and filing of all forms required

        to be filed by client companies, including Counter-Defendants, with the

        United States Internal Revenue Service and the United States Immigration

        and Naturalization Service;

    b.    consulting assistance regarding preparing withholding and payment of all

        required federal income and related taxes to client companies, including

        Counter-Defendants;

    c.    consulting assistance in preparing and filing of required Form 940, 941 and

        similar federal tax forms for client companies, including Counter-

        Defendants;

    d.    consulting assistance and preparing and filing all required state and federal

        Unemployment Insurance Reports and payments of all sums due and

        indicated thereon to client companies, including Counter-Defendants;

    e.    continual maintenance of the workers' compensation insurance with respect

        to all of the workers and in connection therewith, provision to client

        companies, including Counter-Defendants of certificates evidencing such

        insurance coverage;

f.  consulting assistance in preparing and implementing safety programs for workers on behalf of client companies, including Counter-Defendants.

132.    In addition to those services as provided above, Coastal also maintained ownership of all payroll accounts used to pay employees of Counter-Defendants, however, in an effort to create a productive environment, Counter-Defendants were allowed to access the payroll accounts for the issuance of payroll under all reasonable controls and procedures implemented by Coastal in connection with the 2006 Agreement.

133.    Under the 2006 Agreement, Coastal also agreed to obtain and provide workers' compensation insurance for the employees subcontracted by Counter-Defendants.

134.    Pursuant to the Section 1(i) of the 2006 Agreement Counter-Defendants, were required to do the following:

...immediately segregate and pay to all responsible taxing and other government authorities all payroll taxes, Social Security taxes, federal and state withholding taxes, EDD and SDI payments, and all other such payments withheld from and employees' paycheck on behalf of CEI [Coastal] with regard to all employees covered under this agreement contemporaneously with issuing the paychecks to the employees, except where the parties might otherwise agree from time to time.  The client companies [Counter-Defendants] will provide immediate assessable verification under procedures to be established by CEI [Coastal] to verify funding of payroll in the payroll account, as well as funding of payment of all such payroll withholding taxes and other payroll deductions described above.

135.    Counter-Defendants always calculated the taxes due and owing and forwarded that information along to plaintiff but instead of paying those taxes directly, it was agreed by all that the monies to satisfy the tax liabilities would be forwarded to Coastal for Coastal to then pay in a timely fashion.  Attached hereto as **Exhibit O** are true and correct copies of some samples of emails and bank statements that establish that this was the practice that was adopted and utilized up until January 2007.  It should be noted that due to the voluminous nature of the documents in question, we have attached documents only from July 2006 until January 2007.

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

136.    As more particularly set forth in the Claims of Relief 1-4 above, in late 2006, disputes began to arise between Counter-Claimant and Counter-Defendants over the 2004 and 2005 Agreements described above.

137.    As indicated in a correspondence dated on or around January 20, 2007, directed to Mr. Sorenson from Mr. Anderson, Coastal however agreed to continue the relationship between the parties for a limited ten day window of time.. By so doing, Counter-Claimant was attempting to make Counter-Defendants' transition as smooth as possible.  By virtue of Mr. Anderson's January 20, 2007 correspondence, Counter-Defendants were advised that the Workers' Compensation coverage in question as well as the relationship between Counter-Claimant and Counter-Defendants would be terminated as of January 28, 2007.  A copy of January 20, 2007 correspondence is attached hereto as **Exhibit P.**

138.    Upon gaining the knowledge that Counter-Claimant would switch carriers and the Counter-Defendants' business could no longer be included, Counter-Claimant attempted to contact Counter-Defendants immediately to no avail.

139.    On or around January 29, 2007, pursuant to Counter-Defendants' obligation as set forth in Section 1(i) of the 2006 Agreement, a payment of approximately $55,000 became due and owing to the Employment Development Department (hereinafter "EDD") for employee withholding taxes for the weekly payroll period ending January 26, 2007.

140.    Further, pursuant to Section 1(i) of the 2006 Agreement, a separate payment of approximately $660,000  became due to the Internal Revenue Service (hereinafter "IRS") around January 29, 2007 for employee withholding taxes and employer contributions to Social Security and Medicare for the weekly payroll period ending January 26, 2007.

141.    On or around January 29, 2006, Counter-Claimant was advised that Counter-Defendants had failed to forward the monies to Coastal so that Coastal could in turn make the EDD and IRS payments for the weekly payroll period ending January 26, 2007 as stated in the previous two paragraphs above.

142.    On or around January 31, 2007, pursuant to Counter-Defendants' obligation as set forth in Section 1(i) of the 2006 Agreement, a payment of $768,515.03 became due and

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1   owing to the Employment Development Department (hereinafter "EDD") for state
2   unemployment taxes from the period of October 1, 2006 to December 31, 2006. Because this
3   payment was not made timely, a penalty has been assessed and interest has been applied by the
4   EDD. Counter-Claimant is informed and does believe that the original tax plus interest and
5   penalty is calculated to be $814,350.03 as of March 8, 2007. Daily interest of $179 will
6   continue to accrue until the debt is satisfied.

7       143.   Further, pursuant to Section 1(i) of the 2006 Agreement, for the period of
8   October 1, 2006 to December 31, 2006 a separate payment of $175,725.26 became due to the
9   Internal Revenue Service (hereinafter "IRS") around January 31, 2007 for federal
10  unemployment taxes. Counter-Claimant has not been informed of the penalty and interest
11  applied to this outstanding amount, but believes it to be in excess of $20,000.

12      144.   On or around January 30, 2007, Counter-Claimant was advised that Counter-
13  Defendants had failed to forward the monies to Coastal so that Coastal could in turn make the
14  unemployment tax payments to the EDD and IRS as stated in the previous two paragraphs
15  above.

16      145.   Upon being informed of Counter-Defendants' delinquency, Counter-Claimant's
17  Accounting Department made several requests of Counter-Defendants that the outstanding
18  monies being held by Counter-Defendants for both the EDD and IRS unemployment taxes be
19  paid immediately.

20      146.   When the efforts of the Accounting Department failed, on or around January 31,
21  further conversations took place between both the President of Coastal, Robert J. Anderson, Jr.,
22  and the President of Counter-Defendants, D. Stephen Sorensen, as well as legal counsel for
23  both.

24      147.   Despite best efforts on Counter-Claimant's part, the negotiations were not
25  fruitful.

26      148.   As a follow up to said negotiations, New York attorney John Petrone
27  representing Coastal directed a letter to Counter-Defendants, dated February 2, 2007, making
28  one final request prior to going to the EDD and the IRS themselves requesting that Counter-

1  Defendants make payment in full to these taxing authorities. A copy of said February 2, 2007

2  correspondence is attached hereto as **Exhibit Q.**

3       149.  Said payments were not made.

4       150.  On or about February 2, 2007, President of Coastal, Robert J. Anderson, Jr., met

5  with Agent William Hassis, an IRS representative, to discuss the outstanding withholdings due

6  and owing.  At that juncture, he explained the circumstances surrounding the outstanding

7  monies and agreed to provide Agent Hassis with follow up information requested in writing.

8       151.  On that same date, Anderson also spoke with, Kathleen Dunne a representative

9  of the EDD and discussed the circumstances surrounding the lack of payment of the taxes due

10  and owing and agreed to provide Ms. Dunne further information requested in writing as well as

11  a copy of the 2006 agreement.

12       152.  On February 5, 2007, Anderson drafted a correspondence to Agent Hassis at the

13  IRS further detailing the situation and requesting the IRS' assistance in resolving this matter

14  with Counter-Defendants.   A copy of correspondence is attached hereto as **Exhibit R.**

15       153.  On or about February 2, 2007, Anderson sent a separate letter to Kathleen Dunne

16  at the EDD further setting out the dispute and requesting the EDD's assistance in seeking

17  payment from Counter-Defendants.  A copy of said correspondence is attached hereto as

18  **Exhibit S.**

19       154.  For approximately one month, there was a lack of communication between

20  Coastal or any of its officers, agents or employees and the EDD or the IRS.

21       155.  During that time, Coastal remained hopeful that Counter-Defendants planned to

22  do the right thing and pay the monies as required by the 2006 Agreement.

23       156.  It is essential to note, that upon information and belief some of the monies that

24  have been maintained by Counter-Defendants are considered trust fund monies, that is monies

25  that were collected from employees solely for the purpose of paying withholding tax.

26       157.  On or around March 7, 2007, Robert J. Anderson, Jr., President of Coastal,

27  received a phone call from EDD's Kathleen Dunne. Ms. Dunne explained that the tax liability

28  regarding the Coastal account had yet to be paid.  The total amount due and owing at that time is

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1  $814,353.03 with approximately $179.00 in interest accruing per day while the debt goes

2  unpaid. Ms. Dunn at the EDD demanded that payment of this amount be made on or before

3  March 21, 2007 in order to avoid Coastal being considered in breach of their previous separate

4  installment agreement.

5      158.   The monies that are due and owing to the EDD, $814,353.03 and approximately

6  $55,000, together with interest, accrued and became due and payable prior to AIG's cancellation

7  of the policy in question.

8      159.   Counter-Defendants took responsibility for calculating and paying through to

9  Coastal the tax liabilities associated with the employees withholdings and employer

10  contributions. Counter-Defendants also generated all of the payroll checks on their payroll

11  equipment that resulted in the said tax liabilities. Counter-Defendant submitted a report to

12  Coastal for the period from October 1, 2006 through December 31, 2006, admitting that the tax

13  liability had been incurred. Said report is attached hereto as **Exhibit T**.

14      160.   Counter-Defendants have since refused to submit wage data that is stored in their

15  payroll system for the weekly payroll period ending January 26, 2007, making it impossible for

16  Coastal to accurately calculate the exact tax liability for that period. Instead Coastal has had to

17  estimate same based upon the prior six weeks worth of payroll figures.

18      161.   All of the tax liabilities set forth herein, accrued before the January 28th, 2007

19  contract termination date.

20      162.   Counter-Claimant fully performed all activities and actions required under its

21  part pursuant to the Contract, with the exception of providing a 60-Day Notice of Termination

22  pursuant to the terms of the 2006 Contract. Counter-Claimant was excused from performing the

23  60-Day Notice of Termination of the Contract because of the inability beyond Counter-

24  Claimant's control to include the Select companies' books of business within the replacement

25  ACE policy. Further, Counter-Claimants were excused from providing the 60-Day Notice of

26  Termination because of Counter-Defendants' anticipatory breach and indication that they were

27  not bound by the terms of the plain language of the Contract to pay the costs of the amount of

28  staffing services used, which by January 2007 had exceeded the Select companies' estimated

1  allotment.

2      163.    As a result of the conduct of the Counter-Defendants, Counter-Claimant has

3  suffered damages of $814,353.03 for EDD monies owing and due, and approximately

4  $55,000.00 in interest from approximately March 1, 2007, and continuing.  In addition, Counter-

5  Defendants owe Counter-Claimant a separate amount of $175,725.26 for federal unemployment

6  taxes due to the IRS for the period of October 1, 2006, through December 31, 2006, and

7  penalties and interest in the excess of $20,000.00 as of March 1, 2007.  Further, Counter-

8  Claimant is owed approximately $660,000.00 due to the IRS for employee taxes and

9  employer contributions to Social Security and MediCare, for the payroll ending January 26,

10  2007, plus interest and penalties according to proof.

11      164.    Therefore, the total of principal owed for all withholding taxes and

12  unemployment insurance and other employee mandated state and federal withholding is

13  $1,650,078.29, plus interest and penalties which are ongoing according to proof.  Therefore,

14  Counter-Claimant has been damaged in the amount of $1,650,078.29 in principal state and

15  federal tax liability.  The exact number, however, is unknown to Counter-Claimant, and these

16  are preliminary estimates.  Counter-Claimant has been damaged according to proof.  In addition,

17  Counter-Claimant has been damaged for interest and penalties according to proof for the failure

18  of Counter-Defendants to pay monies to federal and state taxing authorities required under the

19  Contract.

20      165.    All tax liabilities set forth herein (except for penalties and interest according to

21  proof) occurred before the January 28, 2007, Contract termination date.

22

23      WHEREFORE, Counter-Claimant, Coastal Employers, Inc., prays for a judgment

24  against Counter-Defendants, Koosharem Corporation, PBT, Inc., New Staff, Inc., K.T., Inc., Pay

25  Services Corp and Real Time Staffing Services, Inc., as follows:

26      AS TO THE FIRST CLAIM FOR RELIEF:

27      1.      for damages in the amount of $362,651;

28      2.      for costs of suit herein;

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1    3.    for reasonable attorney fees as may be allowed;

2    4.    for interest and pre-judgment interest at the legal rate from the date all monies

3    were due; and

4    5.    for such other and further relief as the Court deems just and appropriate.

5    AS TO THE SECOND CLAIM FOR RELIEF:

6    1.    for damages in the amount of $2,039,273;

7    2.    for costs of suit herein;

8    3.    for reasonable attorney fees as may be allowed;

9    4.    for interest and pre-judgment interest at the legal rate from the date all monies

10    were due; and

11    5.    for such other and further relief as the Court deems just and appropriate.

12    AS TO THE THIRD CLAIM FOR RELIEF:

13    1.    for damages in the amount of $993,674;

14    2.    for costs of suit herein;

15    3.    for reasonable attorney fees as may be allowed;

16    4.    for interest and pre-judgment interest at the legal rate from the date all monies

17    were due; and

18    5.    for such other and further relief as the Court deems just and appropriate.

19    AS TO THE FOURTH CLAIM FOR RELIEF:

20    1.    for damages in the amount of $3,624,929;

21    2.    for costs of suit herein;

22    3.    for reasonable attorney fees as may be allowed;

23    4.    for interest and pre-judgment interest at the legal rate from the date all monies

24    were due; and

25    5.    for such other and further relief as the Court deems just and appropriate.

26    AS TO THE FIFTH CLAIM FOR RELIEF:

27    1.    for damages in the principal amount of at least $1,650,078.28 and/or according to

28    proof;

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

1        2.    for interest and penalties according to proof assessed and/or owed to state and

2    federal taxing authorities;

3        3.    for costs of suit herein;

4        4.    for reasonable attorney fees as may be allowed;

5        5.    for interest and pre-judgment interest at the legal rate from the date all monies

6    were due; and

7        6.    for such other and further relief as the Court deems just and appropriate.

8

9    Dated: July 25, 2007               Respectfully Submitted By,

10                            **GOE & FORSYTHE, LLP**

11

12                  By: _____

13                         Robert P. Goe

                        Attorneys for Defendant/Counter-Claimant,

14                           Coastal Employers, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTER-CLAIMANT COASTAL EMPLOYERS, INC.'S COUNTER-CLAIM

# EXHIBIT A

## STAFF SUBCONTRACTING AGREEMENT

This agreement, dated June 14, 2004 (the "Agreement"), is entered into by and between **Koosharem Corp., Inc., PBT, Inc., New Staff, Inc., KT, Inc. and Realtime Staffing, Inc.,** all California corporations, referred to collectively and/or individually as "Client Companies" and Coastal Employers, Inc. ("CEI"), a California corporation.

### RECITALS

WHEREAS, CEI is qualified to provide staff subcontracting services to companies and has agreed to provide such services to Client Companies; and

WHEREAS, Client Companies have agreed to pay CEI a fee for its staff subcontracting services;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, and for good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, the parties covenant and agree as follows:

### TERMS AND CONDITIONS

1.      Relationship of the Parties. The parties acknowledge and agree that each are co-employers under this Agreement and no partnership, joint venture, or other legal entity is created by this Agreement. The parties further acknowledge and agree that CEI is providing the services to assigned co-employees ("Workers"), described in this Agreement at the request of Client Companies and based upon the following representations of Client Companies:

a.      No Worker who has worked for Client Companies prior to the date of this Agreement is entitled to any compensation or benefits which have either not been fully funded by Client Companies or waived by such Worker;

b.      All Workers will be properly trained and supervised by Client Companies for each task which they are directed to undertake by Client Companies, subject to the reservations in Paragraph 10 of this Agreement;

c.      Client Companies shall be solely responsible for the identification and qualification of each Worker which it desires to hire pursuant to this Agreement. The Client Companies agree to report the identity of a Worker to CEI no later than with the first payroll check to be paid to the subject worker.

d.     Client Companies retain all liability for and will strictly comply with all laws, regulations, rules and guidelines established by governmental or quasi-governmental agencies in all aspects of Client Companies' industry, including without limitation, labor relations, pay and safety conditions;

e.     None of the Workers were previously employed by CEI unless through a shared employment relationship;

f.     Client Companies will not engage in "split risk" staffing. A split risk occurs when the Client Companies provide workers to the customers of the Client Companies, some of which are co-employees under this Agreement, and others are insured for workers' compensation under another program or agreement with the Client Companies or other companies affiliated with the Client Companies. Therefore, such a split risk arrangement is forbidden. All leased employees provided by the Client Companies to one of its customers for any particular account will either all be included in this contract or all be excluded. Nothing in this Agreement, however, will preclude a customer of the Client Companies from maintaining a staff of permanent employees covered under the customer's own workers' compensation program not affiliated or procured by the Client Companies;

g.     CEI will be solely dedicated to servicing the Client Companies and/or any additional companies to which the parties may agree that will be included in the contract associated by the Client Companies. The initial state unemployment insurance and training tax rate ("EDD rate") is 3.5 percent, for which CEI will be reimbursed by the Client Companies. The Client Companies will be responsible for paying any increase in the EDD rate. Should there be any retroactive billing and/or adjustment by the Employment Development Department retroactively increasing the rate, the Client Companies will be responsible for reimbursing CEI regarding the same. However, CEI will cooperate fully and participate in the defense of any such change;

h.     The pricing reflected in paragraph 3 is based on the original submission of workers' compensation class codes as reflected in Schedule A, any additional submissions for additional class codes and/or customers not included in the original submission of the Client Companies will be subject to review and acceptance by CEI. Thus CEI may at its sole discretion decline to provide co-employer services with the Client Companies for new class codes for new or existing customers or for the acceptance of new customers. The original submission of class code risks (as reflected in Schedule A) are approved for the program with the following exclusions: 2586, 3030, 54742, 54822, 5606, 5645, 6216, 6218, 6220 3016 and 3022.

Further, any risk or class code resulting in exposures as outlined below are strictly prohibited:

1.  Risks that may result in obligations or liability arising under the Jones Act.
2.  Risks that may result in obligations or liability arising under USL & H coverage.
3.  Commercial Airline Flight Crews.
4.  Professional Sports Teams written as such except administrative personnel who do not travel with the team. Excluded personnel include players, coaches, trainers and all other personnel who regularly travel with the team to away events.
5.  Railroads, except scenic railways, and access lines and industrial aid owner operations when written as an incidental part of a customer's overall operations.
6.  Work and navigation of any commercial vessel.
7.  All mining or quarrying operations.
8.  Wrecking or demolition of buildings of structures in excess of three stories.
9.  Asbestos manufacturing, installation, distribution, transportation or removal.
10. Chemical/petrochemical manufacturers of highly toxic materials.
11. Blasting or excavating operations.
12. Tunnel or subway constructions.
13. Ammunition or explosive manufacturing.
14. Marine wrecking, including repair, cleaning or demolition of commercial vessels or barges.
15. Underground, offshore or submarine operations including underground mining.
16. Construction and/or maintenance of cofferdams.
17. Stevedoring.
18. All business classified as NCCI - Hazard Group IV or AM Best Hazard Groups 9 and 10.
19. Roofing or Waterproofing.
20. 24-hour convenience stores.
21. Agricultural accounts with migrant workers.
22. Amusement parks.
23. Asbestos removal.
24. Bridge construction and painting.
25. Caisson or cofferdam work.
26. Chemical and Dyestuffs.
27. Commercial multi-story construction.
28. Crop dusters.
29. Emergency personnel.
30. Explosives.

    31.    Firearm use.
    32.    Hazardous material handling.
    33.    Heavy manufacturing.
    34.    Iron/steel workers over 2 stories
    35.    Logging.
    36.    Municipal, township, county or state employees.
    37.    Underground mining or strip mining.
    38.    Underwater work.

    i.    CEI will have the right to periodically review the exposures and loss histories associated with particular clients and particular class codes, and upon 30-days' notice may request the Client Companies terminate those relationships with the customers of the Client Companies which CEI finds unacceptable or utilizing class codes which CEI finds unacceptable.

    j.    Client Companies will immediately segregate and pay to all responsible taxing and other government authorities all payroll taxes, Social Security taxes, federal and state withholding taxes, EDD and SDI payments, and all other such payments withheld from an employee's paycheck on behalf of CEI with regard to all employees covered under this Agreement contemporaneously with issuing the paycheck to the co-employees, except where the parties might otherwise agree from time to time. The Client Companies will provide immediate assessable verification under procedures to be established by CEI to verify funding of payroll in the payroll account, as well as funding and payment of all such payroll withholding taxes and other payroll deductions described above.

2.    Services Provided by CEI. Subject to the terms and conditions set forth herein, CEI agrees to provide Client Companies payroll and related functions to Workers, including the following:

    a.    Consulting assistance in obtaining, preparing and filing of all forms required to be filed by the Client Companies with the United States Internal Revenue Service and the United States Immigration and Naturalization Service (i.e., W-2, W-4, and I-9). It is expressly agreed and understood that the Client Companies will obtain, prepare and file the required documents;

    b.    Consulting assistance regarding preparing withholding and payment of all required federal income and related taxes;

    c.    Consulting assistance in preparing and filing of required forms 940, 941 and similar Federal Tax forms;

d.   Consulting assistance in preparing and filing of all required State and Federal Unemployment Insurance Reports and payment of all sums due as indicated thereon;

e.   Continual maintenance of the workers' compensation insurance with respect to all of the Workers and in connection therewith, provision to Client Companies of certificates evidencing such insurance coverage; and

f.   Consulting assistance in preparing and implementing safety programs for the workers.

g.   CEI will maintain ownership of all payroll accounts used to pay co-employees under this Agreement, but will reasonably cooperate with Client Companies to allow Client Companies to readily access the payroll account for the issuance of payroll under all reasonable controls and procedures implemented by CEI.

3.   _Program fee charges to Client Companies_. The parties agree that Client Companies shall be charged a minimum program fee by CEI equal to __4%__ of the total gross employee earnings for each calendar month to induce CEI into providing staff subcontracting services, and that Client Companies warrant and represent to CEI that Client Companies will provide CEI with at least __$50,000.000__ in gross employee earnings over the course of the year commencing June 14, 2004.  Client Companies agree that, in the event gross payroll falls below the __$50,000,000__ per-year minimum for a particular month (based upon minimum gross earnings of $4,356,060.61 for a full month), the Client Companies agree to a fee computed at __4%__ of payroll as if it were at the __$50,000,000__ annualized gross payroll for the particular month. In such instance, Client companies will be entitled to recover any 'excess' portion of the minimum program fee from the program fee due for a subsequent month when and as the monthly payroll target is exceeded.

4.   _Payment Terms_. The parties agree that the Client Companies shall pay CEI the program fee described in paragraph 3 above pursuant to "Schedule B", which is attached, beginning on June 15th and on the 1st day of each month thereafter until the total payments have been paid.

At such time Client Companies exceed their warranted total annual employee earnings (paragraph 3 above), any overpayments by Client Companies will be utilized to offset future monthly charges. If the monthly installment is less than the fee computed on the actual reported payroll, Client Companies agree to pay CEI for the additional charges due in accordance with Para 5 below.

5.   _Audit_. The parties agree that CEI shall have the right to perform monthly audits of all related and pertinent books and records of Client Companies commencing on __July 1, 2004__, and on the 5th day of the month for each of the months for as long as this agreement is in effect. The parties further agree that no later than the close of business on the __3rd__ day of the month for the month preceding, Client Companies shall submit to CEI a complete payroll report as