Drew E. Pomerance, Esq. (SBN 101239)
Burton E. Falk, Esq. (SBN 100644)
John W. Hurney, Esq. (SBN 161617)
**ROXBOROUGH, POMERANCE, NYE, & ADREANI LLP**
5820 Canoga Avenue, Suite 250
Woodland Hills, California 91367
Telephone: (818) 992-9999
Facsimile: (818) 992-9991
dep@rpnlaw.com
jwh@rpnalaw.com

Attorneys for Plaintiffs/Cross-Defendants, REAL TIME STAFFING, INC., KOOSHAREM CORPORATION, NEW STAFF, INC., KT, INC., PAY SERVICES, INC. PBT, INC., and D. STEPHEN SORENSEN

**FILED**
**JUL 2 6 2011**
CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| IN RE:<br><br>CONSOLIDATED EMPLOYER MANAGEMENT SOLUTIONS, A CALIFORNIA CORPORATION<br><br>DEBTOR AND DEBTOR-IN-POSSESSION | Case No. 8:07-BK-10992 RK<br><br>(Jointly administered with Case Nos.: 8:07-bk-10994 and 8:07-bk-10995)<br><br>Chapter 7 Proceeding |
| REAL TIME STAFFING, INC., a California corporation, KOOSHAREM CORPORATION, a California corporation, NEW STAFF, INC., a California corporation, KT, INC., a California corporation, PAY SERVICES, INC., a California corporation, PBT, INC., a California corporation, and D. STEPHEN SORENSEN, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>COASTAL EMPLOYERS, INC., a California corporation, ROBERT J. ANDERSON, an individual, and Does 1 through 100, inclusive,<br><br>Defendants. | Adv. No. 8:07-ap-01105 RK<br><br>**DECLARATION OF STEPHEN SORENSEN**<br><br>Trial Date: August 25, 2011<br>Time: 9:00 a.m.<br>Ctrm: 5D<br>Courtroom: Hon. Robert Kwan |

Original Not Signed

1

**DECLARATION OF STEPHEN SORENSEN**

| | |
|---|---|
| KAREN S. NAYLOR, Chapter 7 Trustee (In Place of COASTAL EMPLOYERS, INC., a California corporation),<br><br>Counter-Claimant,<br><br>v.<br><br>KOOSHAREM CORPORATION, PROFESSIONAL BUSINESS TECHNOLOGIES, INC., aka PBT, INC; NEW STAFF, INC., KT, INC., PAY SERVICES, CORP., REAL TIME STAFFING SERVICES, INC., D. STEPHEN SORENSEN, an individual, and ROES 1 through 100, inclusive.<br><br>Counter-Defendants. | |

## DECLARATION OF STEPHEN SORENSEN

I, Stephen Sorensen do hereby and declare as follows:

1. I am the Chairman and Chief Executive Officer of the Plaintiff Companies. For ease of reference, I will refer to them collectively as "Select". That is the name with which the public is most familiar.

2. I have personal knowledge of all facts as stated in this declaration, and I will be able to competently testify to them at the time of trial.

3. Select is a temporary staffing company that provides a work force to our clients. For a certain fee, Select (among other numerous services) locates and screens the employees, handles all payroll processing, and provides the required workers' compensation insurance for the employees.

4. Beginning in about April 2004, Select entered into a series of agreements with Coastal Employers, a company that I understood was owned and operated by Robert Anderson. I understood that Coastal was also a staffing company, and could provide certain services to Select. Primary among the services that Coastal could provide for Select at that time was the workers' compensation coverage that is required for the employees. Thus, under the agreements that were

1 entered into, Select retained the relationship with the work site client (i.e. the
2 business or company that needs the labor), and Select also performed all payroll
3 processing functions. The employees legally became employees of Coastal, their
4 checks were drawn on Coastal accounts, and Coastal provided workers'
5 compensation insurance under its own policy. In exchange for Coastal's services,
6 Select paid Coastal pursuant to the terms of the various contracts.

7    5. Select entered into three similar contracts with Coastal for 2004, 2005
8 and 2006. As part of each contract, Select prepaid substantial sums of money to
9 Coastal, representing amounts that Coastal required as collateral for claims that might
10 arise under the workers' compensation policies as well as fees that Coastal was to
11 earn under the contract.

12    6. For the 2004 contract, Select paid to Coastal at the outset $2 million as
13 collateral for the workers' compensation claims arising under the 2004 policy year,
14 plus an additional $663,867 for paid losses.

15    7. For the 2005 contract, Select paid at the outset to Coastal $1,820,000 in
16 fees that Coastal required, plus another $5,980,000 in collateral for workers'
17 compensation claims that could arise under the 2005 policy. Thus, Select prepaid to
18 Coastal a total of $7,800,000 under the 2005 contract. I have no idea if Coastal ever
19 forwarded the $5.98 million, or any portion of it, to AIG as collateral for the workers'
20 compensation coverage. It was certainly Coastal's obligation to send that money to
21 AIG.

22    8. For the 2006 contract, Select paid at the outset to Coastal $1,920,000 in
23 fees that Coastal required, plus another $6,400,000 in collateral for workers'
24 compensation claims that might arise under the 2006 policy year. Thus, Select
25 prepaid to Coastal a total of $8,320,000 under the 2006 contract. Again, I have no
26 idea if Coastal ever forwarded the full $6.4 million, or any portion of it, to AIG as
27 collateral for the workers' compensation coverage commencing in 2006. It was
28 certainly Coastal's obligation to send that money to AIG. Accordingly, for the three

3
**DECLARATION OF STEPHEN SORENSEN**

policy years at issue – 2004, 2005, and 2006, <u>Select paid to Coastal a total of at least $18,783,000</u>.

9. In late 2006, I began receiving communications from Mr. Anderson whereby he asserted that Select owed additional money for the 2004 and 2005 program years. At the time, I did not know if that was true or not, but I was willing to look into the matter for the purpose of resolving the issue.

10. In late November or early December 2006, Mr. Anderson contacted me to claim that he ran all the numbers and that Select owed Coastal millions of dollars for 2004 and 2005. As well, he claimed that AIG had made a demand for more collateral under the 2005 and 2006 workers' compensation policies. Anderson sent me a letter detailing his claims which is Trial Exhibit 516.

11. Not surprisingly, I disagreed with much of Mr. Anderson's analysis, and I reminded him that the claims had generally been mishandled by AIG, which increased their cost. I also pointed out that under the terms of the 2005 and 2006 contracts, Select was not obligated to make any further collateral payments until and unless an independent actuary agreed to by the parties determined that there was a shortfall in collateral. That condition has never occurred. I pointed out to Mr. Anderson that Select never agreed to simply send in whatever amounts AIG might demand as collateral. Select is not a party to the Coastal – AIG workers' compensation policy, and it is not in privity with AIG.

12. However, and as is referenced in Exhibit 517 (my response to Anderson), I did acknowledge that Select probably did owe Coastal some additional sums of money representing the increased payroll that was run through the program, and we were prepared to make a payment in exchange for a release of liability for 2004 and 2005. Since we were at that time in the middle of the 2006 program year, it did not make sense to either make any additional payments or release claims arising under the current year.

13. Accordingly, the parties ultimately agreed upon and executed the 2007 settlement agreement, a true copy of which is Trial Exhibit 520. The basic terms of that agreement, as I understood it, is that Select would make a payment of $2.625 million in two installments, with the first installment of $1,625,000 due on January 2nd, and the remaining $1 million to be paid by 4pm Pacific Time on January 22, 2007. In exchange, Select would be released from any and all remaining liability or claims arising out of the 2004 and 2005 program years. The parties further agreed that the 2006 contract would remain in effect and that the parties were to continue their respective performances under the 2006 contract according to its terms.

14. Unbeknownst to me or anyone else at Select that I am aware of, AIG cancelled the workers' compensation coverage for the 2006 year on December 29, 2006, effective on January 18, 2007. Accordingly, Select entered into the 2007 Settlement Agreement and paid the first $1.625 million to Coastal under the terms of that settlement agreement notwithstanding that AIG had already sent to Coastal notice of cancellation of the workers' compensation policy.

15. It was not until January 20, 2007 (only two days before the final installment payment was due), that I received a letter from Robert Anderson informing me for the first time that AIG had cancelled the policy and that there was no workers' compensation coverage available for the employees after January 18, 2007. Therefore, prior to the time that Select was required to make its final installment payment under the 2007 agreement, Coastal breached the 2006 contract by terminating it on less than 60 days written notice as is required under paragraph 9.

16. By virtue of Coastal terminating the agreement on less than 60 days written notice, Select was left out in the cold. It absolutely had to have workers' compensation insurance in order for the employees to continue working for the clients that Select had placed them with. Accordingly, and at that time, I instructed Select not to pay any more monies over to Coastal until the matter could be sorted out and until Select could assess the amount of its damage. By virtue of Select not

1  having any workers' compensation insurance at that time, Select was threatened with
2  losing all of those clients for whom Select could no longer place employees, and the
3  loss of those clients could have cost Select tens of millions of dollars of revenues and
4  profits.
5      17.    Accordingly, Select immediately contacted ACE Insurance Company
6  with whom Select already had a relationship and had a policy of workers
7  compensation covering another portion of Select's work force. Ultimately, Select
8  was able to work out an arrangement whereby the former Coastal employees would
9  now be placed under the policy with ACE Insurance that began on September 30,
10  2006 and would extend through September 30, 2007.
11     18.    As a result of Coastal's breach of contract by terminating the 2006
12  agreement contrary to its terms, Select has been damaged in the amount of
13  $6,767,680. The basis for this amount is as follows: Had Coastal honored the 2006
14  agreement and not breached it, Select would have made the second installment
15  payment of $1 million pursuant to the 2007 settlement agreement, and would not
16  have had to make any more payments to Coastal until there was an actuarial
17  adjustment six months following the end of the 2006 policy. Accordingly, Select was
18  paid up to Coastal through April 30, 2007, and it would not have had to pay any
19  additional sums of money until October 2006 at the earliest. Instead, by virtue of
20  Coastal breaching the contract, Select made a payment to Coastal in the amount of
21  $1,625,000, which has not been returned or otherwise credited to Select, and Select
22  had to pay to ACE $3,062,680 in advance as premium and collateral for coverage up
23  through April 30, 2007, which is for the same period of time that Select already had
24  coverage under its 2006 contract with Coastal. Under the policy with ACE (a true
25  copy of which is Trial Exhibit 522), Select had to make three payments to ACE
26  before April 30, 2007 in amounts of $1,198,934, $931,873, and then another payment
27  of $931,873. Those three payments enabled ACE to provide coverage to Select's
28  employees up through April 30, 2007, so that Select essentially double paid for

coverage during the months of February, March and April of 2007.

19. Accordingly, Select is out the $1,625,000 it paid to Coastal without getting anything in return, along with the $3,062,680 it paid to ACE for workers compensation coverage it had already paid for with Coastal.

20. In addition, by virtue of Coastal cancelling the 2006 contract early, and in violation of its terms, Select is entitled to an additional sum of $2,080,000. The basis for this additional amount is explained below.

21. Under the terms of the May 1, 2006 Staffing Agreement, upon cancellation of the Agreement prior to the end of the contract term, Select is entitled to reimbursement of the greater of (1) 1/12 of all fees and collateral paid in for each month short of the 12 month term of the Agreement, or (2) any adjustment to Select's favor found after the claims are reviewed by an independent outside actuary agreed to by the parties and approved by Coastal's workers' compensation carrier for all claims filed as of that date. On January 20, 2007 Coastal unilaterally cancelled the 2006 Staffing Agreement in violation of the 60-day cancellation notice requirement of said Agreement. By that point, Select had paid $8.32 million in fees and collateral to Coastal under the agreement. As such, Select is entitled to reimbursement from Coastal in an amount of at least $2,080,000 which represents three twelfths (3/12) of the fees and collateral paid by Select, since Select only obtained 9 months of coverage (April 2006-January 2007) instead of a full year's worth.

22. Thus, even if Select does owe Coastal some money, any amounts it owes must be set-off by the $6,767,680 that Coastal clearly owes Select as a result of Coastal terminating the 2006 in violation of its terms.

I declare under penalty of perjury that the foregoing is true and correct, under the laws of the State of California, and that this declaration is executed this 26th day of July, at Santa Barbara, California.

Stephen Sorensen

7
**DECLARATION OF STEPHEN SORENSEN**

# PROOF OF SERVICE

STATE OF CALIFORNIA ) 
) ss.
COUNTY OF LOS ANGELES )

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 5820 Canoga Avenue, Suite 250, Woodland Hills, California 91367.

On July 26, 2011, I served the foregoing document described as **DECLARATION OF STEPHEN SORENSEN**, on the interested parties in this action who are identified below, using the following means of service as indicated below:

**SEE ATTACHED SERVICE LIST.**

☒ **BY U.S. MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Woodland Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 26, 2011 at Woodland Hills, California.

_____
LOURDES CASAS

- 1 -

- 2 -

**SERVICE LIST**

**Ed Hays**
MARSHACK HAYS LLP
870 Roosevelt Avenue
Irvine, CA 92620
949.333.7777
949.333.7778 - Facsimile


Richard P. Gerber
Hart, King & Coldren, a PLC
200 Sandpointe, 4th Floor
Santa Ana, CA 92707