D. EDWARD HAYS, #162507
ehays@marshackhays.com
CYNTHIA S. CONNERS, 117460
cconners@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt Avenue
Irvine, California 92620
(949) 333-7777 - Telephone
(949) 333-7778 - Fax

Attorneys for Defendant and CounterClaimant,
KAREN S. NAYLOR, Chapter 7 Trustee

William R. Hart, Esq., Bar No. 71127
Richard P. Gerber, Esq., Bar No. 59395
rgerber@hkclaw.com
HART, KING & COLDREN
A PROFESSIONAL LAW CORPORATION
200 Sandpointe, Fourth Floor
Santa Ana, California 92707
Telephone:    (714) 432-8700
Facsimile:    (714) 546-7457

Attorneys for Defendant,
ROBERT J. ANDERSON, JR.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No.  8:07-bk-10992-RK |
| CONSOLIDATED EMPLOYER MANAGEMENT SOLUTIONS, a California corporation, | (Jointly administered with Case Nos.: 8:07-bk-10994  and 8:07-bk-10995) |
| | Chapter  7 |
| Debtor and Debtor-in-Possession. | Adv. No.  8:07-ap-01105-RK |
| REAL TIME STAFFING, INC., a California corporation, KOOSHAREM CORPORATION, a California corporation, NEW STAFF, INC., a California corporation, KT, INC., a California corporation, PAY SERVICES, INC., a California corporation, PBT, INC. a California corporation, and D. STEPHEN SORENSEN, an individual, | DIRECT TESTIMONY AND EVIDENCE FOR TRIAL OF:<br><br>(1) JENNIFER GILBERT;<br>(2) RONALD L. ASKEW<br>(3) MARK H. DENMAN<br>(4) DOUGLAS R. HOLMES; AND<br>(5) ROBERT J. ANDERSON, JR. |
| Plaintiffs, | Trial Date<br>Date:   August 25, 2011<br>Time:   9:00 a.m.<br>Ctrm:   5D |
| vs. | |
| COASTAL EMPLOYERS, INC. a California corporation, ROBERT J. ANDERSON, an | |

1

individual, and Does 1 through 100, inclusive,

Defendants.

KAREN S. NAYLOR, Chapter 7 Trustee (In Place of COASTAL EMPLOYERS, INC., a California corporation),

Counter-Claimant,

vs.

KOOSHAREM CORPORATION, PROFESSIONAL BUSINESS TECHNOLOGIES, INC., aka PBT, INC.; NEW STAFF, INC., K.T., INC., PAY SERVICES CORP., and REAL TIME STAFFING SERVICES, INC., D. STEPHEN SORENSEN, an individual, and ROES 1 through 100, inclusive,

Counter-Defendants

TO THE HONORABLE ROBERT N. KWAN, UNITED STATES BANKRUPTCY COURT

JUDGE, THE DEBTORS AND THEIR ATTORNEYS OF RECORD, AND ALL INTERESTED

PARTIES:

    Attached hereto as Exhibits "1," "2," "3," "4," and "5" are the direct testimony

declarations of Jennifer Gilbert, Ronald L. Askew, Mark H. Denman, Douglas R. Holmes, and

Robert J. Anderson, Jr. to be used in the trial of this matter.


Dated:  August 4, 2011                   MARSHACK HAYS LLP


By:   */s/ Cynthia S. Conners*
      D. EDWARD HAYS
      CYNTHIA S. CONNERS
      Attorneys for Counter-Claimant, KAREN
      S. NAYLOR, Chapter 7 Trustee

Dated:  August 4, 2011                   HART, KING & COLDREN


By:   */s/ Richard P. Gerber*
      WILLIAM R. HART
      RICHARD P. GERBER
      Attorneys for Defendant
      ROBERT J. ANDERSON, JR.

55747v1/1005-001.1

Exhibit "1"

Declaration of Jennifer Gilbert

I, Jennifer Gilbert, am over 21 years of age, am not a party in this adversary proceeding, and state the following to be true and correct:

1. I am submitting this declaration by way of my trial testimony

2. The facts set forth in this declaration are personally known to me and if called as witness I could and would competently testify thereto under oath.

3. I am a resident of the State of New York and have been a licensed Certified Public Accountant since 2001. From September 30, 2000, through November 2006, I used my married name, Jennifer Arcuri. Thereafter, from November 2006 to the present, I have resumed using my maiden name, Jennifer Gilbert. Thus, the reference in the documents to both names.

4. In January of 2006, I was hired and worked as a Controller for Consolidated Employer Management Solutions, Inc., a California corporation ("Consolidated"), Coastal Employers, Inc., a New York corporation ("Coastal NY"), and Coastal Employers, Inc., a California corporation, ("Coastal CA"), (collectively, the "Debtors"). My job duties initially included setting up a more suitable accounting system and coordinating bookkeeping and accounting procedures for the Debtors.

5. As part of my duties, I reorganized the books and implemented new software and procedures to assist in having a more cohesive bookkeeping/accounting system in place. The goal was to involve myself in the day-to-day accounting issues, daily, quarterly and annual postings, bank reconciliations and other general activities designed to have a more smoothly running bookkeeping/accounting system in place. I worked directly with Robert J. Anderson, Jr., Ron Wargo, the CFO of the Debtors, and outside accountants used by the Debtors.

6.     In my employment with the Debtors, I was responsible for determining Coastal CA and Coastal NY's ultimate Federal and State payroll tax liabilities, including those portions of liabilities attributed to the business covered under the Select Companies' contracts with Coastal CA.

7.     In June of 2006, I became aware of problems associated with Georgina Arrey, the Coastal CA employee who previously had primary responsibility for handling payroll tax deposits. In coordination with Ron Wargo, I became aware of a deficiency in Ms. Arrey's performance.

8.     In approximately June of 2006, I took over primary responsibility for calculating and coordinating the weekly State and Federal withholding and employer's share of Social Security tax payments, as well as the quarterly SUTA and FUTA tax deposits. I also prepared the quarterly and annual Federal and State payroll tax returns for Coastal NY and Coastal CA. I did not have actual signature authority on the checking account, but made the determination of the required deposits which were executed by the management of Coastal CA pursuant to established procedures.

9.     During my involvement with both Coastal CA and Coastal NY, I was aware that Coastal CA was exclusively dedicated to the service of the Select Companies.

10.     Commencing in June of 2006 through the termination of the Select Companies' contractual relationship with Coastal CA in January of 2007, the following procedure was followed by the Select Companies and Coastal CA to handle the Select Companies' obligation to pay payroll taxes.

11.     Once a week, Doug Price of the Select Companies would send an email to Coastal CA stating the amount of money that the Select Companies were wiring to Coastal CA's bank account. This money would be wired to Coastal CA's bank account for the weekly tax deposit that needed to be made for the Select Companies' payroll. These deposits would consist of the IRS Form 941 payment and the EDD deposit with Coastal CA. The weekly email from the Select Companies by Doug Price would

contain an attachment that specified exactly what type and amount of tax was being wired to the Coastal CA's account.

12.     Under my recommendation and coordination, Coastal CA would then turn around, with the authorization of Robert J. Anderson, Jr., and electronically make the exact payment to the IRS and EDD from the account to which the Select Companies deposited the pass-through tax funds. This usually occurred the next business day.

13.     The Federal and State Unemployment taxes were transferred quarterly by the Select Companies using the same procedure as described in paragraphs 11 and 12, above. At the end of each quarter, for any particular year, the Select Companies would email the Federal and State Unemployment tax reports, generated from software which I could not access, from which I would attempt to reconcile to the Federal Form 940 deposit and EDD Form DE-7 quarterly tax deposit for Coastal CA.   The Select Companies would calculate the amounts due for the taxes on their own and remit those same amounts they calculated and later report to Coastal CA the basis they used and any applicable reports from their payroll system as back up. For the Form 940 and the Form DE-6 tax returns for Coastal CA, I would rely on the information provided by the Select Companies. I also relied on this information to prepare the 2006 Coastal CA annual employer tax return, Form 941 for the Federal, and Form DE-7 for the State of California. Also at the end of each quarter, the Federal Unemployment Tax (FUTA) and the State Unemployment Tax (SUTA) would be remitted by the Select Companies to Coastal CA for pass-through to the IRS or EDD. The quarterly tax returns were prepared by the Select Companies, and magmedia files were submitted directly to the State of California by the Select Companies.

14.     For reconciliation purposes for the year end 2006, I requested an annual report from the Select Companies, which they forwarded to me by email. I used this annual report to recalculate the annual SUTA and FUTA, the annual Form DE-7 (State

employment tax return), and the annual Form 940 (Federal employment tax return) figures, and to prepare the required tax filings for 2006.

15.     The above-listed procedures in paragraphs 11-14 were the only way I had of obtaining and verifying the tax information, as I had no other contemporaneous way of viewing documents. I relied solely on the information that the Select Companies provided for the accuracy of the quarterly and annual Federal and State employment tax returns and for the pass-through payments of the taxes, which tax payments the Select Companies provided.

16.     In order to reconcile the 2006 year, as well as to obtain the fourth quarter FUTA and SUTA funds for the Select Companies' business payroll through Coastal CA, I requested information from Doug Price at the Select Companies to obtain the fourth quarter 2006 filings and the annual 2006 payroll tax filings.

17.     Ultimately these reports were emailed to me, however, no wire transfers were received from the Select Companies for the FUTA and SUTA taxes that were due on January 31, 2007, for the fourth quarter of 2006.

18.     I made several follow-up attempts to reach Doug Price at the Select Companies by phone and email, to request that the quarterly funds be transferred before the January 31, 2007, due date.

19.     In addition, upon calculating the fourth quarter Form 941 for 2006 (Federal employment tax return), I realized there had been an underpayment of $35,334.94 by the Select Companies, which was also due. This stemmed from a discrepancy between the weekly tax deposits by the Select Companies and the fourth quarter 2006 report prepared by the Select Companies. Trial **Exhibit** "___" are true and correct copies of emails requesting payment sent to the Select Companies during this time.

20.     Ultimately no wire transfers were received from the Select Companies for the FUTA, SUTA, Form 941 or any other employment tax liabilities for the fourth

quarter of 2006, and therefore, these funds were not available for forwarding by Coastal CA to the appropriate taxing authorities.

21.     The fourth quarter 2006 returns, however, were filed timely, and the taxing authorities were immediately notified of the underpayments and the circumstances surrounding the same.

22.     The contractual relationship between Coastal CA and the Select Companies terminated at the end of January 2007. There were four payroll periods in January 2007 during which the Select Companies utilized Coastal CA as the employer of record. I was aware of three payrolls in January, and was later informed that it was discovered that the Select Companies produced an additional weekly payroll for which they did not submit any records or tax withholdings to Coastal CA.

23.     I was never able to obtain sufficient information regarding these 2007 payrolls, and therefore, I had no basis for preparing the Form 941, 940, DE-6 and DE-7 reports for Coastal CA for 2007. I therefore filed estimates as instructed by the taxing authorities. I was able to make the exact calculations of the monies owed as a result of the discovery documents provided by the Select Companies to Coastal CA in its adversary proceeding.

24.     In my employment with the Debtors, I was responsible for determining Coastal CA and Coastal NY's ultimate Federal and State payroll tax liabilities, including those portions of liabilities attributed to the business covered under the Select Companies' contracts with Coastal CA. I have been asked to assist the Trustee and defendant Robert Anderson Jr. calculate the amount of tax, penalty and interest the Select Companies owe the Debtors.

25.     The following is a summary of the various taxes, interest and penalties owed by the Select Companies to the taxing authorities, which I prepared from information previously available during the Coastal CA and the Select Companies

contractual relationship, as well as supplemental information that the Select Companies had withheld, but later produced through formal discovery.

### Summary of Taxes, Penalties and Interest Owed

| TAX TYPE | TAX PERIOD | DUE DATE | UNPAID PRINCIPAL | PENALTY* | INTEREST** THRU 3/31/2010 | TOTAL |
|---|---|---|---|---|---|---|
| Form 941 | 4th Quarter 2006 | 1/31/2007 | 35,334.94 | 3,533.49 | 7,210.40 | 46,078.83 |
| Form 941 | 1st Quarter 2007 | 1/31/2007 | 639,394.48 | 63,939.45 | 130,473.88 | 833,807.81 |
| Form 940 | 2006 | 1/31/2007 | 175,725.26 | 17,572.53 | 35,858.23 | 229,156.02 |
| Form 940 | 2007 | 4/30/2007 | 99,218.83 | 9,921.88 | 17,940.74 | 127,081.46 |
| CA DE 7 | 2006 | 1/31/2007 | 768,515.03 | 76,851.50 | 177,722.31 | 1,023,088.84 |
| CA DE 7 | 2007 | 4/30/2007 | 468,142.51 | 46,814.25 | 97,135.24 | 612,092.00 |
| | | Totals | 2,186,331.05 | 218,633.11 | 466,340.80 | 2,871,304.95 |

* 10% Penalty Applied

** Calculated on daily balances per IRS and EDD posted interest rates for the periods

The above summary represents a true and correct statement of all taxes, interest and penalties owed by the Select Companies to the Federal (IRS) and State (California EDD) taxing authorities incurred during the Select Companies' contractual relationship with Coastal CA for the fourth quarter of 2006 and the first quarter of 2007.

26.    I have been informed and so believe that none of the liabilities listed in the summary set forth in Paragraph 25, above, have been paid by the Select Companies and are now due and owing by the Select Companies.

27.    For taxes due to the EDD, I calculated interest from the due date of the payment (as noted on the spreadsheet) through March 31, 2010.    Interest was compounded daily and based on the applicable interest rates for the periods, as published on the California EDD website.

28.     For taxes due to the IRS, I calculated interest from the due date of the payment (as noted on the spreadsheet) through March 31, 2010.   Interest was compounded daily and based on the applicable interest rates for the periods, as published on the IRS website.

I declare under penalty of perjury under the laws of the United States of America, California and New York that the foregoing is true and correct to the best of my belief, and if called and sworn as a witness, I could and would competently testify thereto.   Executed this 2nd day of August, 2011, at *Oriskany,*

*New York* .

*Jennifer Gilbert*

Jennifer Gilbert, Declarant

# Exhibit "2"

Declaration of Ronald Askew

I, Ronald L. Askew, declare:

1. I am submitting this declaration in support of my direct trial testimony.

2. The facts set forth herein are based on my personal knowledge and if called as a witness I could and would competently testify thereto under oath.

3. Since April, 2002, I have been the Managing Director and principle of Askew Kabala & Company, Inc. (hereinafter "AKC") located at 232 West Main Street, Suite 103, Tustin, California 92780. AKC is an investment banking firm offering debt and capital raising opportunities to businesses in the mid-market sector.

4. I was educated at the University of Arizona, earning a degree in Finance, and subsequently an MBA from Golden Gate University.

5. In addition, I have spent over 25 years as a senior bank officer in major and independent banks in California, with my last position as President and CEO of Pacific Inland Bank,

6. My resume is attached to this declaration as Exhibit "A".

7. I have been involved in the financing of many projects during the course of my banking career and at AKC.

8. In November of 2005, Coastal Employers, Inc., ("Coastal") became my clients at AKC. AKC was initially engaged to assist Coastal in securing financing that would be used to form an offshore captive that would provide reinsurance to Coastal's Workers Compensation insurance carrier.

9. My primary contact at the Coastal corporations was Robert J. Anderson, Jr. (Mr. Anderson).

10. During the course of my business relationship with Coastal, there were many meetings and business trips. There were many emails and teleconferences and time spent on the initial project I was engaged to assist the company conclude.

11. The initial project I was engaged to assist Coastal was not able to be completed as Coastal was placed in a vulnerable financial state when Select Personnel Services aka Koosharem Corporation ("Select") failed to pay large sums of money due under prior contracts Select had engaged in with Coastal.

1

12. In December of 2006, I was again engaged by Mr. Anderson and Coastal to assist the company in locating bank financing to satisfy a collateral call made by their Workers Compensation insurance carrier AIG.

13. AKC was able to obtain interest from a number of lending institutions, both banks and hedge funds, however, the time constraint was great and the holiday season demanded a number of breaks in the business discussions with lenders.

14. All the while AKC was in negotiations with lending institutions on behalf of Coastal; Mr. Anderson was furiously negotiating with Select on a payment of the prior debt owed under the prior contracts.

15. Mr. Anderson was also tirelessly negotiating with AIG in an attempt that they might offer more lenient terms on the payment of the collateral call and even a slight reduction in the amount requested.

16. In regards to the negotiations with Select, I participated in a conference call on or about December 17, 2006 where Mr. Anderson explained all of the figures to Mr. Sorensen and the rationale AIG was using to arrive at the figures used in calculating the collateral call amount. The other individuals on the conference call besides Mr. Anderson, Mr. Sorensen and myself were, Douglas Holmes, Mark Denman (Coastal's insurance broker) Matthew Shannon, and a few others from Mr. Sorensen's team at Select.

17. Following Mr. Anderson's explanation of the rationale used by AIG in calculating the collateral call amount, Mr. Sorensen became incensed with Mr. Anderson. Mr. Sorensen told Mr. Anderson, and I quote, "Ok Rob, why don't you take your AIG hat off now and put your Coastal-Select hat back on." Mr. Sorensen went on to say that if he had the relationship with AIG, he would be "in the underwriter's office pounding on his desk and asking for all my unused collateral back".

18. AKC continued its efforts to raise the capital Coastal required following the holiday season to meet the AIG collateral call, however, time was too short and we were unable to fulfill the request.

19. From my review of the Coastal financial reports and tax filings, it appeared a very vibrant and successful company with a bright future.

20. The one item I regret not discounting from the books of Coastal in my analysis was the receivable carried on the accounting records of the company due from Select as it was obviously a bad debt, which was not know at the time of the review of the company financials.

Balance of this page intentionally left blank.

2

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed this ___2___ day of August, 2011, at Tustin, California.

Ronald L. Askew

38219.001/4823-6456-7306v.1

2

# Exhibit "A"

## Ronald L. Askew

Mobile:  714-478-0644
E-mail:  raskew@askewkabala.com

### Askew Kabala & Company, Inc.                            2002 to present

President & Managing Director
Investment Banking and Management Consulting Firm located in Southern California;
engaged in assisting national and international companies in obtaining private
institutional capital, financial restructuring, recapitalization, mezzanine/subordinated debt
placement, business merger or acquisition, and management consulting.  Website:
www.askewkabala.com

### Hankin Investment Banking                               1999 to 2002

Partner & Managing Director
Fifteen year old investment banking firm headquartered in Los Angeles engaged in
merger and acquisitions, mezzanine/equity placement, debt restructuring; representing
senior management and shareholders.  Responsibilities include transaction representation,
corporate finance, marketing, client relationships statewide and nationally.  Managed the
marketing programs for the firm.

### Benefit Capital Company                                 1995 to 1998

Executive Vice President & Part Owner
Director of Corporate Finance
Investment banking firm located in Orange County engaged in merger/acquisition
services, placement of mezzanine and equity, valuation and consulting with management
and shareholders.  Responsibilities included marketing, client relationships, developing
centers of influence, managing client relationships, arranged and conducted seminars,
negotiated contracts and interfaced with buyers or sellers of client companies. Directly
responsible for a majority of new client relationships during my tenure.  Held significant
equity position in company and sold prior to departure.

### Pacific Inland Bank/Bancorp                             1990 to 1994

Chairman of the Board
President, Chief Executive Officer
Regional business bank of a public company, headquartered in Orange County, engaged
in commercial finance, real estate construction lending, trust services to corporate and
retail clients.  Management responsibility for enhancing shareholder value, corporate
strategy, profitability, setting and monitoring corporate policy and goals, interfaced with
the Board of Directors and shareholders.  Expanded the banking institution to gross assets
of $1.5 billion.

### Imperial Bank                                           1985 to 1990

Regional Vice President, Orange County Regional Office
Chairman, Incentive Compensation Committee
Director, Imperial Bank Mortgage Company, Inc.

1

Regional diversified business bank providing corporate financial services nationally and internationally. As senior regional manager, responsible for increasing market share with direct responsibility for asset growth and profitability consisting of marketing, lending and internal operations. I was the primary representative in the business community developing and maintaining a productive network of business and political leaders. Regional office grew from $42 million in assets to $264 million under my management.

| | |
|---|---|
| **Coast Bank** | **1982 to 1985** |

President and Chief Executive Officer
Long Beach, California

| | |
|---|---|
| **Imperial Bank** | **1981 to 1982** |

Regional Vice President, South Bay Region

| | |
|---|---|
| **Union Bank, South Bay Office and Orange County** | **1972 to 1981** |

Vice President, Director of Business Development

| | |
|---|---|
| **Wells Fargo Bank** | **1968 to 1972** |

Various management positions

**Affiliations (current & past):**
Alzheimer's Foundation, Board of Directors; Olive Crest Home for Abused Children, Foundation Trustee Board Member; Little Company of Mary Hospital, Board member; Cystic Fibrosis Foundation, Chapter President; Planning Commission, City of Placentia; Boy Scouts of America, Board member; Real estate Investment Advisor Committee, California Bankers Association, Chairman; South Coast Repertory Theatre, Benefactors Committee; Wine and Food Committee, Center Club; Coastal Family Association, Board member

**Education:**
University of California, Los Angeles, Anderson School of Business, Certification in Corporate Governance, Corporate Directorship, and consisting of an Audit Committee Module on the Sarbanes-Oxley Act of 2002.

Pacific Coast School of Bank Management, Executive Program, University of Washington, Seattle (1982); Golden Gate University, San Francisco, MBA (1970); University of Arizona, Tucson, BS in Finance (1968)

Exhibit "3"

Declaration of Mark H. Denman

I, Mark H. Denman, declare:

1. I am submitting this declaration in support of my direct trial testimony.

2. The facts set forth herein are based on my personal knowledge and if called as a witness I could and would competently testify thereto under oath.

3. Since December 23rd, 2003, I have been employed at Robertson Ryan & Associates, located at 6015 Durand Ave., Suite #300, Racine, WI 53406 Robertson Ryan & Associates is a multiple lines insurance broker headquartered at Two Plaza East, Suite 650, 330 East Kilbourn Avenue, Milwaukee. Wisconsin offering business property & casualty, personal and employee benefits insurance.

4. I am a Vice President and Partner at Robertson Ryan & Associates. I am a nationally recognized expert regarding insurance for Temporary Employment Agencies and Professional Employer Organizations.

5. Starting in April of 2005, Coastal Employers, Inc., a California corporation (Coastal CA), and thereafter in June of 2005, Coastal Employers, Inc., a New York corporation (Coastal NY) became my clients at Robertson Ryan & Associates. One of the insurance services I provided for these entities was the placement of Workers' Compensation insurance

6. My primary contact at the Coastal corporations was Robert J. Anderson, Jr. (Mr Anderson).

7. I am aware and have intimate knowledge that Coastal CA was solely dedicated to the employees of Select Personnel Services aka Koosharem Corporation ("Select") placed into the Coastal Workers Compensation insurance program

8. I am aware that Coastal CA and Select entered into a series of three Staffing Agreements beginning on June 14, 2004 and ending on January 18, 2007.

9. I am aware and have intimate knowledge that Select has had a Workers Compensation program with ACE American Insurance Company ("ACE") since September of 2001 for the majority of it's employees.

10. I am aware and have intimate knowledge that at the time Select and Coastal CA entered into their three contracts, ACE would not accept the types of employees involved in the occupations. or risks, that Select placed in the Coastal Worker's Compensation program.

11. I am aware that Coastal NY was the corporation utilized by Mr Anderson to manage and operate his own personal staffing accounts and was "firewalled" from the Coastal CA – Select business

12. From June of 2004 through April of 2005, Workers Compensation insurance coverage for Coastal CA was provided by Reinsurance Company of America, Inc. I was not the broker of record for the company at that time and was not involved in the placement of this insurance.

13. Starting in April 30, 2005, until January 18, 2007, Workers' Compensation insurance for Coastal CA and Coastal NY was placed with American International Group (AIG).   During this period of time the Workers' Compensation claims were administered by AIG's TPA (third party administrator), AIGCS.

14. During the period of time Coastal CA's Workers' Compensation was placed with AIG, AIG refused to agree to Select's Workers Compensation Account Operating Instructions (Schedule B to the 2005 and 2006 Staffing Agreements between Coastal CA and Select). AIG's refusal in that regard was communicated by me to Select on numerous occasions. ( The reason for the AIG CS denial was because the requirements were unreasonable and outside of the $s_{co}$pe of acceptable TPA Services)

15. Towards the end of the first AIG policy period, I negotiated a transition away from AIGCS claims handling unit based on the lack of satisfaction in their performance on the part of Fred Pachon, Select's Vice President of Risk Management and Insurance General Manager.

16. Even though AIG was reluctant to permit the movement of the claims handling, the management there nevertheless relented and provided numerous different credible nationally recognized and respected TPA's whose services could be utilized in lieu of AIGCS.

17. On March 13, 2006, I sent Fred Pachon an email, Trial Exhibit 55, listing the approved replacement TPA's he and Select could choose from since they were so dissatisfied with the AIGCS claims handling.

18. On March 14, 2006, Mr. Pachon responded to Trial Exhibit 55 with his own email, Trial Exhibit 56, which stated: "One question, why are we moving away from AIG claims management?" Needless to ay I was taken aback by the response from Mr Pachon. I was certain that he would choose to utilize the services of a TPA by the name of ESIS, Inc. (ESIS) that was on the AIG TPA listing provided.

19. ESIS is the in-house claims handling unit for ACE.

20. Mr. Pachon has worked with ESIS from the inception of Select's Workers Compensation insurance program with ACE since 2001

21. Mr. Pachon would often compare the performance of ESIS to that of AIGCS    d
point out p   orted deficiencies in the performance of AIGCS based on said
comparisons

22. Even though Mr. Pachon had worked with ESIS since 2001, he and Select chose
not have ESIS take over the adjustment of their claims from the Coastal insurance
program with AIG.

23. Given the surprise by Mr. Pachon's email response, I call   Mr. Anderson to
ascertain if he had any knowledge or understanding as to why Mr. Pachon and
Select had changed course on their insistence that another TPA be made available.
Mr. Anderson had no knowledge or understanding on the negative response from
Mr. Pachon so we agreed to place a telephone call to Mr. Pachon in ord   to
receive additional information.

24. Upon placing a joint telephone call to Mr. Pachon, we learned that he was under
the impression that the claims handling unit at AIGCS had improved dramatically
throughout the course of the first policy year with AIG (the 2005 contract) and
that he felt a change was no longer necessary. He specifically said that he had
"whipped them into shape" and that "a move would be too expensive" Needless
to say, I was pleasantly surprised that his opinion of AIGS had improved.

25. Until January 18, 2007, when the AI Workers' Compensation policy for Coastal
CA and Coastal NY terminated, the Workers' Compensation claims were handled
by AIGCS.

26. On or about November 28, 2006, AIG mailed a collateral call in the amount of
$7,800,000 to my office with a deadline of December 28, 2006, Trial Exhibit 89.
Due to my absence from my office for the holiday season, I did not see a copy of
said Exhibit until December 4, 2006, and it was not forwarded to Mr. Anderson
until after December 4, 2006.

27. Under each of the policies AIG issued, they required that monthly payroll audits
be submitted no later than the 15th of each month for the month prior. These
audits included the gross payroll amount for each Workers Compensation class
code, the manual premium rate and the corresponding manual premium.

28. AIG had the right under their contract with Coastal to increase the amount of
premium and collateral charged for either of the policies if the payroll increased
by 25% or more. This would be regarded as a material change in the risk assumed
by AIG. This is standard in the insurance industry.

29. Following a mid-term payroll and premium desk audit, AIG issued a collateral
call on November 28, 2006 because Select had seriously over run the amount of
payroll Select had estimated under both the 2005 and the 2006 Agreements

30. Under the 2005 Agreement, Select estimated $104,000,000 in Workers' Compensation ratable payroll. Based on Select's self reported payroll audits for 2005 they actually ran $161,337,334.65 in Workers' Compensation ratable payroll, an overrun of $57,037,334.65 or 55.1%.

31. Under the 2006 Agreement, Select estimated $128,000,000 in Workers' Compensation ratable payroll. Based on Select's self reported payroll audits through October of 2006 (just six months into the policy) they had produced $93,486,943 in Workers' Compensation ratable payroll. AIG appropriately extrapolated that Select would produce $187,000,000 in ratable payroll for the policy year, or 46 1% over their estimate. Therefore, the collateral call was warranted.

32. As it turns out, based on my review of the self reported payroll audits from Select through the end of January of 2007, at the time the 2006 Agreement and AIG insurance coverage was terminated, Select had reported $136,740,558 in ratable payroll. This cements the fact that the AIG estimate for the Select business of $187,000,000 for the entire policy year was completely accurate

33. I participated in a conference call on or about December 17, 2006 where Mr Anderson of Coastal explained all of these figures to Mr Sorensen and the rationale AIG was using to arrive at the figures used in calculating the collateral call amount. The other individuals on the conference call besides Mr Anderson, Mr Sorensen and myself were, Douglas Holmes, Ronald Askew, Matthew Shannon, Gary Baker, Richard Hulme, Fred Pachon and Steven Biersmith

34. Following Mr Anderson's explanation of the rationale used by AIG in calculating the collateral call amount, Mr Sorensen became incensed with Mr. Anderson. Mr Sorensen told Mr Anderson, and I quote, "Ok Rob, why don't you take your AIG hat off now and put your Coastal-Select hat back on." Mr Sorensen went on to say that if he had the relationship with AIG, he would be "in the underwriter's office pounding on his desk and asking for all my unused collateral back" Neither of these harsh negotiating tactics would have made any difference. AIG is a recognized leader in the servicing of workers compensation insurance programs, this is inclusive of actuarially supported calculations that determine the proper amount of collateral for any given program.

35. The types of insurance calculations AIG used to arrive at the appropriate amount of collateral to request in November of 2006 after detecting the increase in payroll volume are time tested and true.

36. The fact is the more payroll that is run through any particular Worker's Compensation program or policy, the more claims there will be.

37. A parallel example of this would be if an insurance company insures a $200,000 home and shortly after the inception of the policy, the homeowner makes $100,000 of improvements to the home. In this instance, the insurance company

must raise the premium, deductible and collateral charged commiserate with that of a $300,000 home

38. In this direct case with the AIG Workers Compensation insurance program, the more payroll results in more risk and ultimately more employees which calculates to more claims

39. An insurance company cannot stay in business if they do not collect the appropriate amount of money for the risk they are bearing. Nor can a company like Coastal survive if they don't collect the appropriate amount of money for the pass through costs they are incurring under a contract.

40. AIG had correctly calculated the collateral call within the terms and provisions of their contract.

41. I personally made several attempts via telephone and email to persuade Select to pay their share of the $7,800,000 AIG collateral call with no success.

42. I also made several attempts to persuade Select to simply pay the amounts due under the 2004 and 2005 contracts that I had been made aware of by Mr Anderson.

43. Mr Anderson assured me on numerous occasions that if Select would simply pay the amounts due under the 2004 and 2005 contracts, Coastal CA and Coastal NY would have no financial difficulty making the 7.8 million dollar collateral payment to AIG and continuing the insurance program

44. On December 29, 2006, AIG mailed their Notice of Cancellation for Nonpayment of Collateral, with an effective date of cancellation of January 18, 2007, Trial Exhibit 109

45. Due to the New Year's holiday, I did not see a copy of Trial Exhibit 109 until January 4, 2007 I sent Mr. Anderson a copy of said Exhibit via email attachment the same day on January 4, 2007

46. Mr Anderson, Gary Baker, Douglas Holmes, myself and the rest of Mr Anderson's management team at Coastal continued to attempt to negotiate a compromise with AIG up until January 17, 2007 However, the negotiations did not prove fruitful as AIG was unwilling to reduce the amount of the collateral call

47. Sometime after the receipt of the AIG Notice of Cancellation, on or about January 8, 2007, following a discussion with Mr. Anderson, I was charged with the responsibility of locating replacement Workers' Compensation insurance for Coastal

48. On January 18, 2007, I was successful in binding coverage with ACE   However, I was not successful in convincing ACE to cover Select's book of business with Coastal, because of Select's prior relationship with ACE and the fact that ACE did not want to insure the exposures represented by Select.   During the ACE underwriting process, I was required to carve out all Select Payroll and claims from my submission to ACE.

49. ACE stated that if Select wanted to bring them their Coastal book of business, they would have to access their insurance products through their longstanding insurance program that had incepted in 2001.

50. At Mr Anderson's request, I did negotiate a reasonable transition period wherein Select could run their payroll through the new Coastal policy with ACE until the end of January or early February

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed thi ___ day of August, 2011, at _____ , Wisconsin.

Mark H. Denman

38219.001/4823-6456-7306v.1

# Exhibit "4"

# DECLARATION OF DOUGLAS R. HOLMES

I, Douglas R. Holmes, declare the following to be true and correct:

1.    I am submitting this declaration in lieu of my trial testimony.

2.    The facts set forth in this declaration are personally known to me and if called as a witness I could and would competently testify thereto under oath.

3.    I am an attorney at law duly authorized to practice before all the courts of the State of California and the United States Federal District Court of Central California.

4.    I am a certified specialist in the field of Workers' Compensation Law of the State of California. In that regard I have practiced in the field of Workers' Compensation since 1980. My experience includes defending Workers' Compensation claims, consulting with employers and carriers on claims, coverages, Workers' Compensation claims reviews, and practice before the California Workers' Compensation Appeals Board, the California Rating Bureau and the California Department of Insurance. I have conducted over 40 Workers' Compensation Claims reviews in my practice. I have also been a corporate director of an insurance company focusing on Workers' Compensation and am currently the president of an insurance company which focuses on construction liability. In my capacity as both a Workers' Compensation attorney consultant and an insurance company director, I have on various occasions consulted with, hired, and reviewed the work of various actuaries and I have familiarity with their duties, methodologies and limitations. I am also a California licensed property and casualty insurance agent/broker. Attached and labeled Addendum A is my resume.

5.    My duties as a Workers' Compensation attorney have included, but not limited to, analyzing Workers' Compensation claims and defenses, analyzing and/or recommending appropriate reserves, reviewing medical records and arranging medical consultations, making recommendations and implementing settlements and preparing settlement papers and packages and Workers' Compensation litigation including trial, cross-examination and appeals.

6.    In that regard, I have provided consultation services from inception to the present to all of the corporate debtors in this bankruptcy proceeding hereinafter referred to collectively as Coastal.

1   These services included assistance and selection of Workers' Compensation insurance companies, and
2   3rd party claims administrator's (TPAs). I have also assisted Coastal in claims analysis and reporting.
3   Specifically, I have engaged in a number of claims reviews with the 3rd party claims administrators
4   providing Workers' Compensation claims handling and adjustment services to the Worker's
5   Compensation insurance carriers providing coverage to Coastal.

6       7.      In approximately May of 2004, at the request of Coastal and its insurance carrier at the
7   time, Reinsurance Company of America (RCA), I interviewed, negotiated and prepared the claims
8   management agreement with Southland, the TPA that provided Workers' Compensation claims
9   services for Coastal's RCA program.

10      8.      The following year Coastal replaced its Workers' Compensation carrier with the
11  American Int'l Group (AIG), effective April 30, 2005.  This policy was renewed in 2006 until
12  terminated in January 2007. AIG used AIGCS, an in-house company, as its 3rd party claims
13  administrator.

14      9.      From the inception of the Workers' Compensation program of Coastal in 2004 through
15  the present, I have maintained contact with the claims administrators/departments handling the
16  Workers' Compensation claims.

17      10.     Since 2004 I have performed approximately 18-20 different claims reviews at
18  Southland Claims Service and/or AIGCS (American Int'l Group Claims Services). I did claims
19  reviews at Southland on November 18, 2004, November 30, 2004, July 05, October 26 and November
20  1, 2005, April 13, 2006, and August 2, 2007. I may have done other reviews for which I cannot
21  currently locate documentation.  In addition in early 2006 I arranged for Sam Smith to perform a
22  claims audit. There are very few open claims left with Southland, since they only handled claims from
23  April 2004 through April 2005. In some of the claims reviews, I used the assistance of Michele
24  Alvarez, an experienced claims examiner whom I have known since 1981.  Attached and labeled
25  Addendums B, C, and D are samples of the claims reviews/correspondence I generated
26  contemporaneously from those activities. A number of the claims reviews at Southland were attended
27  by Fred Pachon and other representatives of the Select companies. In addition, Mr. Pachon and others
28  from Select would separately meet with Southland.

---

38219.001/4813-4909-8250v.1

11.     After Coastal began using AIG in approximately April 2005, I conducted reviews on July 19, 2005 (appx), January 5, 2006, April 13, 2006, September 13, 2006, October 12, 2006, January 19, 2007, March 3, 2009, August 6, 2010, and June 27, 2011. Most of these reviews were conducted with the assistance of Michele Alvarez. Attached and labeled Addendum E, F, and G are some sample correspondence contemporaneously generated from the AIG review activities. I'm also aware that Fred Pachon and others from the Select Companies conducted their own claims reviews with AIG and maintained constant communication with AIG at least through 2008 on claims handling and defense issues.

12.     Both Coastal and Select had extensive involvement with both RCA and AIG. Specifically Select through Fred Pachon was directing the claims examiners on settlement authority, use of defense counsel, and strategy as well as determination of accepted and denied claims. As stated above, AIG used an in-house company called AIG Claims Services (AIGCS) in Santa Ana for the Workers' Compensation claims administration. AIG offered to allow Coastal and Select, upon renewal for the 2006 policy, to utilize another TPA. I understand that Select wished to stay with AIGCS.

13.     In my review of Southland Claims Service I found them to be very attentive and professional in their claims handling. They did a good job in responding to the first notice of claims, properly opened the claims files, properly investigated the claims, as well as arranging medical analysis when necessary. For example, see addendum C where I complimented Mr. Grace, the owner, on the professionalism of the staff. I can see no basis whatsoever in my opinion for any claimed dissatisfaction or financial loss on the part of Select concerning the claims handling during the period approximately from June of 2004 through April 30, 2005.

14.     During the time that RCA was the insurance carrier, the claims were administered by Southland Claims Services. At this time Select produced $77,398,889 in payroll through Coastal. The amount of manual [standard] Workers' Compensation premium which would be generated by the above-described Select portion of payroll was $10,837,007. A term used in the Workers' Compensation and insurance industries generally is loss ratio. A loss ratio is a comparison of total incurred losses, including paid in and reserve losses as well as claims handling expenses, divided by

Exhibit "4"
Page 24

1   the manual or standard premium. In this case the loss ratio for the Select book of business with RCA

2   administered by Southland under the 2004 Agreement was 41.4%.

3       15.    Generally speaking, Workers' Compensation carriers strive to operate at a 65% loss

4   ratio. The California State Workers' Compensation Insurance Fund, who is the carrier of last resort

5   for employers in California, as well as the California Workers' Compensation Rating Bureau,

6   typically strive to develop premium rates based on a presumed 65% loss ratio. Therefore, with a

7   41.4% loss ratio Select can have no grievance regarding claims handling and this alone suggests on a

8   statistical basis that the claims were handled appropriately.

9       16.    The same degree of professionalism was shown by AIGCS on behalf of the AIG

10  companies from April, 2005 through the termination of the Select/Coastal business relationship on

11  January 18, 2007, with the exception of a bit of a slow start described below. During that time, as with

12  RCA, Mr. Pachon and his team were very aggressively active with AIGCS. Mr. Pachon was

13  responsible for selecting the use of outside counsel on litigated claims involving Select, settlement

14  authority, participation in claims handling decisions and overall strategies. During the first year that

15  Select was with AIG through Coastal for the period of April 2005 through April 2006, Select ran

16  payroll under the Coastal/AIG program in the amount of $164,127,913. The manual premium that was

17  generated was $21,876,192. The losses were $9,231,340 thereby producing a loss ratio of 42.2%. For

18  the period of April 2006 through January 2007, Select ran $136,740,550 through Coastal which

19  yielded a manual premium of $15,285,118 with losses of $6,327,352, thus producing a loss ratio of

20  41.4%. Again, as with RCA, this number is well below the 65% loss ratio industry standard and

21  shows that AIG's performance for the Select/Coastal book of business produced good results.

22      17.    The source of the loss information described in paragraphs 14 through 16 above were

23  derived from the claims reserves and incurred numbers in the carrier loss runs. Information on payroll

24  was based on payroll reports I receive from Coastal, who in turn received them from Select. The

25  calculation of manual premium was adjusted to reflect the appropriate class codes of the book of

26  business based on the work of Robert J. Anderson, Jr. and Dr. Arthur Levine in calculating the

27  blended class code rate to correct misreported classification information from Select.

28

1    18.   I have concluded based on my opinion from my years of experience in handling

2  Workers' Compensation claims on behalf of carriers and employers as well as from my ongoing

3  reviews of the RCA [Southland] and AIGCS claims management that the Workers' Compensation

4  claims administration by RCA and AIG was done in a professional and adequate manner consistent

5  with industry standards. I have also concluded that neither Coastal nor Select suffered any adverse

6  economic consequences as are the result of any purported claims mishandling. Although initially

7  when the AIG/Coastal account was set up there was some slowness and lack of responsiveness on the

8  part of AIGCS, this problem was corrected within a couple of months as a result of both intervention

9  from Coastal and Fred Pachon at Select. I am not aware of any specific economic consequences

10  resulting from the slow startup of AIGCS.

11    19.   I understand that some concern had been expressed on the part of Select regarding the

12  use of an actuary regarding the following provision from Para. 3.c of the 2006 & 2007 agreements:

13

14  Six (6) months after the one-year anniversary of this Agreement, the collateral account will be reviewed by an outside, independent actuary agreed to by the parties. Such review will be made in good faith and after consulting with Client Companies. Based on the independent determination of the actuary, any excess in the collateral account will be reimbursed to the Client Companies within ten (10) days subject to the approval of CEI's workers compensation insurance carrier (currently AIG). Likewise, any shortfalls in the collateral account will be paid by the Client Companies upon ten (10) days' written notice. Thereafter, the collateral account will be reviewed every six months, with a final settling of the collateral account five (5) years from the one-year anniversary of the commencement of this Agreement subject to the approval of CEI's workers compensation insurance carrier (currently AIG) and receipt of excess collateral from the carrier by CEI. Client Companies will be reimbursed for any excesses subject to the approval of CEI's workers compensation insurance carrier (currently AIG) and receipt from the carrier by CEI, and will pay any shortfalls in the collateral account as determined at each review upon ten (10) days' written notice. The amounts to be reimbursed to the Client Companies or paid in as additional collateral by the Client Companies shall be mutually agreed upon by the parties and approved by AIG.

19  The 2005 agreement had a similar less intricate provision for actuarial review of the "collateral

20  account" . The collateral account obligation of Select to Coastal relates to the requirement on the part

21  of Select to pay to Coastal an initial default collateral payment based on a percentage of payroll to

22  cover the deductible position of the claims associated with the Select portion of the Coastal business.

23  This collateral account was used to fund and/or compensate Coastal for the claim collateral

24  obligations to the respective carrier [RCA or AIG] associated with the each claim.  For example

25  during the 2006 agreement term Coastal was allowed to draw (or more properly access) from the

26  Select collateral payments up to $1 million of losses on each Select/Coastal Workers' Compensation

27  claim. Likewise, Coastal with its insurance policy with AIG was required to pay the first million

28  dollars of loss per Workers' Compensation claim to AIG. Therefore, the deductible reimbursement

38219.001/4813-4909-8250v.1

1    from Select from its prepaid collateral "account" was essentially passed through to AIG or RCA. Any

2    unused collateral funding paid by Select to Coastal would be subject to reimbursement to Select after

3    closing of the claims. The above cited actuarial provision and the one referenced for the 2004

4    Agreement provided a mechanism that was never utilized by the parties nor ever requested by Select

5    to adjust the collateral account based on actual development of losses. Since the collateral account

6    was insufficient to satisfy the losses except for possibly the 2007 year, Select was never harmed by

7    the lack of adjustment or actuarial analysis of the collateral account. Because Select had exceeded the

8    payrolls provided for in the 2004 and 2005 Agreements without paying for the overage, essentially the

9    collateral account was rendered insufficient to cover the increase in losses associated by the increase

10    in exposure associated with Select mobilizing more workers into the Select/Coastal program without

11    paying the initial minimum default collateral payments on a per payroll dollar basis as required by the

12    Agreements.

13          20.    The issue of actuarial review of the collateral account provided for in the agreement is

14    therefore essentially moot. Actuarial analysis is used to estimate future losses above and beyond the

15    actual claims exposures including the paid and reserved losses and paid and reserved loss adjustment

16    expenses referred to as the "incurred" losses for a claim or a group of claims. To the extent that

17    reimbursement is claimed against Select under the Agreements for actual paid and reserved losses

18    actuarial analysis is unnecessary. Actuarial analysis is only a useful tool to determine the estimate of

19    unknown and/or unreported claims referred to as "incurred but not reported" [IBNR]. Also, actuarial

20    analysis is a useful tool to estimate upward development of existing reserved claims. However, as the

21    claims become "seasoned" as a result of aging, the reserves become more accurate. Actuarial analysis

22    could have been used to determine if the collateral account was excessive referred to in the trade as

23    "redundant". However, there was no possibility of such redundancy since the actual claim costs

24    exceeded the Select collateral account payments. Select's failure to make payments to Coastal for the

25    excess usage beyond the amounts estimated in each of the Agreements resulted in the collateral

26    accounts being clearly underfunded. The issue of course came to a head when AIG demanded more

27    collateral from Coastal in December of 2006. Naturally, Coastal approached Select for payment of

28    the 2004 and 2005 contract shortfalls. Since no good deed goes unrewarded, Select took advantage of

38219.001/4813-4909-8250v.1

1  the vulnerable position of Coastal and lowballed them on their obligation as evidenced by the ill-fated

2  settlement agreement.

3      21.    At the last claims review I did for the AIG open claims last month there were

4  approximately 20 remaining active claims, including both Select and non--Select Coastal claims. In

5  my opinion the reserves were fairly accurate, since no new claims were opened recently as coverage

6  terminated in January of 2007 for the Select/Coastal exposure. The existing claims were for the most

7  part thoroughly analyzed and many of which were already in a settlement posture. Therefore, the open

8  reserves on the existing claims was, in my opinion, fairly accurate and reflective of ultimate payout.

9  Therefore, actuarial review of future exposures for the Select/Coastal AIG and RCA claims is

10  relatively moot, since the deductible obligation of Select is substantially fixed by examining the actual

11  paid losses by RCA and AIG as well as the review of the unpaid reserves on the few remaining open

12  cases. Because more than 4 years has transpired from the date the claims exposure ceased, no new

13  claims will be likely forthcoming and the vast bulk of the claims payments and expenses have already

14  been accomplished.

15      22.    In the interests of full disclosure, this declarant wishes to inform the Court that he had

16  a business relationship with the owner of Coastal since approximately 2003 and is co-owner with him

17  of an insurance general agency. In addition, the undersigned has in the past provided legal

18  consultation to Coastal prior to the filing of the initial bankruptcy Chapter 11 and afterwards. The

19  undersigned also currently represents some of the third-party and ostensibly related defendants in a

20  separate adversary proceeding for preference and/or insider payments. The undersigned also

21  represented Select in the early 90's regarding a Workers' Compensation premium calculation

22  proceeding before the California Workers' Compensation Rating Bureau, an authorized rating agency

23  of the California Department of Insurance, regarding a loss experience issue relating to premium

24  calculations for some of Select's related companies operating at the time. The undersigned also was

25  the responsible party for introducing Mr. Sorensen and Select to Coastal around April or May of

26  2004. The undersigned also was involved in mutually drafting and negotiating the three (3)

27  Agreements with The Select companies and their attorneys as well as negotiating and mutually

28  drafting the settlement agreement which was the subject of the recent motion for summary

38219.001/4813-4909-8250v.1

1  adjudication. Nothing I learned from my prior relationship with the Select companies has any bearing

2  or relevance to the issues in this case or with my declaration herein.

3    I declare under penalty of perjury under the laws of the United States of America, and

4  California that the foregoing is true and correct to the best of my belief, and if called and sworn as a

5  witness, I could and would competently testify thereto. Executed this ___3___ day of August, 2011, at

6  Glendora, California

7

8

9              _____
               Douglas R Holmes, Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

38219.001/4813-4909-8250v.1

# Addendum "A"

54965v1/1005-001.1

# DOUGLAS R. HOLMES

13200 Crossroads Parkway North Suite 470, City of Industry, CA 91746
Phone (714) 672-9777    Fax (714) 672-9799
e-mail: dholmes@dholmeslaw.com

| | |
|---|---|
| **EDUCATION** | **SOUTHWESTERN UNIVERSITY OF LAW** |
| | X      J. D. - Scholastic Honors; Deans List |
| | X      Graduated-1978 |
| | |
| | **CALIFORNIA STATE UNIVERSITY, Los Angeles** |
| | X      B. A. - Political Science |
| | X      Graduated-1974 |

**INSURANCE**
**EXPERIENCE**

**UNITED CONTRACTORS INSURANCE COMPANY, INC., RRG**
Domiciled in Delaware

X      President, CEO and board member from formation date of October 17, 2004, through the present

         X      Incorporated United Contractors Insurance Company, Inc., RRG (UCIC) as a liability carrier for small contractors and artisans, originally in California and expanding into other states

         X      Obtained financing, retained service providers and prepared application for the formation as a Washington, D.C., domiciled insurance carrier under the Federal Liability Risk Retention Act

X      March 2004 to Present

**UNITED CONTRACTORS INSURANCE SERVICES GROUP, INC.**
45110 Club Drive, Suites D, Indian Wells, California 92210

         X      Vice president and director

         X      United Contractors Insurance Services Group, Inc. (UCISG) is a managing general underwriter, currently dedicated to serving UCIC by providing underwriting policyholder issuance and other services

         X      March 2004 to Present

**INSURANCE COMPANY OF THE AMERICAS**
1201 Sixth Avenue West, Suite 210, Bradenton, Florida

         X      Assisted in the acquisition of the carrier through the liquidation department of the Department of Insurance in Arizona and was an officer and director of the carrier from October 2002 through December 31, 2004

         X      Duties included some general consulting work and claims handling consulting, as well as participating in the Board of Directors of the company

         X      October 2002 to December 31, 2004

**LEGAL**
**EXPERIENCE:**

**LAW OFFICES DOUGLAS R. HOLMES**
13200 Crossroads Parkway North Suite 470, City of Industry, CA

         X      Workers compensation defense and subrogation

         X      Representing self-insured and uninsured employers, as well as some general civil business litigation and workers= compensation claimants. Activities include workers= compensation and some general coverage litigation, workers= compensation premium rate, classification issues and general insurance business consulting. Areas of practice include the W.C.A.B., W.C.I.R.B., Department of Insurance and civil and appellate courts

         X      April 1997 to Present

| | |
|---|---|
| **LEGAL**<br>**EXPERIENCE Cont.** | **HOPPER & HOLMES**<br>Norwalk and Santa Fe Springs, California |

**HOPPER & HOLMES**
Norwalk and Santa Fe Springs, California

X    Partnership with James R. Hopper, Esq.

X    Practice focused on workers compensation defense and subrogation including representing both carriers, self insured and uninsured employers

X    Handling related coverage rate premium and classification issues relating to workers compensation and general insurance consulting

X    1984 to April 1997

**LAW OFFICE DON WILLS**
Pasadena, California

X    Associate Attorney

X    Practice limited to workers compensation defense and subrogation

X    February 1983 to March 1984

**MURCHISON & CUMMING, Los Angeles**

X    Associate Attorney

X    Workers Compensation Unit within large multifaceted defense firm; Workers Compensation defense for various carriers and some subrogation

X    December 1981 to February 1983

**BANDY & DORNSTEEN, Los Angeles**
(House Counsel for Employers Insurance of Wausau)

X    In house counsel devoted exclusively to Workers Compensation Defense

X    June 1980 to December 1981

**WILLIAMS & HOLMES, Monterey Park**

X    General Practice with Wayne Williams, Esq.

X    Civil Litigation; Family Law; Misdemeanor Criminal Law

X    January 1979 to June 1980

**PROFESSIONAL**
**ASSOCIATIONS**

**CALIFORNIA STATE BAR -** Member 1978 to present
**CALIFORNIA DEPT OF INSURANCE-** Licensed Property&Casualty Broker 2005 to present

**CERTIFICATIONS**

Certified Specialist-Workers Compensation Law
State Bar of California Board of Legal Specialization

# Addendum "B"

54965v1/1005-001.1

December 6, 2004

**PERSONAL & CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**

Mr. Robert J. Anderson, Jr.
CONSOLIDATED EMPLOYER MANAGEMENT
 SOLUTIONS, INC.
8580 STATE ROUTE 69
ORISKANY NY 13424                                      (315) 292-1038 x2015
                                                       (315) 768-0217 Fax

RE:    Claims Review

Dear Mr. Anderson:

**Overview**

As you know, I appeared at the claims review at Southland Claims Service, Inc.
("Southland"), on Thursday, December 2, 2004. Present were Christy Westrup, Sharon
McLaughlin, and Robin Mineo. In general all of the claims appear to be handled properly, the
examiners seem to timely respond to any requirements of the claim and to take initiative early on
to mitigate damages, as well as preventing non litigated claimants from seeking an attorney as a
result of early intervention. Overall, however, the examiners are rather conservative on the
reserves, particularly in the area of permanent disability.

There were a few problems that were noted. All of the clients seem to promptly report claims,
except for Preferred Personnel ("Preferred") who tends to sit on medical only claims. Ultimately
when the claim is referred over to Southland, Preferred expects Southland to jump on the claim
on short notice. This has upset some of the Southland examiners, because they feel that they
would not have been rushed had Preferred sent the claim timely. However, it does not appear
that Preferred is sitting on claims that are litigated or loss time. There has been no indication that
the delay in reporting has resulted in increased exposure. There is no indication now that
Preferred is putting any pressure on the examiners to lowball permanent disability reserves. The
examiners are using their own independent judgment on reserves. My general impression,
however, is that they are conservative. In any event, the decision on reserving is completely
done by Southland and its examiners on an independent basis. There is no evidence of any
outside influence from any of the clients, CEMS or RCA to implement a particular reserving
policy.

If Ms. Westrup finds a client (other than Preferred) that is not promptly reporting claims (for
example, medical reports from the treating doctor are received before a notice of injury),
Ms. Westrup contacts the client directly and provides a reporting kit. All claims are reported
directly by the clients to Southland and are not filtered either through CEMS or RCA. At this
time, the funding situation from RCA is satisfactory.

Exhibit "4"
Page 34

Mr. Robert J. Anderson, Jr.
December 6, 2004
Claims Review
Page 2

I did not comment nor give any particular instructions or recommendations on reserves. There, however, were a few claims where I suggested and/or discussed further handling techniques. In all cases, the suggestions were accepted, and I am forwarding separate confirming letters on those activities.

The parameters for reviewing the claims were the top 25 reserve claims, and separately, the top 25 CEMS/Preferred claims, if any of the latter were not included in the first group. However, for some reason, I only reviewed 22 claims. It was indicated to me, however, that these represented the highest reserve claims in the system.

### Return-to-Work Issue

One of the problems that needs addressing is coordinating return to work. The Preferred account does the best job on getting people back to work. Once a job position is offered within the temporary restrictions of the treating doctor, the carrier has satisfied its obligation, and no further liability for temporary disability is available. However, we have had some problems with some of the accounts. Decton Trade Solutions (Decton), a CEMS account, was not cooperative on returning Edward Tucker to work. There were modified restrictions imposed by the primary treating chiropractor which could not be met by Decton. Another option is to use the CEMS owned temporary company as a return-to-work platform. There are always temporary jobs that an injured worker can do. I recommend that we have a return-to-work coordinator who can interface with claims to get people back to work and to encourage clients to make modified duty available. The claims people indicated general frustration in being able to coordinate return-to-work activities with anybody.

Another problem occurs with Select Personnel Services (Select). Although Select is very good on a short term basis in providing return to work, Select has a policy that they will not provide modified duty over 60 days. Their reasoning is probably to discourage workers on extended disability to contaminate the workplace with ideas of filing claims. Therefore, once a disability extends 60 days or the claimant litigates, Select does not offer return to work. This activity in and of itself is a clear violation of Labor Code Section 132a, which involves an unlawful discrimination. If an injury prevents a worker from doing his usual and customary job and modified duty is not available, then the employer is not obligated to provide employment. If, however, the employer does provide modified duty, the employer cannot do so on a discriminatory basis, as does Select by discriminating against those employees that have an attorney. Moreover, the 60-day rule has resulted in some claimants being terminated who were about to be released by the doctor, thus blowing up a claim. I think the Preferred method of providing modified duty no matter what is probably the best policy.

We also have the same problem with Larry Johnson of LLI Staffing, Inc. He should be returned to modified duty as imposed by the defense QME.

Mr. Robert J. Anderson, Jr.
December 6, 2004
Claims Review
Page 3

As you may recall, we had an additional death episode which recently occurred wherein a worker under the American Work Force contract died on a roof after spontaneously bleeding from the mouth, nose and ears. There has been no claim asserted for the death. Claims is monitoring the situation and will obtain a copy of the autopsy report. The death sounds like it might be associated with a non-industrial internal bleeding associated with alcoholism or possibly a stroke or other type of spontaneous vascular rupture.

## Anti-Fraud Program

California requires each carrier doing more than a half million in premium to have an anti-fraud plan on file with the Department. I do not believe RCA has filed one with the State of California Department of Insurance. Bill Grace is preparing a generic anti-fraud plan and forwarding it to James Kernan for his signature. Since there is a market review being conducted, it is important that Jim sign this plan, which involves no additional cost or obligation, between RCA and Southland, and return it to Southland for filing with the State of California. Jim should review whether or not such a plan needs to be filed in Illinois.

## Preferred HCO Status

Preferred participated in an HCO which ended October 1, 2004. Under an HCO (Health Care Organization), a qualified employer by providing an HCO but without non-industrial medical benefits, could maintain control for 90 days. The HCO program expired for any employees hired after October 1, 2004. However, those employees on the payroll prior to October 1, 2004, will remain in the HCO program. Once the new rules kick in regarding the Medical Provider Network (MPN) guidelines, the HCO program will no longer be necessary.

## Adjustment of Reserves

I have reviewed the reserves in detail and found only one case over reserved. The Ravago case could be reduced by $14,100.00, since the claimant's wound is healing nicely and he has not litigated the case. However, the following cases were under reserved:

| | |
|---|---|
| Arturo Alvarado | $ 13,700.00 |
| Diomedes Castaneda | $ 38,250.00 |

| Elvia Hinojosa | $ 11,090.00 |
| Larry Johnson | $ 14,013.00 |
| Patricio Martinez | $ 7,650.00 |
| Manuel Monje | $ 5,400.00 |
| Ramon Morales | $ 8,459.00 |
| Jose Ore | $ 7,500.00 |

Mr. Robert J. Anderson, Jr.
December 6, 2004
Claims Review
Page 4

| Jesus Torres | $ 13,486.64 |
| Edward Tucker | $ 6,500.00 |
| Rogelio Villasenor | $ 15,000.00 |
| Juan Carlos Zamora | $ 8,549.00 |

| Total Under Reserved | $ 149,597.64 | |
| Less | ( 14,100.00) | (Ravago Over Reserve) |
| Net Under Reserved | $ 135,497.64 | |

The total incurred reserves of all of these claims is $602,646.12. Carrying these numbers out and applying them to the entire book, this would suggest that the book is under reserved by 23.42 percent.

Please contact me if you have any questions.

Very truly yours,

LAW OFFICES OF DOUGLAS R. HOLMES

Douglas R. Holmes
DRH/dh; Enclosures

# Addendum "C"

54965v1/1005-001.1

March 29, 2005

Via E-Mail

Bill Grace, Manager

SOUTHLAND CLAIMS SERVICE, INC.

P.O. BOX 958

GARDEN GROVE CA 92842                    (714) 772-1933

                                         (714) 772-7718 Fax

RE:    Claims Review                     bill@soutlandclaims.com

Dear Mr. Grace:

This is just a note to let you know I have reviewed the work of Chris Westrup, your claims manager, Robin Mineo, the adjuster on the Preferred files, Carmen Vazquez, the adjuster on the Coastal files, and Sharon McLaughlin, the adjuster on the unsegregated CEMS files, as well as some Preferred and Coastal files.

I would like to express my appreciation at the excellent work the above four claims staff members have shown in these files. All of your staff members show attention to detail and have remained on top of the files. I have received positive feedback from Preferred and Coastal regarding the claims handling.

Please keep up the good work!

Very truly yours,

LAW OFFICES OF DOUGLAS R. HOLMES


Douglas R. Holmes

DRH/dh

cc via e-mail

     Robert J. Anderson, Jr., C.E.M.S.

     James M. Kernan, RCA

# Addendum "D"

54965v1/1005-001.1

Exhibit "4"
Page 41

**Law Offices of**
**DOUGLAS R. HOLMES**
Three Pointe Drive, Suite 302
Brea CA 92821
(714) 672-9777   (714) 672-9799 Fax

July 19, 2005

Robert J. Anderson, Jr.
c/o CONSOLIDATED EMPLOYER
 MANAGEMENT SOLUTIONS, INC.
8580 STATE ROUTE 69
ORISKANY NY13424                                      (315) 292-1038
                                                       (800) 581-2170 Phone/Fax

Re:    Claims Review - Southland Claims Service, Inc.

Dear Mr. Anderson:

Enclosed are the case reviews prepared by Michele Alvarez using her own format.  We have
divided these claims into three groups as follows:

Group A -    Request for Money – In this group, we are requesting specific settlement
authority.  Within this group, there are alternate requests in the absence of the ability to settle the
case for additional defense activities.

Group B -    Requests for further investigative and defense handling activities.  In this group,
the claims are not ripe for settlement and need further work up to put them in a closing and/or
settlement posture.  Southland has no authority to not only settle the cases, but lacks authority to
perform basic claim functions, such as activity check requests (the typical cost of a simple
activity check is $250.00) and subrosa (this of course is surveillance and filming activity which
runs between $40.00 to $50.00 per hour).  Given the nature of the employee population,
including the possibility of a number of undocumented workers who obtain employment through
false documents, the temporary nature of the employees, and the fact that a number of the
employees are using multiple names, aggressive use of activity checks and subrosa is warranted.
Claims' hands are being tied by the RCA approach requiring authority on everything.  You and I
have had had previous discussions on the management culture at RCA and the need for better
delegation regarding the TPA's.

In a general sense, I would recommend you discuss with Jim the possibility of giving Southland
at least $5,000.00 settlement authority on every indemnity claim, as well as allowing activity
checks and/or subrosa up to two days' surveillance.  Michele Alvarez has learned from talking
with Claims that requests for permission to do activities from the simplest activity check to
subrosa are falling on deaf ears at RCA.  RCA simply does not respond to these requests.
Oftentimes Claims receives anonymous tips that particular workers are performing heavy
activities and their hands are tied on following up.  This is an intolerable situation that is creating