1 | D. EDWARD HAYS, #162507
ehays@marshackhays.com
2 | CYNTHIA S. CONNERS, #117460
cconners@marshackhays.com
3 | MARSHACK HAYS LLP
870 Roosevelt Avenue
4 | Irvine, California 92620
Telephone:  (949) 333-7777
5 | Facsimile:  (949) 333-7778

6 | Attorneys for and CounterClaimant,
KAREN S. NAYLOR, Chapter 7 Trustee
7 |
William R. Hart, Esq., Bar No. 71127
8 | Richard P. Gerber, Esq., Bar No. 59395
Todd A. Picker, Esq., Bar No. 132905
9 | rgerber@hkclaw.com
HART, KING & COLDREN
10 | A PROFESSIONAL LAW CORPORATION
200 Sandpointe, Fourth Floor
11 | Santa Ana, California 92707
Telephone:     (714) 432-8700
12 | Facsimile:     (714) 546-7457

13 | Attorneys for Defendant,
ROBERT J. ANDERSON, JR.

14 |

15 | **UNITED STATES BANKRUPTCY COURT**

16 | **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

| | |
|---|---|
| 17 | In re | Bankruptcy Case No. 8:07-bk-10992-RK (Jointly Administered and Substantively Consolidated with Case No.'s 8:07-bk-10994-RK and 8:07-bk-10995-RK) |
| 18 | CONSOLIDATED EMPLOYER MANAGEMENT SOLUTIONS, INC., a California corporation, COASTAL EMPLOYERS, INC., a New York corporation, and COASTAL EMPLOYERS, INC., a California corporation, | Chapter 7 |
| 19-20 | | Adversary Case No.: 8:07-ap-01105-RK |
| 21 | Debtors. | DECLARATION OF RICHARD P. GERBER IN SUPPORT OF OPPOSITION TO PLAINTIFFS' AND COUNTER-DEFENDANTS MOTION IN LIMINE NO. 2 TO PRECLUDE RECOVERY OF ANY MONIES ALLEGEDLY OWED TO THE U.S. INTERNAL REVENUE SERVICE OR THE STATE OF CALIFORNIA; REQUEST FOR SANCTIONS PURSUANT TO FRCP 11 |
| 23 | REAL TIME STAFFING, INC., a California corporation; KOOSHAREM CORPORATION, a California corporation; NEW STAFF, INC., a California corporation; KT, INC., a California corporation; PAY SERVICES INC., a California corporation; PBT, INC., a California corporation; D. STEPHEN SORENSEN; and D. STEPHEN SORENSEN, an individual, | |

28

1

|  | Plaintiffs, | Trial |  |
| --- | --- | --- | --- |
| 1 | v. | Date: | August 25, 2011 |
| 2 | COASTAL EMPLOYERS, INC., a California | Time: | 9:00am |
|  | corporation; ROBERT J. ANDERSON, an | Ctrm: | 5D |
| 3 | individual, and DOES 1 through 100, |  |  |
|  | inclusive, |  |  |
| 4 | Defendants. |  |  |

6    Attached hereto as Exhibit "1" is the Declaration of Richard P. Gerber in Support of

7  Opposition to Plaintiffs' and Counter-Defendants Motion in Limine No. 2 to Preclude Recovery of

8  any Monies Allegedly Owed to the U.S. Internal Revenue Service or the State of California; Request

9  for Sanctions Pursuant To FRCP 11.

11  Dated:  August 11, 2011                                    MARSHACK HAYS LLP

13                                                                      By: _____/s/ Cynthia S. Conners_____
14                                                                               D. EDWARD HAYS
                                                                                  CYNTHIA S. CONNERS
15                                                                               Attorneys for Counter-Claimant,
                                                                                  KAREN S. NAYLOR, Chapter 7 Trustee

16  Dated:  August 11, 2011                                    HART, KING & COLDREN

18                                                                      By: ___[signature]___
19                                                                               WILLIAM R. HART
                                                                                  RICHARD P. GERBER
20                                                                               Attorneys for Defendant,
                                                                                  ROBERT J. ANDERSON, JR.

2

Exhibit "1"

## DECLARATION OF RICHARD P. GERBER

I, RICHARD P. GERBER, declare:

      1.    I am an attorney at law duly licensed to practice before all of the courts in the State of California and am a member of the bar of this court.  I am the attorney of record for Defendant Robert J. Anderson, Jr., and as such am fully familiar with the facts and procedural history of this case and have personal knowledge of the matters set forth below.  If called as a witness, I could and would competently testify to the same.

      2.    Attached hereto as Exhibit "A" is a true and correct copy of the First Amended Counterclaim filed by counter-claimant, Karen S. Naylor the Chapter 7 Trustee, minus the voluminous exhibits.

      3.    Attached hereto as Exhibit "B" is a true and correct of the document my office retrieved which bears the Westlaw citation 1996 WL 34306869.

      4.    Attached hereto as Exhibit "C" is a true and correct copy of the declaration of Select employee Ian Kindberg.

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  August 11, 2011

_RICHARD P. GERBER_

RICHARD P. GERBER

38219.001/4852-5052-7498v.1
56377v1/1005-001.1

Exhibit "1"

Page 3

# Exhibit "A"

Case 8:07-ap-01105-RK   Doc 41-1   Filed 11/08/09   Entered 11/08/09 10:47:04   Desc
Exhibit Part 2 of 3   Page 2 of 82

1    D. EDWARD HAYS, #162507
     ehays@marshackhays.com
2    CYNTHIA S. CONNERS, #117460
     cconners@marshackhays.com
3    MARSHACK HAYS LLP
     5410 Trabuco Road, Suite 130
4    Irvine, California 92620
     (949) 333-7777
5    (949) 333-7778 - Fax

6    Attorneys for Defendant and Counterclaimant,
     KAREN S. NAYLOR solely in her capacity as
7    Chapter 7 Trustee

8            UNITED STATES BANKRUPTCY COURT

9       CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

10

11    In re:                         Case No. 8:07-bk-10992-RK

12    CONSOLIDATED EMPLOYER       (Jointly administered with Case Nos.:
     MANAGEMENT SOLUTIONS, a California    8:07-bk-10994 and 8:07-bk-10995)
13    corporation,

                               Chapter 7
14            Debtor and Debtor-in-
            Possession                 Adv. No. 8:07-ap-01105-RK
15

16    REAL TIME STAFFING, INC., a California     FIRST AMENDED COUNTERCLAIM
     corporation, KOOSHAREM CORPORATION,   FILED BY KAREN S. NAYLOR SOLELY IN
17    a California corporation, NEW STAFF, INC., a   HER CAPACITY AS CHAPTER 7 TRUSTEE
     California corporation, KT, INC., a California
18    corporation, PAY SERVICES, INC., a
     California corporation, PBT, INC. a California
19    corporation, and D. STEPHEN SORENSEN, an
     individual,
20

21           Plaintiffs,

22    vs.

23    COASTAL EMPLOYERS, INC. a California
     corporation, ROBERT J. ANDERSON, an
24    individual, and Does 1 through 100, inclusive.

25           Defendants.

26

27

28

                                      1                             EXHIBIT "3"

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 3 of 82

1   KAREN S. NAYLOR, Chapter 7 Trustee (In
    Place of COASTAL EMPLOYERS, INC., a
2   California corporation),

3                    Counter-Claimant,

4   vs.

5   KOOSHAREM CORPORATION,
    PROFESSIONAL BUSINESS
6   TECHNOLOGIES, INC., aka PBT, INC.; NEW
    STAFF, INC., K.T., INC., PAY SERVICES
7   CORP., and REAL TIME STAFFING
    SERVICES, INC.,
8   D. STEPHEN SORENSEN, an individual, and
    ROES 1 through 100, inclusive,
9
                     Counter-Defendants.
10

11

12  TO THE HONORABLE ROBERT N. KWAN, UNITED STATES BANKRUPTCY JUDGE, AND

13  INTERESTED PARTIES:

14          Counter-Claimant, Karen Naylor, the duly appointed and acting Chapter 7 Trustee of the

15  substantively consolidated bankruptcy estates of Consolidated Employers Management Solutions, Inc.

16  (Case No. 8:07-10992-RK); Coastal Employers, Inc. a California Corporation (Case No: 8:08-bk-

17  10994); and Coastal Employers, Inc., a New York Corporation (Case No. 8:08-bk-10995-RK), alleges

18  the following in support of her First Amended Counter-Claim against Counter-Defendants, Koosharem

19  Corporation (hereinafter "Koosharem"); Professional Business Technologies, Inc., a/k/a PBT, Inc.

20  (hereinafter "PBT"); New Staff, Inc. (hereinafter "New Staff"); K.T., Inc. (hereinafter "K.T."); Pay

21  Services Corp (hereinafter "Pay Services"); Real Time Staffing Services, Inc. (hereinafter "Real Time"),

22  and D. Stephen Sorensen, an individual.  The original counter-claim was filed by Debtor, Coastal

23  Employers, Inc., a California corporation ("Coastal California"), in its own name.  Coastal California

24  later filed bankruptcy and the case converted to Chapter 7. Thus, the Trustee in her representative

25  capacity brings this First Amended Counterclaim on behalf of the substantively consolidated bankruptcy

26  estates.

27          1.      At all times hereinafter mentioned, Coastal Employers, Inc., a California

28  corporation (hereinafter "Coastal California" or "Debtor") was and is a corporation organized under the

                                            2

EXHIBIT "3"

1  laws of the State of California, which at all times relevant herein maintained its California office at 265

2  South Anita Drive, Suite 201, Orange, California 92868.

3        2.     At all times hereinbefore mentioned, and at the time of commencement of this

4  action, Debtor also maintained offices located at 8580 State Route 69, Oriskany, Oneida County, New

5  York 13424.

6        3.     The offices which Debtor maintained and operated in Oriskany, New York served

7  as the headquarters for this entity during all relevant times.

8        4.     Upon information and belief, Counter-Defendant Koosharem was and is a

9  corporation organized under the laws of the State of California with its principal office located at 3820

10  State Street, Santa Barbara, California 93105.

11        5.     Upon information and belief, Counter-Defendant PBT was and is a corporation

12  organized under the laws of the State of California with its principal office located at 3820 State Street,

13  Santa Barbara, California 93105.

14        6.     Upon information and belief, Counter-Defendant New Staff was and is a

15  corporation organized under the laws of the State of California with its principal office located at 3820

16  State Street, Santa Barbara, California 93105.

17        7.     Upon information and belief, Counter-Defendant K.T. was and is a corporation

18  organized under the laws of the State of California with its principal office located at 3820 State Street,

19  Suite A, Santa Barbara, California 93105.

20        8.     Upon information and belief, Counter-Defendant Pay Services was and is a

21  corporation organized under the laws of the State of California with its principal office located at 3820

22  State Street, Santa Barbara, California 93105.

23        9.     Upon information and belief, Counter-Defendant Real Time was and is a

24  corporation organized under the laws of the State of California with its principal office located at 3820

25  State Street, Santa Barbara, California 93105.

26        10.    Upon information and belief, Counter-Defendant D. Stephen Sorensen, aka Steve

27  Sorensen, is an individual and resident of the State of California, and the chief executive officer of the

28

1   corporate Counter-Defendants and the primary decision maker and controller of the corporate Counter-

2   Defendants with regard to the events and actions herein alleged.

3        11.    Upon information and belief, Counter-Defendants are related to each other and

4   acted as a "joint venture" and a single enterprise to participate in the various agreements. The corporate

5   Counter-Defendants are sometimes referred to herein as "The Select Companies".

6        12.    Venue and jurisdiction are proper in this Court for the same reasons venue and

7   jurisdiction are appropriate in the underlying action. This Counter-Claim stems from facts and activities

8   related to the underlying Complaint of Plaintiffs herein.

9        13.    In addition to jurisdiction being proper in this Court, jurisdiction was proper in the

10  state district where the underlying Complaint was originally filed before being removed to this

11  bankruptcy action.

12       14.    The true names and capacities whether individual(s), corporate, associate, or

13  otherwise of Counter-Defendant(s) sued herein as ROES 1 through 100, inclusive, are unknown to The

14  Trustee who, therefore, sues said Counter-Defendants by fictitious names. The Trustee will amend this

15  Counter-Claim to show the true names and capacities when the same have been ascertained.

16       15.    Debtor was qualified to provide staffing services to companies and sometimes is

17  also referred to as a "staffing company."

18       16.    Upon information and belief, in the context of the relationship in question, the

19  Select Companies are considered staffing subcontractor companies.

20       17.    Upon information and belief, The Select Companies are and were staffing

21  subcontracting companies and, at one time, were client companies of Debtor.

22       18.    On June 14, 2004, Debtor and The Select Companies executed a Staff

23  Subcontracting Agreement (hereafter the "2004 Agreement"). A true and correct a copy of the 2004

24  Agreement is attached as Exhibit "1" and incorporated herein by reference.

25       19.    Debtor provided staffing services to client companies and specifically to The

26  Select Companies, including, but not limited to:

27

28

-4-

EXHIBIT "3"

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 6 of 82

1       a.    consulting assistance in obtaining, preparing and filing of all forms

2   required to be filed by client companies, including The Select Companies, with the United States

3   Internal Revenue Service and the United States Immigration and Naturalization Service;

4       b.    consulting assistance regarding preparing withholding and payment of all

5   required federal income and related taxes to client companies, including The Select Companies;

6       c.    consulting assistance in preparing and filing of required Forms 940, 941

7   and similar federal tax forms for client companies, including The Select Companies;

8       d.    consulting assistance and preparing and filing all required state and

9   federal Unemployment Insurance Reports and payments of all sums due and indicated thereon to client

10  companies, including The Select Companies;

11      e.    continual maintenance of the workers' compensation insurance with

12  respect to all of the workers and in connection therewith, provision to client companies, including The

13  Select Companies, of certificates evidencing such insurance coverage;

14      f.    consulting assistance in preparing and implementing safety programs for

15  workers on behalf of client companies, including The Select Companies.

16      20.    In addition to those services as provided above, Debtor also maintained ownership

17  of all payroll accounts used to pay employees of client companies including The Select Companies',

18  however, in an effort to create a productive environment, client companies were allowed to access the

19  payroll accounts for the issuance of payroll under all reasonable controls and procedures implemented

20  by Debtor.

21      21.    Pursuant to Section 8 of the 2004 Agreement, Debtor was required to provide

22  workers' compensation coverage for the employees subcontracted by The Select Companies. The same

23  was provided to The Select Companies under Policy Number WC0610040100001 (hereinafter the "2004

24  Policy") effective June 14, 2004 and continuing to April 30, 2005 which was procured through

25  Reinsurance Company of America, who maintained offices in Oriskany, New York.

26      22.    Under the 2004 Agreement, The Select Companies also agreed, pursuant to

27  Section 3 of said 2004 Agreement, to pay 4% of gross payroll representing a fixed payroll fee. The

28  2004 Agreement states in pertinent part:

1    "...in that Client Companies [The Select Companies] warrant and

2    represent to CEI [Coastal] that Client Companies will provide CEI with at

3    least $50,000,000 in gross employee earnings over the course of the year

4    commencing June 14, 2004....In such instance, Client Companies will be

5    entitled to recover any excess portion of the minimum program fee from

6    the program fee due for a subsequent month when and as the monthly

7    payroll target is exceeded."

8         23.    The original invoices and estimates forwarded to The Select Companies on behalf

9    of Debtor and ultimately paid by The Select Companies were based on the referenced $50,000,000

10   payroll figure as contained in Section 3 of 2004 Agreement.

11        24.    However, at the conclusion of the contract, it has been determined, in accordance

12   and pursuant to The Select Companies' own records, that The Select Companies ran a total of

13   approximately $77,000,000 in payroll in connection with the 2004 Agreement.

14        25.    On or around December 14, 2006, The Select Companies were advised in

15   correspondence directed to their President, D. Stephen Sorensen, from Robert J. Anderson Jr. that in

16   accordance with this provision, The Select Companies were required to pay an additional $362,651 to

17   Debtor for the additional payroll in excess of the $50,000,000 agreed to pursuant to 2004 Agreement.

18   Attached as Exhibit "2" is a true and correct copy of the December 14, 2006 correspondence.

19        26.    Section 8 of the 2004 Agreement also sets forth certain requirements of The

20   Select Companies in connection with Debtor providing the same Workers Compensation Insurance

21   previously referenced herein. In pertinent part, the 2004 Agreement states:

22        "CEI [Coastal] agrees to furnish Client Companies [The Select

23        Companies] with certificates of insurance indicating compliance with ten

24        (10) days of each such request by Client Companies. Client Companies

25        agrees to have a $500,000 per claim deductible with no aggregate limit

26        and a Loss Fund as defined in paragraph 15. Client Companies shall pay

27        towards the loss deductible on a monthly basis, based on claims and

28        claims expenses paid by the insurance company and/or CEI."

6                                              EXHIBIT "3"

27.    Section 14 of the 2004 Agreement requires The Select Companies to pay
$2,000,000 (or 4% of total annual gross employee earnings) into a Loss Fund to collateralize The Select
Companies' obligations to Debtor. This section also sets forth the manner in which that $2,000,000 was
to be paid. Additionally, and of importance, this provision also states in pertinent part that:

> "If the cumulative total of monthly collateral payments is less than 4% of
> cumulative actual reported payroll, Client Companies agree to pay CEI
> [Coastal] the additional collateral in accordance with paragraph 5
> above. CEI shall have the exclusive right to determine the amount of
> money that shall be paid to the Loss Fund by Client Companies to
> adequately collateralize Client Companies' obligations under the Staff
> Subcontracting Agreement. Client Companies agree to pay CEI the
> additional Loss Fund payments within five days of receiving notice of
> CEI. The collateral obligation under this agreement is based on annual
> payroll of $50,000,000 and initial submission of Client Companies. The
> collateral requirements will be adjusted monthly above the initial amount
> based proportionately on payroll and/or class code changes from the initial
> submission." (Emphasis added).

28.    Of importance, Section 14 additionally states:

> "Client Companies [The Select Companies] further agree to pay losses
> as the claim payments are made by CEI [Coastal] in addition to the
> collateral obligation. These losses will either be paid directly by the
> Client Companies or paid by the Client Companies into a funding account
> used by the insurance carrier or a licensed third-party administrator within
> ten days of invoicing for reimbursement." (Emphasis added).

29.    Select prepaid collateral in the amount of $2,000,000 and as of mid-December,
2006, The Select Companies had paid an additional $660,206.66 towards their deductible position.
However, the total payments made by Debtor on behalf of The Select Companies as of mid-December
amounted to $4,403,203.13. Even with crediting Select with the $2,660,206.66 that has been paid thus

1   far, there is a shortfall due of $1,742,996.47 in connection with claims reimbursement and the Collateral

2   Fund.

3           30.    On or around May 1, 2005, Debtor and The Select Companies executed a second

4   Staff Servicing Agreement (hereinafter referred to as "2005 Agreement"). A true and correct copy of

5   the 2005 Agreement is attached as Exhibit "3" and incorporated herein by reference.

6           31.    According to the 2005 Agreement, Debtor provided staffing services to The

7   Select Companies also known as client companies, including, but not limited to:

8           a.    consulting assistance in obtaining, preparing and filing of all forms

9   required to be filed by client companies, including The Select Companies, with the United States

10   Internal Revenue Service and the United States Immigration and Naturalization Service;

11           b.    consulting assistance regarding preparing withholding and payment of all

12   required federal income and related taxes to client companies, including The Select Companies;

13           c.    consulting assistance in preparing and filing of required Form 940, 941

14   and similar federal tax forms for client companies, including The Select Companies;

15           d.    consulting assistance and preparing and filing all required state and

16   federal Unemployment Insurance Reports and payments of all sums due and indicated thereon to client

17   companies, including The Select Companies;

18           e.    continual maintenance of the workers' compensation insurance with

19   respect to all of the workers and in connection therewith, provision to client companies, including The

20   Select Companies of certificates evidencing such insurance coverage;

21           f.    consulting assistance in preparing and implementing safety programs for

22   workers on behalf of client companies, including The Select Companies.

23          In addition to those services as provided above, Debtor also maintained ownership of all

24   payroll accounts used to pay employees of client companies including The Select Companies, however,

25   in an effort to create a productive environment, The Select Companies were allowed to access the

26   payroll accounts for the issuance of payroll under all reasonable controls and procedures implemented

27   by Debtor in connection with the 2005 Agreement.

28

1      32. Under 2005 Agreement, Debtor also agreed to obtain and provide workers'

2   compensation insurance for the employees subcontracted by The Select Companies.

3      33. Pursuant to the 2005 Agreement and in reliance thereon, Debtor provided

4   workers' compensation coverage to The Select Companies under Policy Number WC1242444

5   (hereinafter the "2005-2006 Policy") effective April 30, 2005 and continuing until April 30, 2006 which

6   was procured through AIG which maintains its headquarters office in New York, New York.

7      34. The 2005 Agreement contains a comparable provision to that of 2004 Agreement

8   with respect to the fixed cost the The Select Companies were responsible for.

9      35. In pertinent part, Section 3 of 2005 Agreement states:

10      "For purposes of calculating program fees, collateral and other costs,

11      Client Companies [The Select Companies] has estimated and agree to be

12      charged a minimum of at least $104,000,000 and workers' comp ratable

13      payroll ("Payroll") that shall be provided CEI [Coastal] over the course of

14      the year commencing May 1, 2005.  Client Companies shall be charged at

15      the rate of 7.5% of this amount of payroll, or $7.8 Million for the year,

16      broken down as follows:  1.75% ($1,820,000) shall be a minimum

17      program fee payable to CEI [Coastal] for providing staffing

18      services...**should Client Companies surpass the original estimated**

19      **minimum payroll amount, Client Companies agree to pay additional**

20      **program fees and collateral consistent with the rates per hundred**

21      **dollars of payroll stated above.** The 7.5% blended amount being

22      charged to the Client Companies pursuant to this paragraph is based on

23      Client Companies' original underwriting submission to CEI." (Emphasis

24      added).

25      36. As of mid-December, 2006, it has been determined that for the 2005-2006 policy

26   year, additional payroll has been produced beyond the agreed to minimum of $104,000,000.

27   The payroll actually produced for this contract period is $161,337,334.65, or $57,337,334.65 in excess

28   of what was originally estimated.

9

EXHIBIT "3"

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 11 of 82

1         37.    The Trustee acknowledges that The Select Companies made the original

2    payments in accordance with the 2005 Agreement; however, due to the additional payroll beyond the

3    $104,000,000 minimum, there is an additional $1,003,403.36 due and owing from The Select

4    Companies to Debtor to cover the policy fixed cost. This amount was demanded from The Select

5    Companies at least as early as December 14, 2006.

6         38.    The Select Companies also failed to comply with the collateral fund provision of

7    Section 3 of the 2005 Agreement. Based upon the payroll that was produced during the contract period

8    and according to the plain words of Section 3 as set forth above, The Select Companies were required to

9    forward a total of $9,276,896.74 for the collateral fund. To date, The Select Companies have forwarded

10    only $5,980,000 in connection with the collateral fund,, leaving a balance still due of $3,296,896.74.

11         39.    Of particular importance, on or about December 7, 2006, Debtor, via President,

12    Robert J. Anderson Jr., received its first notice of a collateral call from AIG with respect to the Workers

13    Compensation policy issued during the 2005 contract period.. Attached as Exhibit "4" is a true and

14    correct copy of said e-mail attaching collateral call information.

15         40.    As noted, although the original correspondence from American International

16    Group was dated November 28, 2006. Mr. Anderson did not receive same until December 7th via e-mail

17    transmission.

18         41.    At that time, AIG made a request for $7.8 Million to be paid in full on or before

19    December 28, 2006.

20         42.    Within days, Robert J. Anderson Jr., President of Debtor, as a follow up to a

21    telephone conference, sent a letter to D. Stephen Sorensen, of The Select Companies, to inform him of

22    the collateral call that was made by AIG and the fact that said call would require action on both the part

23    of Debtor and The Select Companies. Attached as Exhibit "5" is a true and correct copy of said e-mail

24    as well as attachments forwarded at that juncture.

25         43.    Upon information and belief, Debtor's President, Robert J. Anderson Jr.,

26    requested that D. Stephen Sorensen participate in a conference call to discuss AIG's collateral call and

27    the subsequent ramifications of same. It was agreed that the parties would participate in a telephone

28    conference at that time.

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 12 of 82

44.    Upon information and belief, prior to said conversation, President, Robert J.
Anderson Jr. transmitted an e-mail to D. Stephen Sorensen setting forth the amounts due and owing to
Debtor as well as an explanation of how the numbers were arrived upon, and also requesting immediate
payment of all amounts due and owing.

45.    The Select Companies forwarded a reply to Debtor's request on December 15,
2006. A copy of said correspondence is attached as Exhibit "6."

46.    In essence, the December 15, 2006 correspondence provided by The Select
Companies simply rejected Debtor's analysis and offered very minimal dollars to resolve the matters
despite contending that no such monies were due and owing.

47.    Upon information and belief, on or around December 17, 2006, a letter was
transmitted to The Select Companies by Robert J. Anderson Jr., President of Debtor, further explaining
Debtor's position and thus disputing The Select Companies' position as set forth in their December 15,
2006 correspondence. Attached as Exhibit "7" is a true and correct copy of said transmission from Mr.
Anderson to The Select Companies.

48.    In the meantime, as evidenced by Robert J. Anderson Jr.'s December 26, 2006
correspondence directed to AIG's Jim Hennessy, Debtor was making efforts to resolve the collateral and
coverage issues with AIG. A copy of the letter is attached as Exhibit "8."

49.    To further evidence Debtor's attempt to rectify the current policy with AIG and
the upcoming potential renewal with AIG, as evidenced by the December 21, 2006 correspondence from
Ronald Askew, Debtor was exploring outside options in an attempt to comply with the collateral call
made by AIG. A copy of said letter is attached as Exhibit "9."

50.    In the midst of Debtor's conversations with AIG, a settlement was thought to have
been reached with The Select Companies with respect to the controversy set forth herein.

51.    A Confidential Settlement Agreement and General Release (hereinafter
"Settlement Agreement") was entered into between The Select Companies and Debtor on or around
January 2, 2007. A copy of said agreement is attached as Exhibit "10."

52.    Debtor continued to dispute AIG's position as set forth in Mr. Anderson's January
11, 2007 correspondence to AIG's James Hennessy.

1        53.     Upon information and belief, in the midst of settlement negotiations which Debtor

2  believed would be fruitful, AIG forwarded a cancellation notice with respect to the 2006-2007 policy

3  period dated January 18, 2007. A copy is attached as Exhibit "11."

4        54.     Upon information and belief, even despite having received said notice, Debtor

5  continued to make efforts to salvage the relationship with AIG to no avail. AIG's collateral

6  requirements were simply impossible for Debtor to fulfill.

7        55.     Upon information and belief, in light of the difficulties that Debtor was

8  experiencing with AIG, Debtor made a proactive decision on or around January 10, 2007 to at least seek

9  other workers' compensation insurance quotes for Debtor's business.

10        56.     On or around January 11, 2007, at which point it became crystal clear that the

11  relationship between AIG and Debtor could not be preserved, Debtor authorized the drafting of a

12  Temporary Restraining Order (hereinafter "TRO") to be filed against AIG requesting that the Court

13  restrain AIG from canceling the policy in question.

14        57.     Upon information and belief, the required statutory notice was provided to AIG of

15  the filing of the TRO and at that juncture AIG requested additional time to resolve the matter.

16        58.     When negotiations once again stalled and eventually failed, Debtor made an

17  executive decision to seek workers' compensation coverage through ACE American Insurance

18  Company (hereinafter "ACE") rather than AIG. Further, it was determined that the TRO would be a

19  less than fruitful avenue to pursue at that juncture in light of the ACE quote that existed. There was a

20  50% chance that the court would not issue the requested TRO which would leave Debtor's employees

21  without insurance coverage and Debtor's clients without the much needed labor provided by Debtor.

22  Simply put, the replacement coverage offered by ACE was a sure thing and AIG was not.

23        59.     Upon information and belief, an unfortunate element of the ACE policy is that

24  Debtor was unable to include the business produced by The Select Companies within the ACE quote,

25  primarily due to the fact that The Select Companies were obviously not willing to properly remit

26  payment within the terms of the previous contracts.

27

28

EXHIBIT "3"

1    60.    Upon information and belief, upon gaining the knowledge that Debtor would

2  switch carriers and that the The Select Companies' business would no longer be included, Debtor

3  attempted to contact The Select Companies immediately to no avail.

4    61.    Of particular importance, Section 3 of the Settlement Agreement, states that: "In

5  resolution of the above-described claims by Debtor against Select for obligations or its claims as

6  described above, Select will pay Debtor the sum of $2,625,000 payable as follows: by electronic wire

7  transfer and no later than 4:00 p.m. on January 2, 2007. $1,625,000. The remaining $1,000,000 is

8  payable by 4:00 p.m. on January 22, 2007."

9    62.    Upon information and belief, The Select Companies complied with the first

10  transfer deadline.

11    63.    Upon information and belief, in light of subsequent developments and The Select

12  Companies' interpretation of the same, The Select Companies refuse to pay the remaining $1,000,000

13  they agreed to pay pursuant to the Settlement Agreement.

14    64.    Pursuant to Section 4(b) of the Settlement Agreement, "should Select fail to issue

15  the second payment after three (3) days' written notice to cure, Coastal at its option may retain the first

16  payment and declare null and void its release and waiver of its claims against Select related to the

17  disputes described in subparagraphs 2(a) and 2(b) above, and bring claim against and seek further

18  monies owed by Select, giving Select credit for the receipt of the first payment. In such an event, Select

19  shall not be permitted to assert the agreement as a bar or defense against such claims.

20    65.    On or around January 23, 2007, then attorneys for Debtor, the law firm of Petrone

21  & Petrone, P.C., forwarded to The Select Companies a 3-day Notice to Cure in accordance with the

22  Settlement Agreement. To date, Debtor has yet to receive the remaining monies due and owing under

23  the Settlement Agreement and thus the same has been deemed null and void by Debtor. A copy of the

24  3-day Notice to Cure served upon D. Stephen Sorenson via certified mail on January 23, 2007 is

25  attached as Exhibit "12," and a copy of the correspondence deeming the Settlement Agreement null and

26  void is attached as Exhibit "13."

27    66.    Upon information and belief, despite Debtor's many notices of The Select

28  Companies delinquencies, the only attempt to resolve the matters are reflected in Settlement Agreement.

13

EXHIBIT "3"

1   Based upon The Select Companies' breach of said Settlement Agreement, The Trustee is now entitled to

2   seek recovery for all damages in connection with the circumstances which give rise to the underlying

3   disputes. However, The Trustee acknowledges that the one payment made under the Settlement

4   Agreement will serve as an offset to the total amounts due and owing pursuant to the contracts which

5   form the basis for the breaches in question.

6   **FIRST CLAIM FOR RELIEF**

7   **FOR BREACH OF CONTRACT**

8   (2004 Agreement-Additional Owed and Unpaid Program Fees.

9   As to All Corporate Counter-Defendants)

10      67.   The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

11   paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

12      68.   Since the inception of the 2004 Agreement, Debtor has complied with the terms

13   of the 2004 Agreement.

14      69.   The Select Companies were required to pay program fee charges to Debtor in

15   connection with the business in question.

16      70.   Specifically, Section 3 of the 2004 Agreement requires the The Select Companies

17   to be charged and pay a program fee of 4% of the total gross employee earnings for each calendar month

18   to induce Debtor into providing staff subcontracting services. The same 4% was to be honored when

19   and if the payroll exceeded $50,000,000.

20      71.   The Select Companies paid the necessary fees up to the $50,000,000 worth of

21   payroll.

22      72.   Upon information and belief, the payroll produced in connection with 2004

23   Agreement was approximately $77,000,000.

24      73.   The Select Companies have failed to pay all of the additional monies due and

25   owing to Debtor as fees as a result of payroll coming in over $50,000,000 in connection with the 2004

26   Agreement.

27      74.   Beginning in or around December, 2006, several requests were made of The

28   Select Companies to forward the fees in connection with the 2004 Agreement.

14

1    75.    As a result of those correspondence and subsequent negotiations, a Settlement

2  Agreement was entered into which covered the fees in question.

3    76.    Pursuant to said Settlement Agreement, Counter-Defendants were required to

4  forward two separate payments in full satisfaction of any outstanding dispute with respect to the 2004

5  Agreement and 2005 Agreement.

6    77.    Upon information and belief, The Select Companies forwarded the first payment

7  of $1,625,000 in a timely fashion. Pursuant to the Settlement Agreement, this amount will serve as a

8  credit toward The Select Companies' outstanding debt to Debtor.

9    78.    The Select Companies have failed to forward the second installment of

10  $1,000,000.

11    79.    As a result of said default, Debtor's then counsel forwarded a 3-day Notice to

12  Cure to The Select Companies in an attempt to remedy the default. To date, The Select Companies have

13  yet to forward the $1,000,000 in accordance with said contract.

14    80.    Up to and including the time of The Select Companies' refusal to pay the

15  outstanding obligation, Debtor complied with all obligations under the 2004 Agreement.

16    81.    By reason of the foregoing, Debtor has been and will continue to be damaged in

17  the amount of $362,651.

18                    SECOND CLAIM FOR RELIEF

19                    FOR BREACH OF CONTRACT

20            (2004 Contract-Additional Owed and Unpaid Collateral,

21                As to All Corporate Counter-Defendants)

22    82.    The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

23  paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

24    83.    According to Section 14 of the 2004 Agreement, The Select Companies were

25  required to pay a minimum of $2,000,000 into a Loss Fund to collateralize The Select Companies'

26  obligations, based on the anticipated payroll.

27    84.    The Select Companies remitted the $2,000,000 in six equal installments.

28

1    85.    Since that time, additional losses have accrued with respect to the 2004-2005
2  contract period.

3    86.    The Select Companies have forwarded additional monies to satisfy some claim
4  reimbursements in the total of $660,206.66.

5    87.    Since that time, additional claims have been paid by Debtor in the amount of
6  $1,742,996.47.

7    88.    Upon information and belief, beginning in December, 2006 and continuing up
8  until the present, Debtor has made several requests for The Select Companies to forward the remaining
9  claim/collateral monies.

10    89.    Based upon said negotiations, a Settlement Agreement was entered into between
11  the parties on or around January 2, 2007.

12    90.    Pursuant to said Settlement Agreement, The Select Companies were required to
13  make two separate payments in full satisfaction of this as well as other debts.

14    91.    The Select Companies made the first payment in a timely fashion. Pursuant to the
15  Settlement Agreement, this amount will serve as a credit toward The Select Companies' outstanding
16  debt to Debtor.

17    92.    The Select Companies have failed to adhere to the requirements of the Settlement
18  Agreement by failing to forward the second payment amounting to $1,000,000.

19    93.    Since having defaulted, Debtor's then counsel has contacted The Select
20  Companies and served a 3-day Notice to Cure requesting immediate payment of the $1,000,000.

21    94.    Upon information and belief, to date, The Select Companies have failed to pay the
22  remaining $1,000,000 to Debtor.

23    95.    The Settlement Agreement is now null and void as set forth in Debtor's January
24  23, 2007 correspondence. Debtor had the right to exercise said option when and if The Select
25  Companies chose to default on the second payment requirement pursuant to Section 3 of the Settlement
26  Agreement.

27

28

1       96.    To date, Debtor has neither received the additional monies requested for the

2 claim/collateral fund nor have they received the second payment as set forth in the Settlement

3 Agreement.

4       97.    Up to and including the time of The Select Companies' refusal to pay the

5 outstanding monies to the collateral fund, claims reimbursements and/or the second payment as required

6 by the Settlement Agreement, Debtor complied with all obligations under the 2005 Agreement.

7       98.    By reason of the foregoing, Debtor has been and will continue to be damaged in

8 the amount of $1,742,996.47.

9       99.    Debtor requests that the remaining monies requested in connection with the

10 collateral fund and claims reimbursements be required to be paid immediately.

11 <u>THIRD CLAIM FOR RELIEF</u>

12 <u>FOR BREACH OF CONTRACT</u>

13 (2005 Agreement-Additional Owed and Unpaid Program Fees.

14 As to All Corporate Counter-Defendants)

15       100.    The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

16 paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

17       101.    Since the inception of the 2005 Agreement, Debtor has complied with the terms

18 of the 2004 Agreement.

19       102.    The Select Companies were required to pay program fee charges to Debtor in

20 connection with the business in question.

21       103.    In pertinent part, Section 3 of 2005 Agreement states:

22 "For purposes of calculating program fees, collateral and other costs.

23 Client Companies [The Select Companies] has estimated and agree to be

24 charged a minimum of at least $104,000,000 and workers' comp ratable

25 payroll ("Payroll") that shall be provided CEI [Coastal] over the course of

26 the year commencing May 1, 2005. Client Companies shall be charged at

27 the rate of 7.5% of this amount of payroll, or $7.8 Million for the year.

28 broken down as follows: 1.75% ($1,820,000) shall be a minimum

17

EXHIBIT "3"

1    program fee payable to CEI for providing staffing services…**should**

2    **Client Companies surpass the original estimated minimum payroll**

3    **amount, Client Companies agree to pay additional program fees and**

4    **collateral consistent with the rates per hundred dollars of payroll**

5    **stated above.** The 7.5% blended amount being charged to the Client

6    Companies pursuant to this paragraph is based on a Client Companies'

7    original underwriting submission to CEI." (Emphasis added).

8    104.   The Select Companies paid the necessary fees up to cover $104,000,000 worth of

9    payroll.

10   105.   Upon information and belief, The Select Companies have failed to pay the

11   additional monies due and owing to Debtor as fees as a result of payroll coming in over $104,000,000.

12   106.   Based upon the $161,337,334.65 of payroll produced in connection with the 2005

13   Agreement, The Select Companies owe Debtor an additional $1,003,403.36 to cover the agreed upon

14   fees.

15   107.   Beginning in or around December, 2006, several requests were made of The

16   Select Companies to forward the fees in connection with the 2005 Agreement.

17   108.   As a result of those correspondence and subsequent negotiations, a Settlement

18   Agreement was entered into which covered the fees in question.

19   109.   Pursuant to said Settlement Agreement, The Select Companies were required to

20   forward two separate payments in full satisfaction of any outstanding dispute with respect to the 2004

21   Agreement and 2005 Agreement.

22   110.   Upon information and belief, The Select Companies forwarded the first payment

23   of $1,625,000 in a timely fashion. Pursuant to the Settlement Agreement, this amount will serve as a

24   credit toward The Select Companies' total outstanding debt to Debtor.

25   111.   The Select Companies have failed to forward the second installment of

26   $1,000,000.

27

28

EXHIBIT "3"

1        112.   As a result of said default, Debtor's counsel forwarded a 3-day Notice to Cure to

2 The Select Companies in an attempt to remedy the default. To date, The Select Companies have yet to

3 forward the remaining $1,000,000 in accordance with said contract.

4        113.   Up to and including the time of The Select Companies' refusal to pay the

5 outstanding obligation, Debtor complied with all obligations under the 2005 Agreement.

6        114.   By reason of the foregoing, Debtor has been and will continue to be damaged in

7 the amount of $1,003,403.36.

8        115.   All amounts due and owing under this claim of relief do not include additional

9 monies owed by The Select Companies in the Ninth and/or Tenth Claim for Relief associated with an

10 upward revision of the blended (composite) rate requested in the Ninth and/or Tenth Claim for Relief.

11 <u>FOURTH CLAIM FOR RELIEF</u>

12 <u>FOR BREACH OF CONTRACT</u>

13 (2005 Agreement-Additional Owed and Unpaid Collateral;

14 As to All Corporate Counter-Defendants)

15        116.   Counter-Claimant repeats, reiterates and re-alleges each and every allegation set

16 forth in paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

17        117.   The Select Companies also failed to comply with the collateral fund provision of

18 Section 3 of the 2005 Agreement. Based upon the payroll that was produced during the contract period

19 and according to the plain words of Section 3 as set forth above, The Select Companies were required to

20 forward a total of $9,276,896.74 for the collateral fund.

21        118.   To date, The Select Companies have forwarded only $5,980,000 in connection

22 with the collateral fund

23        119.   Upon information and belief, beginning in December, 2006 and continuing up

24 until the present, Debtor has made several requests for The Select Companies to forward the remaining

25 collateral monies in connection with the 2005 Agreement.

26        120.   Based upon said negotiations, a Settlement Agreement was entered into between

27 the parties on or around January 2, 2007.

28

19

EXHIBIT "3"

Case 8:07-ap-01105-RK   Doc 41-1   Filed 11/08/09   Entered 11/08/09 10:47:04   Desc
Exhibit Part 2 of 3   Page 21 of 82

1       121.    Pursuant to said Settlement Agreement, The Select Companies were required to

2   make two separate payments in full satisfaction of this as well as other debts in question.

3       122.    The Select Companies made the first payment in a timely fashion.   Pursuant to the

4   Settlement Agreement, this amount will serve as a credit toward The Select Companies' outstanding

5   debt to Debtor.

6       123.    The Select Companies have failed to adhere to the requirements of the Settlement

7   Agreement and failed to forward the second payment amounting to $1,000,000.

8       124.    Since having defaulted, Debtor's then counsel contacted The Select Companies

9   and served a 3-day Notice to Cure requesting immediate payment of the $1,000,000.

10      125.    Upon information and belief, to date, The Select Companies have failed to pay the

11  remaining $1,000,000 to Debtor.

12      126.    The Settlement Agreement is now null and void based upon Debtor's January 23,

13  2007 correspondence. Debtor had the right to exercise said option when and if The Select Companies

14  chose to default on the second payment requirement.

15      127.    To date, Debtor has neither received the additional monies requested for the

16  claim/collateral fund nor has it received the second payment as set forth in the Settlement Agreement.

17      128.    Up to and including the time of The Select Companies' refusal to pay the

18  outstanding monies to the collateral fund and/or the second payment as required by the Settlement

19  Agreement, Debtor has complied with all obligations under the 2005 Agreement.

20      129.    By reason of the foregoing, Debtor has been and will continue to be damaged in

21  the amount of $3,296,896.74.

22      130.    The Trustee requests that the remaining monies requested in connection with the

23  collateral fund be required to be paid immediately.

24      131.    All amounts due and owing under this claim of relief do not include additional

25  monies owed by The Select Companies in the Ninth and/or Tenth Claim for Relief associated with an

26  upward revision of the blended (composite) rate requested in the Ninth and/or Tenth Claim for Relief.

27  / / /

28  / / /

### FIFTH CLAIM FOR RELIEF

### FOR BREACH OF CONTRACT

(2006 Agreement-New and Unpaid Taxes, As to All Corporate Counter-Defendants)

132.    The Trustee repeats, reiterates and re-alleges each and every allegation set forth in paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

133.    On or around May 1, 2006, Debtor and The Select Companies executed a third consecutive Staffing Servicing Agreement (hereinafter referred to as "2006 Agreement"), a copy of which is attached as Exhibit "14." According to the 2006 Agreement, Debtor provided staffing services to The Select Companies also known as client companies, including, but not limited to:

a.    consulting assistance in obtaining, preparing and filing of all forms required to be filed by client companies, including The Select Companies, with the United States Internal Revenue Service and the United States Immigration and Naturalization Service;

b.    consulting assistance regarding preparing withholding and payment of all required federal income and related taxes to client companies, including The Select Companies;

c.    consulting assistance in preparing and filing of required Form 940, 941 and similar federal tax forms for client companies, including The Select Companies;

d.    consulting assistance and preparing and filing all required state and federal Unemployment Insurance Reports and payments of all sums due and indicated thereon to client companies, including The Select Companies;

e.    continual maintenance of the workers' compensation insurance with respect to all of the workers and in connection therewith, provision to client companies, including The Select Companies of certificates evidencing such insurance coverage;

f.    consulting assistance in preparing and implementing safety programs for workers on behalf of client companies, including The Select Companies.

134.    In addition to those services as provided above, Debtor also maintained ownership of all payroll accounts used to pay employees of The Select Companies, however, in an effort to create a productive environment, The Select Companies were allowed to access the payroll accounts for the

21

EXHIBIT "3"

1  issuance of payroll under all reasonable controls and procedures implemented by Debtor in connection

2  with the 2006 Agreement.

3      135.    Under the 2006 Agreement, Debtor also agreed to obtain and provide workers'

4  compensation insurance for the employees subcontracted by The Select Companies.

5      136.    Pursuant to the Section 1(i) of the 2006 Agreement The Select Companies, were

6  required to do the following:

7      "...immediately segregate and pay to all responsible taxing and other

8      government authorities all payroll taxes, Social Security taxes, federal and

9      state withholding taxes, EDD and SDI payments, and all other such

10      payments withheld from and employees' paycheck on behalf of CEI

11      [Coastal] with regard to all employees covered under this agreement

12      contemporaneously with issuing the paychecks to the employees, except

13      where the parties might otherwise agree from time to time. The client

14      companies [The Select Companies] will provide immediate assessable

15      verification under procedures to be established by CEI to verify funding of

16      payroll in the payroll account, as well as funding of payment of all such

17      payroll withholding taxes and other payroll deductions described above."

18      137.    The Select Companies always calculated the taxes due and owing and forwarded

19  that information along to Debtor but instead of paying those taxes directly, it was agreed by all that the

20  monies to satisfy the tax liabilities would also be forwarded to Debtor for Debtor to then pay in a timely

21  fashion. Attached as Exhibit "15" are true and correct copies of some samples of emails and bank

22  statements that establish that this was the practice that was adopted and utilized until January 2007.

23  It should be noted that due to the voluminous nature of the documents in question, Counter-claimant has

24  attached documents only from July 2006 until January 2007.

25      138.    As more particularly set forth in the First through Fourth Claims for Relief above,

26  in late 2006, disputes began to arise between Debtor and The Select Companies over the 2004 and 2005

27  Agreements described above.

28

22               EXHIBIT "3"
COUNTER-CLAIMANT KAREN NAYLOR, TRUSTEE'S FIRST AMENDED COUNTER-CLAIM    Page 82
10359v1/1005-001

139.    As indicated in a correspondence dated on or around January 20, 2007, directed to Mr. Sorenson from Mr. Anderson, Debtor however agreed to continue the relationship between the parties for a limited ten day window of time.. By so doing, Debtor was attempting to make The Select Companies' transition as smooth as possible.  By virtue of Mr. Anderson's January 20, 2007 correspondence, The Select Companies were advised that the Workers' Compensation coverage in question as well as the relationship between Debtor and The Select Companies would be terminated as of January 28, 2007. A copy of January 20, 2007 correspondence is attached as Exhibit " 16."

140.    Upon gaining the knowledge that Debtor would switch carriers and the The Select Companies' business could no longer be included, Debtor attempted to contact The Select Companies immediately to no avail.

141.    On or around January 29, 2007, pursuant to The Select Companies' obligation as set forth in Section 1(i) of the 2006 Agreement, a payment of approximately $362,125.41  became due and owing to the Employment Development Department (hereinafter "EDD") for employee withholding taxes for the weekly payroll period ending January 26, 2007.

142.    Further, pursuant to Section 1(i) of the 2006 Agreement, a separate  payment of approximately $640,251.93 became due to the Internal Revenue Service (hereinafter "IRS") around January 29, 2007 for employee withholding taxes and employer contributions to Social Security and Medicare for the weekly payroll period ending January 26, 2007.

143.    On or around January 29, 2006, Debtor was advised that The Select Companies had failed to forward the monies to Debtor so that Debtor could in turn make the EDD and IRS payments for the weekly payroll period ending January 26, 2007 as stated in the previous two paragraphs above.

144.    On or around January 31, 2007, pursuant to The Select Companies' obligation as set forth in Section 1(i) of the 2006 Agreement, a payment of $211,060.20 became due and owing to the Employment Development Department (hereinafter "EDD") for state unemployment taxes from the period of October 1, 2006 to December 31, 2006.  Because this payment was not made timely, a penalty has been assessed and interest has been applied by the EDD. The Trustee is informed and does believe

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 25 of 82

1    that the original tax plus interest and penalty is calculated to be $971,333.03 as of July 31, 2009. Daily

2    interest of $179 will continue to accrue until the debt is satisfied.

3            145.    Further, pursuant to Section 1(i) of the 2006 Agreement, for the period of

4    October 1, 2006 to December 31, 2006 a separate payment of $175,725.26 became due to the Internal

5    Revenue Service (hereinafter "IRS") around January 31, 2007 for federal unemployment taxes. The

6    Trustee has not been informed of the penalty and interest applied to this outstanding amount, but

7    believes it to be in excess of $20,000.

8            146.    On or around January 30, 2006, Debtor was advised that The Select Companies

9    had failed to forward the monies to Debtor so that Debtor could in turn make the unemployment tax

10    payments to the EDD and IRS as stated in the previous two paragraphs above.

11            147.    Upon being informed of The Select Companies' delinquency, Debtor's

12    Accounting Department made several requests of The Select Companies that the outstanding monies

13    being held by The Select Companies for both the EDD and IRS unemployment taxes be paid

14    immediately.

15            148.    When the efforts of the Accounting Department failed, on or around January 31,

16    further conversations took place between Debtor's President, Robert J. Anderson, Jr., and the President

17    of The Select Companies, D. Stephen Sorensen, as well as legal counsel for both.

18            149.    Despite best efforts on Debtor's part, the negotiations were not fruitful.

19            150.    As a follow up to said negotiations, New York attorney John Petrone representing

20    Debtor directed a letter to The Select Companies, dated February 2, 2007, making one final request prior

21    to going to the EDD and the IRS themselves requesting that The Select Companies make payment in full

22    to these taxing authorities. A copy of said February 2, 2007 correspondence is attached as Exhibit "17."

23            151.    Said payments were not made.

24            152.    On or about February 2, 2007, Debtor's President, Robert J. Anderson, Jr., met

25    with Agent William Hassis, an IRS representative, to discuss the outstanding withholdings due and

26    owing. At that juncture, he explained the circumstances surrounding the outstanding monies and agreed

27    to provide Agent Hassis with follow up information requested in writing.

28

153. On that same date, Anderson also spoke with Kathleen Dunne, a representative of the EDD, and discussed the circumstances surrounding the lack of payment of the taxes due and owing, and agreed to provide Ms. Dunne further information requested in writing as well as a copy of the 2006 agreement.

154. On February 5, 2007, Anderson drafted a correspondence to Agent Hassis at the IRS further detailing the situation and requesting the IRS' assistance in resolving this matter with The Select Companies. A copy of correspondence is attached as Exhibit "18."

155. On or about February 2, 2007, Anderson sent a separate letter to Kathleen Dunne at the EDD further setting out the dispute and requesting the EDD's assistance in seeking payment from The Select Companies. A copy of said correspondence is attached as Exhibit "19."

156. For approximately one month, there was a lack of communication between Debtor or any of its officers, agents or employees and the EDD or the IRS.

157. During that time, Debtor remained hopeful that The Select Companies planned to do the right thing and pay the monies as required by the 2006 Agreement.

158. It is essential to note, that upon information and belief some of the monies that have been maintained by The Select Companies are considered trust fund monies, that is monies that were collected from employees solely for the purpose of paying withholding tax.

159. On or around March 7, 2007, Robert J. Anderson, Jr., President of Debtor, received a phone call from EDD's Kathleen Dunne. Ms. Dunne explained that the tax liability regarding the Debtor account had yet to be paid. The total amount due and owing at that time was $814,353.03 with approximately $179.00 in interest accruing per day while the debt goes unpaid. Ms. Dunn at the EDD demanded that payment of this amount be made on or before March 21, 2007 in order to avoid Debtor being considered in breach of their previous separate installment agreement.

160. The monies that are due and owing to the EDD, $814,353.03 and approximately $55,000, together with interest, accrued and became due and payable prior to AIG's cancellation of the policy in question.

161. The Select Companies took responsibility for calculating and paying through to Debtor the tax liabilities associated with the employees' withholdings and employer contributions. The

25

1   Select Companies also generated all of the payroll checks on their payroll equipment that resulted in the

2   said tax liabilities. The Select Companies submitted a report to Debtor for the period from October 1,

3   2006 through December 31, 2006, admitting that the tax liability had been incurred. Said report is

4   attached as Exhibit "20."

5          162.    The Select Companies have since refused to submit wage data that is stored in

6   their payroll system for the weekly payroll period ending January 26, 2007, making it impossible for

7   Debtor to accurately calculate the exact tax liability for that period. Instead Debtor has had to estimate

8   same based upon the prior six weeks worth of payroll figures.

9          163.    All of the tax liabilities set forth herein, accrued before the January 28, 2007

10  contract termination date.

11         164.    Debtor fully performed all activities and actions required under its part pursuant

12  to the Contract, with the exception of providing a 60-Day Notice of Termination pursuant to the terms of

13  the 2006 Contract. Debtor was excused from performing the 60-Day Notice of Termination of the

14  Contract because of the inability beyond Debtor's control to include the Select companies' books of

15  business within the replacement ACE policy. Further, Debtor was excused from providing the 60-Day

16  Notice of Termination because of The Select Companies' anticipatory breach and indication that they

17  were not bound by the terms of the plain language of the Contract to pay the costs of the amount of

18  staffing services used, which by January 2007 had exceeded the Select companies' estimated allotment.

19         165.    As a result of the conduct of the The Select Companies, Debtor has suffered

20  damages of $1,130,640.44 for EDD monies owing and due, with interest continuing to accrue from

21  approximately March 1, 2007.. In addition, The Select Companies owe the estate a separate amount of

22  $211,060.20 for federal income taxes due to the IRS for the period of October 1, 2006, through

23  December 31, 2006, plus penalties and interest according to proof. Further, The estate is owed

24  approximately $640,251.93 due to the IRS for employee taxes and employer contributions to Social

25  Security and MediCare, for the month of January 26, 2007, plus interest and penalties according to

26  proof.

27         166.    Therefore, the total of principal owed for all withholding taxes, unemployment

28  insurance, other employee mandated state and federal withholding and known penalties and interest is

Case 8:07-ap-01105-RK   Doc 41-1   Filed 11/08/09   Entered 11/08/09 10:47.04   Desc
Exhibit Part 2 of 3   Page 28 of 82

1   $1,981,952.57, plus unknown interest and penalties which are ongoing according to proof. Therefore,

2   The estate has been damaged in the amount of $1,981,952.57 in principal state and federal tax liability.

3   The exact number, however, is unknown to The Trustee, and these are preliminary estimates. The estate

4   has been damaged according to proof. In addition, The estate has been damaged for unknown interest

5   and penalties according to proof for the failure of The Select Companies to pay monies owed under the

6   Contract.

7          167.    All tax liabilities set forth herein (except for some known and unknown penalties

8   and interest according to proof) occurred before the January 28, 2007, Contract termination date.

9                          <u>SIXTH CLAIM FOR RELIEF</u>

10                         <u>FOR BREACH OF CONTRACT</u>

11              (2006 Agreement-Additional Owed and Unpaid Program Fees.

12                         As to All Corporate Counter-Defendants)

13         168.    The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

14   paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

15         169.    Since the inception of the 2006 Agreement, Debtor has complied with the terms

16   of the 2004 and 2005 agreements.

17         170.    The Select Companies were required to pay program fee charges to Debtor in

18   connection with the business in question.

19         171.    In pertinent part, Section 3 of 2006 Agreement states:

20         "For purposes of calculating program fees, collateral and other costs.

21         Client Companies [The Select Companies] has estimated and agree to be

22         charged a minimum of at least $128,000,000 and workers' comp ratable

23         payroll ("Payroll") that shall be provided CEI [Debtor] over the course of

24         the year commencing May 1, 2006. Client Companies shall be charged at

25         the rate of 6.5% of this amount of payroll, or $8,320,000 for the year.

26         broken down as follows:  1.5% ($1,920,000) shall be a minimum program

27         fee payable to CEI for providing staffing services...should Client

28         Companies surpass the original estimated minimum payroll amount.

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 29 of 82

1    Client Companies agree to pay additional program fees and collateral

2    consistent with the rates per hundred dollars of payroll stated above.

3    The 6.5% blended amount being charged to the Client Companies

4    pursuant to this paragraph is based on a Client Companies' original

5    underwriting submission to CEI. (Emphasis added).

6        172.    The Select Companies paid the necessary fees up to cover $128,000,000 worth of

7    payroll.

8        173.    Upon information and belief, The Select Companies have failed to pay the

9    additional monies due and owing to Debtor as fees as a result of payroll produced under the agreement

10   of over $130,687,629.31.

11       174.    Based upon the $130,687,629.31 of payroll produced in connection with the 2006

12   Agreement, The Select Companies owe Debtor an additional $40,314.44 to cover the agreed upon

13   program fees not including collateral.

14       175.    Beginning in or around December, 2006, several requests were made of The

15   Select Companies to forward the fees in connection with the 2006 Agreement.

16       176.    Up to and including the time of The Select Companies' refusal to pay the

17   outstanding obligation, Debtor complied with all obligations under the 2006 Agreement.

18       177.    By reason of the foregoing, Debtor has been and will continue to be damaged in

19   the amount of $40,314.44.

20       178.    All amounts due and owing under this claim of relief do not include additional

21   monies owed by The Select Companies in the Ninth and/or Tenth Claim for Relief associated with an

22   upward revision of the blended (composite) rate requested in the Ninth and/or Tenth Claim for Relief.

23                    SEVENTH CLAIM FOR RELIEF

24                    FOR BREACH OF CONTRACT

25            (2006 Agreement-Additional Owed and Unpaid Collateral.

26                As to All Corporate Counter-Defendants)

27       179.    The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

28   paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

EXHIBIT "3"
Page 88

Exhibit "A"
Page 31

1    180.  The Select Companies also failed to comply with the collateral fund provision of

2 Section 3 of the 2006 Agreement. Based upon the payroll that was produced during the contract period

3 and according to the plain words of Section 3 as set forth above, The Select Companies were required to

4 forward a total of $6,534,381.47 for the collateral fund.

5    181.  To date, The Select Companies have forwarded only $6,400,000 in connection

6 with the collateral fund.

7    182.  Upon information and belief, beginning in December, 2006 and continuing up

8 until the present, Debtor has made several requests for The Select Companies to forward the remaining

9 collateral monies in connection with the 2006 Agreement.

10    183.  To date, Debtor has neither received the additional monies owed for the

11 claim/collateral fund.

12    184.  Up to and including the present time, Debtor has complied with the terms of all

13 agreements in place.

14    185.  By reason of the foregoing, Debtor has been and will continue to be damaged in

15 the amount of $134,381.47.

16    186.  The Trustee requests that the remaining monies requested in connection with the

17 collateral fund be required to be paid immediately.

18    187.  All amounts due and owing under this claim of relief do not include additional

19 monies owed by The Select Companies in the Ninth and/or Tenth Claim for Relief associated with an

20 upward revision of the blended (composite) rate requested in the Ninth and/or Tenth Claim for Relief.

21        **EIGHTH CLAIM FOR RELIEF**

22   **FOR BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

23    (2004 Agreement, As to All Corporate Counter-Defendants)

24    188.  The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

25 paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

26    189.  Implied in the Agreement between Debtor and the The Select Companies, and

27 each of them, with regard to entering into the 2004 Agreement was a covenant of good faith and fair

28 dealing, and an implied representation that the mix of business represented by The Select Companies to

29                   EXHIBIT "3"

COUNTER-CLAIMANT KAREN NAYLOR, TRUSTEE'S FIRST AMENDED COUNTER-CLAIM Page 89

Exhibit "A"
Page 32

1   Debtor was such that the blended rate of 8% of the payroll (4% for minimum collateral and 4% for

2   minimum service fees)accurately reflected the workers' compensation insurance classifications for work

3   performed by the Select Companies' employees.

4          190.   The Select Companies and Debtor had a special relationship in that The Select

5   Companies were a very large, successful temporary company much bigger than Debtor, and present in

6   the agreement was a reliance that The Select Companies would act with integrity and honesty in

7   accurately estimating and reporting the proper class code for its employees, and would not engage in the

8   wholesale misrepresentation and fraud in which they ultimately engaged.

9          191.   The Select Companies, and each of them, breached the implied covenant of good

10  faith and fair dealing by misrepresenting and misclassifying the amount and type of business and

11  employment to be produced under the 2004 Agreement.

12         192.   As a direct and proximate result of The Select Companies' breach of the implied

13  duty of good faith and fair dealing, Debtor was damaged in the amount of at least $5,390,000 or an

14  amount according to proof at trial.

15         193.   In performing said acts, The Select Companies acted with knowledge of the

16  special relationship between Debtor and The Select Companies, the vulnerability of Debtor, and the

17  position of trust which applied to The Select Companies in estimating and reporting payroll business

18  produced.  The Select Companies' in conscious disregard of the rights of Debtor under said agreement

19  and said covenant of good faith and fair dealing implied herein, caused Debtor damages according to

20  proof.

21         194.   As the result of the conduct hereinabove alleged, Debtor is entitled to exemplary

22  and punitive damages in an amount sufficient to punish and make an example of The Select Companies.

23  The aforementioned acts were performed by The Select Companies' agents, servants and/or employees,

24  thus justifying the imposition of exemplary and punitive damages upon The Select Companies.

25         195.   The above acts were not known nor reasonably discovered until after December

26  2009, when Debtor uncovered evidence of wholesale fraud and misrepresentation of class codes in the

27  2004 Agreement (and the two later ones) and realized and were informed of The Select Companies' true

28  intent to not honor their obligations under the Agreement.

196.   All amounts due and owing under this claim of relief do not include additional monies owed by The Select Companies as alleged in the First and/or Second Claim for Relief associated with additional collateral and service fees as required to be paid under the original terms of the 2004 agreement.

### NINTH CLAIM FOR RELIEF

### FOR BREACH OF CONTRACT

(2005 Agreement-Additional Program Fees and Collateral Owed As a Result of Adjustment of Blended [Composite] Rate, As to All Corporate Counter-Defendants)

197.   The Trustee repeats, reiterates and re-alleges each and every allegation set forth in paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

198.   Pursuant to Paragraph 3.a. of the 2005 Agreement (Exhibit "3"), the contract provided as follows:

3.a   Program Costs. For purposes of calculating program fees, collateral and other costs, Client Companies has estimated and agree to be charged on a minimum of at least $104,000,000 in Workers Comp Ratable Payroll (Payroll) that shall be provided CEI over the course of the year commencing May 1, 2005. Client Companies shall be charged at the rate of 7.5% of this amount of Payroll, or $7,800,000 for the year, broken down as follows:

1.75% ($1,820,000) shall be a minimum program fee payable to CEI for

providing staffing services and 5.75% ($5,980,000) shall be for minimum

collateral and claims, further described below. Client Company will pay

their pro rata share of any additional premium (audit premium) charged by

the workers' compensation carrier following any periodic or annual audit that

the carrier may implement. Should Client Companies surpass the

original estimated minimum payroll amount, Client Companies

agree to pay additional program fees and collateral consistent with the rates

per hundred dollars of payroll stated above.  The 7.5% blended rate being

charged the Client Companies pursuant to this paragraph is based on

the Client Companies original underwriting submission to CEI. Should

---

31

EXHIBIT "3"

1     there be an average increase in the distribution of the workers compensation

2     class codes that is resultant in an overall higher composite class code

3     rate. Client Companies shall pay their proportionate share of the increase in

4     the average composite billed rate and collateral, now fixed at 7.5%.

5         199.    Paragraph 1.g. of said Agreement indicated that, "The costs reflected in paragraph 3

6 are based on the original submission of workers' compensation class codes as reflected in Schedule A."

7         200.    The Select Companies inaccurately reported class codes for employees

8 pursuant to the 2005 agreement. The true and correct composite billed rate and collateral percentage

9 should be increased from 7.5% to at least 13.50% based on an analysis of payroll produced in under

10 the 2005 agreement in conjunction with applying the correct class code to said payroll. This analysis

11 is ongoing and the rate could be upwardly adjusted according to proof. Based on the amount of

12 payroll actually produced for the 2005 agreement of $161,337,334.65, Debtor is entitled to at least

13 an additional $9,680,240.08 or according to proof in combined minimum collateral and service fees

14 as a result of the upward adjustment of the composite rate.

15         201.    Based on the proportionate increase of the composite rate (blended rate),

16 Debtor is entitled to 13.5 instead of 7.5%. The service fee rate for the 2005 contract is increased to

17 3.15% from the original 1.75%. Therefore Debtor is entitled to additional services fees as a result of

18 the adjustment of the composite rate in the amount of $2,258,722.68 or according to proof.

19         202.    Based on the proportionate increase of the composite rate (blended rate),

20 Debtor is entitled to 13.5% instead of 7.5%. The minimum collateral fee rate for the 2005 contract is

21 increased to 10.35% from the original 5.75%. Therefore Debtor is entitled to additional collateral

22 payment as a result of the adjustment of the composite rate in the amount of $7,421,517.40 or

23 according to proof.

24         203.    No formal demand had been made for this increased collateral, since the

25 underreporting of class codes by the Counter-Defendants was uncovered after litigation had

26 commenced. The filing and serving of this claim for relief will constitute a demand for such

27 payment.

28

32          EXHIBIT "3"
COUNTER-CLAIMANT KAREN NAYLOR, TRUSTEE'S FIRST AMENDED COUNTER-CLAIM   Page 92
10359v1/1005-001

Exhibit "A"
Page 35

1       204.   The additional funds owed as alleged in this Claim for Relief are separate and

2   apart from an additional to monies owed as alleged in the above listed Claims for relief including

3   but not limited to the 3rd and 4th Claims for Relief listed above.

4   **TENTH CLAIM FOR RELIEF**

5   **FOR BREACH OF CONTRACT**

6   (2006 Agreement-Additional Program Fees and Collateral Owed

7   As a Result of Adjustment of Blended [Composite] Rate,

8   As to All Corporate Counter-Defendants)

9       205.   The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

10  paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

11      206.   Pursuant to Paragraph 3.a. of the 2006 Agreement (Exhibit "14"), the contract

12  provided as follows:

13      3.a   Program Costs. For purposes of calculating program fees, collateral and

14  other costs, Client Companies has estimated and agree to be charged on a minimum of at least

15  $128,000,000 in Workers Comp Ratable Payroll (Payroll) that shall be provided CEI over the course of

16  the year commencing May 1, 2006. Client Companies shall be charged at the rate of 6.5% of this amount

17  of Payroll, or $8,320,000 for the year, broken down as follows:

18      1.50% ($1,920,000) shall be a minimum program fee payable to CEI for

19      providing staffing services and 5.00% ($6,400,000), shall be for minimum

20      collateral and claims, further described below. Client Company will pay

21      their pro rata share of any additional premium (audit premium) charged by

22      the workers' compensation carrier following any periodic or annual audit that

23      the carrier may implement. Should Client Companies surpass the

24      original estimated minimum payroll amount, Client Companies

25      agree to pay additional program fees and collateral consistent with the rates

26      per hundred dollars of payroll stated above. The 6.5% blended rate being

27      charged the Client Companies pursuant to this paragraph is based on

28      the Client Companies original underwriting submission to CEI. Should

33

EXHIBIT "3"

1           there be an average increase in the distribution of the workers compensation

2           class codes that is resultant in an overall higher composite class code

3           rate. Client Companies shall pay their proportionate share of the increase in

4           the average composite billed rate and collateral, now fixed at 6.5%.

5           (Emphasis added).

6               207.   The Select Companies inaccurately reported class codes for employees

7 pursuant to the 2006 agreement. The true and correct composite billed rate and collateral percentage

8 should be increased from 6.5% to at least 10.65% based on an analysis of payroll produced under

9 the 2006 agreement in conjunction with applying the correct class code to said payroll. This analysis

10 is ongoing and the rate could be upwardly adjusted according to proof. Based on the amount of

11 payroll actually produced for the 2006 agreement of $130,687,629.31. Debtor was entitled to an

12 additional $5,423,536.61 or according to proof in combined minimum collateral and service fees as

13 a result of the upward adjustment of the composite rate.

14               208.   Based on the proportionate increase of the composite rate (blended rate),

15 Debtor is entitled to 10.65% instead of 6.5%. The service fee rate for the 2006 contract is increased

16 to 2.5% from the original 1.50 %. Therefore Debtor was entitled to additional service fees as a result

17 of the adjustment of the composite rate in the amount of $1,347,190.73 or according to proof.

18               209.   Based on the proportionate increase of the composite rate (blended rate),

19 Debtor is entitled to 10.65% instead of 6.5%. The minimum collateral fee rate for the 2006 contract

20 is increased to 8.15% from the original 5.00 %. Therefore Debtor is entitled to additional minimum

21 collateral payment as a result of the adjustment of the composite rate in the amount of

22 $4,251,041.79 or according to proof.

23               210.   No formal demand had been made for this increased collateral, since the

24 underreporting of class codes by the Counter-Defendants was uncovered after litigation had

25 commenced. The filing and serving of this claim for relief will constitute a demand for such

26 payment.

27

28

1    211.   The additional funds owed as alleged in this Claim for Relief are separate and

2  apart from an additional to monies owed as alleged in the above listed Claims for relief including

3  but not limited to the 5th, 6th, and 7th Claims for Relief listed above.

4                        ELEVENTH CLAIM FOR RELIEF

5                          FOR FRAUD AND DECEIT

6        (As to All Corporate Counter-Defendants and D. Stephen Sorensen, Individually)

7    212.   The Trustee repeats, reiterates and re-alleges each and every allegation set forth in

8  paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

9    213.   At the time of entering into the three above-described agreements (Exhibits "1,"

10  "3" and "14"), the Select Companies, and D. Stephen Sorensen, their chief executive officer and

11  controlling owner, had represented that they would abide by the terms of the agreements and pay what

12  they were required to pay under the agreements.  These representations, made both affirmatively and/or

13  implied, were reasonably relied upon by Debtor.  These representations were false in that the Select

14  Companies, consistent with the way they historically conducted business, which was unknown to

15  Debtor, never intended to abide by the terms of the contracts, and never intended to pay the agreed

16  amount, as well as when confronted about under payments prior to termination of the contract

17  relationship, had always promised that the prior obligations would be brought current.  Based on this

18  reliance, Debtor continued to do business with the Select Companies to its detriment until January 2007,

19  when it was forced to terminate its relationship with the Select Companies as a result of the Select

20  Companies' conduct.

21    214.   The Select Companies further fraudulently and deceptively under-reported the

22  class codes during the course of their relationship with Debtor.  Debtor relied on the class codes as

23  reported and did not realize the falsity of the reports and under reporting until after Debtor was placed in

24  bankruptcy.

25    215.   Debtor also relied on the representations that The Select Companies would pay

26  their tax obligations and did not realize that the Select Companies would refuse to pay their tax

27  obligations without justification as hereinabove alleged.

28

216.    Had Debtor known the true facts and intentions of the Select Companies, Debtor would not have engaged in business with the Select Companies and would not have entered into any of the above contracts, but did so relying on the intentional misrepresentations of the Select Companies as stated above.

217.    The above-described representations made by the Select Companies were false in that Select Companies never intended to live up to their contractual obligations, and further, that Select Companies willfully understated the applicable class codes. When these representations were made, the Select Companies knew they were false and made them with the intention to deceive, and Debtor acted upon them in reliance that these representations were true. As a proximate result of the fraudulent conduct of the Select Companies as herein alleged, Debtor was damaged not only in the amounts alleged in the first through the tenth claims for relief above, but Debtor also suffered the loss of its business and reputation. As a result of the failure of the Select Companies to fulfill their obligations under the contracts, particularly the Select Companies' willful non-payment of their final tax obligations at the time of termination, Debtor was no longer able to conduct business, and suffered damages of at least an additional $20 million or according to proof representing the value of Debtor's business, in addition to other damages alleged above.

218.    The aforementioned conduct of the Select Companies was an intentional misrepresentation, deceit, and/or concealment of material facts known to the Select Companies with the intention on the part of the Select Companies of depriving Debtor of its property and legal rights and otherwise causing injury, and was a despicable conduct that subjected Debtor to cruel and unjust hardship in a conscious disregard of Debtor's rights so as to justify an award of exemplary and punitive damages.

## TWELFTH CLAIM FOR RELIEF

## FOR DAMAGES ASSOCIATED WITH FRAUDULENT TRANSFERS

(2004 Agreement, 2005 Agreement and 2006 Agreement.

As to All Corporate Counter-Defendants)

219.    The Trustee repeats, reiterates and re-alleges each and every allegation set forth in paragraphs 1-66 above with the same force and effect as if fully set forth hereafter.

36

EXHIBIT "3"

220.    In acting as hereinabove alleged, including but not limited to, utilizing the administrative services and the workers' compensation coverage provided to the Select Companies by Debtor without paying for said services, and obtaining those services by deceptively underreporting class codes, the Select Companies, and each of them, fraudulently obtained and took assets of Debtor and transferred and/or utilized and took the value of those services for themselves without paying for them in defraud of Debtor and the creditors of Debtor. The amount of the value of the above-described services which were fraudulently transferred consists of the entire amount of damages alleged in the first ten claims for relief above and/according to proof.

221.    Included in the above damages are the taxes referred to in the Fifth Claim for Relief above wherein the Select Companies fraudulently and maliciously collected taxes on behalf of and belonging to Debtor from the Select Companies' clients and fraudulently transferred the monies to themselves rather than to Debtor or Debtor's tax authority creditors.

222.    The Trustee is informed and believes and thereon alleges that Select Companies knew at the time that they fraudulently transferred tax monies owed to Debtor to themselves and at the time that they fraudulently obtained the above-described services from Debtor and transferred the value of services to themselves or resold the value to their clients, and failing to pay the monies owed to Debtor as hereinabove alleged, acted with the intent to hinder, delay and defraud Debtor and Debtor's creditors of monies that they were due and owing.

223.    The conduct as alleged above was willful, malicious, oppressive and burdensome, and The estate is entitled to punitive and/or exemplary damages according to proof.

### THIRTEENTH CLAIM FOR RELIEF

### FOR ACCOUNTING

(As to All Corporate Counter-Defendants and All Agreements)

224.    The Trustee repeats and realleges paragraphs 1 through 66 as though fully set forth herein;

225.    The amount of total money due from the Select Companies to Debtor in its entirety is unknown to the Trustee at this time but is reasonably believed at a minimum the amounts alleged due in the First through Tenth Claims for Relief.

1        226.    Before and after litigation Debtor and subsequently the Trustee through her

2   attorney had repeatedly demanded a full accounting, including but not limited to a full and complete

3   disclosure of all payroll produced pursuant to the above-described agreements, the applicable class

4   codes, the amount of taxes withheld, the amount of taxes paid and unpaid and other pertinent details.

5   The Select Companies have refused to fully and completely respond to such requests and have further

6   not agreed to a full and complete accounting between the parties.

7        227.    Unless and until Select is order to produce a full and complete accounting, the

8   Trustee cannot determine the full and complete amount owed.

9        WHEREFORE, the Trustee prays for a judgment against Counter-Defendants,

10  Koosharem Corporation, PBT, Inc., New Staff, Inc., K.T., Inc., Pay Services Corp and Real Time

11  Staffing Services, Inc., as follows:

12      AS TO THE FIRST CLAIM FOR RELIEF:

13         1.    for damages in the amount of $362,651 and/or according to proof;

14         2.    for costs of suit and prejudgment interest herein;

15         3.    for reasonable attorney fees as may be allowed; and

16         4.    for such other and further relief as the Court deems just and appropriate.

17      AS TO THE SECOND CLAIM FOR RELIEF:

18         1.    for damages in the amount of $1,742,996.47 and/or according to proof;

19         2.    for costs of suit and prejudgment herein;

20         3.    for reasonable attorney fees as may be allowed; and

21         4.    for such other and further relief as the Court deems just and appropriate.

22      AS TO THE THIRD CLAIM FOR RELIEF:

23         1.    for damages in the amount of $1,003,403.36 and/or according to proof;

24         2.    for costs of suit and prejudgment interest herein;

25         3.    for reasonable attorney fees as may be allowed; and

26         4.    for such other and further relief as the Court deems just and appropriate.

27      AS TO THE FOURTH CLAIM FOR RELIEF:

28         1.    for damages in the amount of $3,296,896.74 and/or according to proof;

COUNTER-CLAIMANT KAREN NAYLOR, TRUSTEE'S FIRST AMENDED COUNTER-CLAIM    Page 98

16359v1/1005-001

1       2.    for costs of suit and prejudgment interest herein;

2       3.    for reasonable attorney fees as may be allowed; and

3       4.    for such other and further relief as the Court deems just and appropriate.

4   AS TO THE FIFTH CLAIM FOR RELIEF:

5       1.    for damages in the amount of at least $1,981,952.57 and/or according to proof;

6       2.    for unknown interest and penalties according to proof assessed and/or owed to

7   state and federal taxing authorities:

8       3.    for costs of suit herein;

9       4.    for reasonable attorney fees as may be allowed; and

10      5.    for such other and further relief as the Court deems just and appropriate.

11  AS TO THE SIXTH CLAIM FOR RELIEF:

12      1.    for damages in the principal amount of at least $40,314.44 according to proof;

13      2.    for interest at the maximum legal rate;

14      3.    for costs of suit herein;

15      4.    for reasonable attorney fees as may be allowed; and

16      5.    for such other and further relief as the Court deems just and appropriate.

17  AS TO THE SEVENTH CLAIM FOR RELIEF:

18      1.    for damages in the principal amount of at least $134,381.47 according to proof;

19      2.    for interest at the maximum legal rate;

20      3.    for costs of suit herein;

21      4.    for reasonable attorney fees as may be allowed; and

22      5.    for such other and further relief as the Court deems just and appropriate.

23  AS TO THE EIGHTH CLAIM FOR RELIEF:

24      1.    for damages in an amount of at least $5,390,000;

25      2.    for punitive and/or exemplary damages in an amount appropriate to punish

26  Select Companies and deter the Select Companies and others from engaging in similar conduct;

27      3.    for costs of suit and prejudgment interest herein; and

28      4.    for such other and further relief as the Court deems just and appropriate.

Case 8:07-ap-01105-RK    Doc 41-1    Filed 11/08/09    Entered 11/08/09 10:47:04    Desc
Exhibit Part 2 of 3    Page 41 of 82

1    AS TO THE NINTH CLAIM FOR RELIEF:

2        1.    for damages in the principal amount of at least $2,258,722.68 for additional

3    minimum program fees and/or according to proof;

4        2.    for damages in the principal amount of at least $7,421,517.40 for additional

5    minimum collateral fund and/or according to proof;

6        3.    for interest at the maximum legal rate;

7        4.    for costs of suit herein;

8        5.    for reasonable attorney fees as may be allowed; and

9        6.    for such other and further relief as the Court deems just and appropriate.

10    AS TO THE TENTH CLAIM FOR RELIEF:

11        1.    for damages in the principal amount of at least $1,347,190.73 for additional

12    minimum program fees and/or according to proof;

13        2.    for damages in the principal amount of at least $4,251,041.79 for additional

14    minimum collateral fund and/or according to proof;

15        3.    for interest at the maximum legal rate;

16        4.    for costs of suit herein;

17        5.    for reasonable attorney fees as may be allowed; and

18        6.    for such other and further relief as the Court deems just and appropriate.

19    AS TO THE ELEVENTH CLAIM FOR RELIEF:

20        The Trustee prays for a judgment against Counter-Defendants, Koosharem Corporation,

21    PBT, Inc., New Staff, Inc., K.T., Inc., Pay Services Corp, Real Time Staffing Services, Inc., and D.

22    Stephen Sorensen, an individual, as follows:

23        1.    for general damages in the amount of at least $20,000,000 and/or according to

24    proof;

25        2.    for punitive and/or exemplary damages in an amount appropriate to punish

26    Counter-Defendants and deter the Counter-Defendants and others from engaging in similar conduct;

27        3    for costs of suit herein; and

28        4    for such other and further relief as the Court deems just and appropriate.

AS TO THE TWELFTH CLAIM FOR RELIEF:

1.    that the transfer, conveyance, or receipt of the monies or equivalent value of services obtained by the Select Companies as alleged in the first through 10th Claims of Relief be annulled and declared void as to Debtor herein to the extent necessary to satisfy all the claims of the creditors herein as well as the administration, and trustee fees related to the bankruptcy as well as any distribution rights ultimately owed to the owner of the debtors;

2.    that the equivalent funds for the relief sought in the first 10 causes of action in the hands of the Select Companies be attached in accordance with provisions of Sections 481.010 through 493.060 of the Code of the California Code of Civil Procedure;

3.    that Select Companies be restrained from dissipating any funds held by them except in the normal course and scope of their business until the funds reflected in the first 10 causes of action are either attached or transferred to the estate;

4.    that a temporary restraining order and an order pendente lite be granted the Counter-Plaintiff enjoining and restraining the Counter-Defense and each of them from transferring money assets accounts or otherwise selling transferring or conveying property held by them except in the normal course and scope of their business pending further order of the court.

5.    that a judgment herein be granted for the amount sought in the first 10 causes of action or according to proof and said amount be declared a lien and/or a security interest on the property of the defendants;

6.    for a money judgment consisting of a least the amount sought in the first 10 causes of action combined and/or according to proof;

7.    for exemplary or punitive damages;

8.    for costs of suit herein incurred;

9.    for interest at the maximum legal rate;

10.    for such other and further relief as the court may deem proper.

AS TO THE THIRTEENTH CLAIM FOR RELIEF:

1.    for an accounting between the Debtor and the Select Companies;

EXHIBIT "3"

Page 101

Exhibit "A"
Page 44

1      2.    for payment over to the estate of amounts due from the Select Companies as a

2 result of the account and interest;

3      3.    for costs of suit herein;

4      4.    for reasonable attorneys fees as may be allowed; and

5      5.    for such other and further relief as the Court deems just and appropriate.

6

7 DATED: November 6, 2009       MARSHACK HAYS LLP

8            / S/ D. Edward Hays

9            By: _____

10               D. EDWARD HAYS
               Attorneys for Counter-Claimant and Chapter 7

11               Trustee KAREN S. NAYLOR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

103594/1005-001

Exhibit "B"

Westlaw.

1996 WL 34306869 (S.D.N.Y.)                                                    Page 1

For Dockets See 1:96cv01680

United States District Court, S.D. New York.
COYNE ELECTRICAL CONTRACTORS, INC., Individually and as Trustee pursuant to New York Lien Law,
Article 3-A, Section 77 subdivision 1, Plaintiff,
v.
THE UNITED STATES OF AMERICA, Internal Revenue Service, Bank Leumi Trust Company of New York, New
York State Department of Taxation and Finance, et al., Defendants.
Nos. 96 Civ. 1680, 1852-1861, 3821 (SHS).
May 9, 1996.

Memorandum of Law of Defendant Bank Leumi In Support of Motion to Dismiss Complaints

Warshaw Burstein Cohen, Schlesinger & Kuh, LLP, Attorneys for Defendant, Bank Leumi Trust Company, of New
York, 555 Fifth Avenue, New York, New York 10017, (212) 984-7700.

Of Counsel: Jay A. Kranis, Donald M. Levinsohn.

*TABLE OF CONTENTS*

PRELIMINARY STATEMENT ... 1

ARGUMENT ... 4

POINT I ... 4

COYNE'S CLAIMS AGAINST BANK LEUMI FOR VIOLATION OF 31 U.S.C. § 3713 MUST BE DISMISSED
FOR LACK OF STANDING ... 4

POINT II ... 9

COYNE'S PURPORTED CLAIM UNDER 31 U.S.C. § 3713 IS INDEPENDENTLY BARRED BY RES JUDI-
CATA ... 9

POINT III ... 13

BECAUSE COYNE LACKS STANDING TO ASSERT CLAIMS UNDER 31 U.S.C. § 3713, THERE IS NO BA-
SIS FOR FEDERAL JURISDICTION AS AGAINST BANK LEUMI ... 13

POINT IV ... 18

BECAUSE THERE IS NO FEDERAL SUBJECT MATTER JURISDICTION AS TO BANK LEUMI, THE
STATE-LAW CLAIMS AGAINST BANK LEUMI, BASED ON THE NEW YORK UNIFORM COMMERCIAL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

CODE, MUST ALSO BE DISMISSED ... 18

CONCLUSION ... 21

*PRELIMINARY STATEMENT*

Bank Leumi Trust Company of New York ("Bank Leumi"), a defendant in each of eleven virtually identical actions ("Actions") commenced by plaintiff Coyne Electrical Contractors, Inc. ("Coyne"), all pending before this Court, submits this memorandum in support of its omnibus motion, pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), to dismiss all the claims asserted against it in the Actions.

Each of Coyne's eleven complaints ("Complaints") makes exactly the same allegations against Bank Leumi, in identical language, and each purports to assert the same two claims for relief against Bank Leumi -- again, in identical language.[FN1] Thus, each Complaint alleges:

> FN1. An Appendix annexed hereto sets forth the respective paragraph numbers of the parallel allegations against Bank Leumi in each of the Complaints. Specific paragraph references in text are to the first Complaint listed in the Appendix ("Complaint 1," Index No. 96 Civ. 1852).

> The only difference among Coyne's eleven Complaints -- in all of which Bank Leumi, the United States of America, Internal Revenue Service ("IRS"), and the New York State Department of Taxation and Finance, are named as defendants -- is that each Complaint also names a different alleged account debtor of Coyne as a defendant, claiming that each such account debtor owes money to Coyne for work performed, and that each has taken certain actions allegedly violating the statutory "trust fund" provisions of the New York Lien Law. No Lien Law claims are asserted against Bank Leumi in any of the eleven Actions.

(a) as the sole colorable basis for federal jurisdiction against Bank Leumi, a claim that payments received by Bank Leumi after January 1994 from Coyne, its debtor, in reduction of Coyne's outstanding loan balance, supposedly constituted an "unlawful preference" over allegedly superior IRS tax liens (Complaint 1, ¶ 40), purportedly "in violation of the lien and claims of the IRS, in violation of 31 U.S.C. Section 3713" (id., ¶ 167) -- the Federal Insolvency Statute, governing the priority of IRS and other Government claims against insolvent debtors -- and purportedly requiring Bank Leumi to "account" for all such payments (id. ¶ 169); and

(b) a claim seeking a declaratory judgment that Bank Leumi's security interest in Coyne's accounts receivable and other personalty was not properly perfected and/or continued under the New York Uniform Commercial Code, and "is not a valid and enforceable lien" upon funds which Coyne is allegedly owed by its account debtors (id. ¶¶ 165-66).

As demonstrated below, the claim Coyne asserts against Bank Leumi in each Complaint based on a purported violation of 31 U.S.C. § 3713 -- a federal statute under which no private right of action exists -- must be dismissed for lack of standing. (Point I, *infra*). Even apart from the absence of standing, Coyne is barred by *res judicata* from pursuing its Section 3713 claim in these Actions -- or any other claim arising from the same alleged facts -- by virtue of the dismissal, in another action between Bank Leumi and Coyne, of a Coyne counterclaim alleging the identical wrongdoing and the identical violation of 31 U.S.C. § 3713. (Point II, *infra*).

By reason of the dismissal of its Section 3713 claim here, Coyne loses its sole predicate for federal court jurisdiction over Bank Leumi: all the other federal statutes cited in the "Jurisdiction" section of the Complaints (28 U.S.C. §§ 1331, 1340, 2410, and 1367) (*see* ¶¶ 1-3 of each Complaint) are completely inapplicable to the claims against Bank Leumi, and none can serve as a basis for federal jurisdiction over those claims. (Point III, *infra*). In the absence of any viable federal claim against Bank Leumi -- and because there is no diversity of citizenship here -- the pendent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

State-law claim asserted against Bank Leumi in each Complaint, based on the New York Uniform Commercial Code, must be dismissed as well. (Point IV, *infra*).

*ARGUMENT*

*POINT I*

COYNE'S CLAIMS AGAINST BANK LEUMI FOR VIOLATION OF 31 U.S.C. § 3713 *MUST BE DISMISSED FOR LACK OF STANDING.*

In each of the eleven Complaints, Coyne asserts that because Coyne was supposedly "insolvent" and "indebted to" the IRS as of January 1994 (Complaint 1, ¶¶ 19, 30), subsequent payments made by Coyne to Bank Leumi from the proceeds of its accounts receivable, to reduce its outstanding loan balance, constituted "an unlawful preference" (*id.* ¶ 40) over the purportedly superior lien of the IRS, "in violation of the lien and claims of the IRS, in violation of 31 U.S.C. Section 3713" (id. ¶ 167)[FN2]. In addition, according to Coyne, Bank Leumi falsely represented to Coyne and the IRS that it held a valid perfected security interest in Coyne's accounts receivable (id. ¶ 41), allegedly fraudulently inducing the IRS to enter into a lien subordination agreement with Bank Leumi dated January 11, 1995 (id. ¶ 42), by which the IRS agreed to subordinate its lien to Bank Leumi's security interests and real estate mortgages.

> FN2. Although Coyne couches its allegations regarding its outstanding loan balance to Bank Leumi in terms of the indebtedness "claimed by Bank Leumi" increasing from S3,750,000 on June 1, 1989 to $6,000,000 in January 1994 (Complaint 1, ¶¶ 17-18), Coyne is careful never to deny that such indebtedness actually existed -- nor could it deny its indebtedness without violating F.R.C.P. 11(b).

Coyne clearly and indisputably lacks standing to raise this purported claim for violation of 31 U.S.C. § 3713. There is simply no authority for the proposition that Coyne has a private right of action under that statute, or can use it as a basis for raising the issue of the relative priorities of Bank Leumi and the IRS with respect to monies not in Coyne's possession -- let alone as a basis for claiming that the IRS was fraudulently induced to enter into a lien subordination agreement with Bank Leumi. Even if any such issues existed, only the IRS itself -- not Coyne -- would have standing to raise them.[FN3]

> FN3. Because Coyne clearly lacks standing to assert its purported claim under 31 U.S.C. § 3713, Bank Leumi does not undertake on this motion to refute Coyne's long series of irrelevant and baseless allegations regarding the supposedly unperfected nature of Bank Leumi's security interest in Coyne's accounts receivable and other personalty, or regarding Bank Leumi's supposed fraud upon the IRS and Coyne in connection with the lien subordination agreement dated January 11, 1995. Suffice it to say that Bank Leumi strongly disputes all these allegations, and, if it ever becomes necessary, is fully prepared to refute them, as a matter both of law and of fact, in a proper forum against a proper party. Simply put, there was no misrepresentation here because the alleged representation was entirely true: Bank Leumi's security interest in Coyne's accounts receivable, arising under a Security Agreement executed by Coyne in Bank Leumi's favor in May 1989, was, and remains, valid and properly perfected under N.Y. UCC § 9-401(1)(c), which provides that the proper place to file a financing or continuation statement is in "the department of state" where, as here, the debtor has a place of business in more than one county in this State (in Coyne's case, Bronx and Kings Counties).

Thus, the federal statute upon which Coyne relies, 31 U.S.C. § 3713 -- popularly known as the "Insolvency Statute" -- is entitled "Priority of *Government* claims" (emphasis supplied). It provides that a "claim of *the United States government* shall be paid first" under certain specified circumstances, including when "a person indebted to the Government is insolvent" and, *inter alia*, "without enough property to pay all debts makes a voluntary assignment of property." Id. § 3713(a)(1)(A)(i) (emphasis supplied). On its face, the Insolvency Statute creates no private right of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

action in favor of the "debtor" or anyone else; the courts have repeatedly held that the Statute's purpose is "to insure that adequate public revenues would be available to shoulder public burdens and to discharge public debts" of the federal government (*Lapadula & Villani, Inc. v. United States*, 563 F.Supp. 782, 784 (S.D.N.Y. 1983)) -- not to benefit, or create rights in, any class of private plaintiffs.

Since it is well-settled that "Courts will imply a private remedy only where they find that Congress intended such a result" (*Delen v. Scaife*, 775 F.Supp. 712, 717 (S.D.N.Y. 1991)), that a plaintiff bears the "burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the relevant statute" (*Victorian v. Miller*, 813 F.2d 718, 721 (5th Cir. 1987)), and that there must be a showing, *inter alia*, that the plaintiff was "one of the class for whose 'special benefit the statute was enacted such that the statute creates a federal right in favor of the plaintiff' " (*DiGiovanni v. City of Rochester*, 680 F.Supp. 80, 82 (W.D.N.Y. 1988) (citation omitted)), there is plainly no private right of action here. *See, e.g., Lapadula, supra*, 563 F.Supp. at 784 (Section 3713's predecessor "may not be invoked" even by the FDIC, "an agency which is not an integral part of the governmental mechanism"); *DiGiovanni, supra*, 680 F.Supp. at 82-83 (no private cause of action based on federal tax withholding statutes, since "[i]f these statutes are intended to benefit anyone, it is the Federal Government to whom the withheld tax is to be remitted"); *Delen, supra*, 775 F.Supp. at 717 (no private remedy for violations of federal tax laws because enforcement of those laws "has always been a public function"); *Turner v. Unification Church*, 473 F.Supp. 367, 376-77 (D.R.I. 1978), *aff'd*, 602 F.2d 458 (1st Cir. 1979) (same); *Chemtech Industries v. Goldman Financial Group, Inc.*, 809 F.Supp. 729, 734 (E.D.Mo. 1992) (same).[FN4]

> FN4. Coyne could not avoid this result even if it attempted to characterize its claim as seeking a declaratory judgment regarding the relative lien priorities of Bank Leumi and the IRS: the Declaratory Judgment Act, 28 U.S.C. §2201, expressly provides that a Court may not declare the rights and other legal relations of interested parties where federal taxes are in issue. *See Lapadula, supra*, 563 F.Supp. at 784; *Bob Jones University v. Simon*, 416 U.S. 725, 732-33 n.7 (1974).

In short, Coyne's claims against Bank Leumi for violation of 31 U.S.C. § 3713 -- the sole predicate for the assertion of federal jurisdiction over Bank Leumi -- must be dismissed for lack of standing, pursuant to Fed.R.Civ.P. 12(b)(1) and/or 12(b)(6).[FN5]

> FN5. *Compare New Alliance Party v. F.B.I.*, 858 F. Supp. 425, 434 (S.D.N.Y. 1994) ("plaintiffs lack standing to bring this cause of action and, therefore, the court has no jurisdiction over this matter"), and *Pfizer v. Elan Pharmaceutical Research Corp.*, 812 F. Supp. 1352, 1357 n.6 (D. Del. 1993) ("a Rule 12(b)(1) motion to dismiss for want of subject matter jurisdiction arguably provides a closer analogy" for attacks on standing than a Rule 12(b)(6) motion), *with School Crossing Guards Ass'n v. Beame*, 438 F. Supp. 1275, 1280 (S.D.N.Y. 1977) ("failure to show standing results in failure to state a claim upon which relief can be granted, and requires dismissal of the complaint"). *See also* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1360 at 435-36 & nn. 15, 17-18 (1990) (citing cases decided both under Rule 12(b)(1) and under Rule 12(b)(6)); id. § 1350 at 77 & n. 5.1 (Supp. 1995) (citing cases decided under Rule 12(b)(1)).

However, even if Coyne did have standing under the Insolvency Statute, the allegedly "unlawful" post-January 1994 payments by Coyne to Bank Leumi in reduction of Coyne's outstanding loan balance clearly did not constitute the requisite "voluntary assignment of property" within the meaning of 31 U.S.C. §3713(a)(1)(A)(i): the only type of assignment of property that triggers application of the Insolvency Statute is one by which the debtor's "insolvency ...[is] manifested." *United States v. Oklahoma*, 261 U.S. 253, 260 (1923). *Accord Bramwell v. United States Fidelity & Guaranty Co.*, 269 U.S. 483, 488 (1926) ("no evidence can be received of the insolvency of the debtor until he has been divested of his property in one of the modes stated" in the statute, including a voluntary assignment); *In re Belkin*, 358 F.2d 378, 381-82 (6th Cir. 1966); *Jonathan's Landing, Inc. v. Townsend*, 960 F.2d 1538, 1542-43 & n.14 (11th Cir. 1992) (purpose of requiring debtor's insolvency be manifested by one of three express acts listed in statute -- including voluntary assignment of property -- is "firmly to establish evidence of the debtor's insolvency" before awarding the government priority).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Therefore, the courts have held that only where the party indebted to the government "makes an assignment of *all* his property" -- in consequence, the equivalent of a general assignment for the benefit of creditors -- is there the requisite "manifestation" of insolvency. *United States v. Fabricated Air Products Co.,* 206 F.Supp. 228, 231 (E.D. Tex. 1962) (emphasis supplied). *Accord Bramwell, supra,* 269 U.S. at 491-92 (statute applied where bank directors "hand [ed] over the possession and control of all the bank's property to be converted into money to pay the bank's debts," which "made the bank's insolvency notorious"); *Manhattan Rubber Manufacturing Co. v. Lucey Manufacturing Co.,* 26 F.2d 839, 840 (S.D.N.Y. 1928) (where "assignment was [of] less than all of the debtor's property," the government "is not entitled to priority").

Coyne does not -- and cannot -- allege that it made any general or total assignment to Bank Leumi here, claiming only that Bank Leumi received "sums" and "funds" from Coyne, from "the proceeds of accounts receivable paid to Coyne." (Complaint 1, ¶¶ 43, 167). Accordingly, the Insolvency Statute would not apply even if Coyne had standing to invoke it, and all the causes of action purportedly arising under that Statute would have to be dismissed in any event, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted.

## POINT II

### COYNE'S PURPORTED CLAIM UNDER 31 U.S.C. § 3713 IS *INDEPENDENTLY BARRED BY RES JUDICATA.*

Even apart from the clear absence of standing here, Coyne is independently barred by principles of *res judicata* from pursuing its Section 3713 claim in these Actions. It is well-settled that in considering a motion to dismiss, a district court "may ...consider matters of which judicial notice may be taken" without treating the motion as one for summary judgment. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir. 1991); *accord Messina v. Mazzeo,* 854 F.Supp. 116, 128 (E.D.N.Y. 1994). In particular, "courts routinely take judicial notice of documents filed in other courts ...to establish the fact of such litigation and related filings" (*Kramer,* 937 F.2d at 774), and also "can take judicial notice of the decisions in other proceedings." *Deshmukh v. Cook,* 630 F.Supp. 956, 960 (S.D.N.Y.1986).

Here, then, the Court may take judicial notice of a pending mortgage foreclosure action brought by Bank Leumi against Coyne (*Bank Leumi Trust Company of New York v. Coyne Electrical Contractors, Inc., et al.,* Index No. 6073/96 (Sup. Ct. Bronx Cty.)) (the "Bronx Foreclosure Action"); the subject of the Bronx Foreclosure Action is a March 1, 1990 mortgage in the principal sum of $499,000, executed by Coyne and a related entity to partially secure Coyne's indebtedness to Bank Leumi. In the Bronx Foreclosure Action, Coyne served an Answer on or about March 4, 1996, which, *inter alia,* asserted a counterclaim making the verbatim identical allegations regarding Bank Leumi's purported fraud and "unlawful preference" *vis a vis* the IRS as those in the Complaint here, and charging the identical violation of 31 U.S.C. §3713. (A copy of Coyne's Answer in the Bronx Foreclosure Action is annexed to the accompanying affidavit of Jay A. Kranis ("Kranis Aff."), as Ex. A.)

On or about March 25, 1996, Bank Leumi moved in the Bronx Foreclosure Action for summary judgment on its complaint as to liability, and for dismissal of the 31 U.S.C. § 3713 counterclaim for, *inter alia,* lack of standing, raising legal arguments substantively identical to those set forth in text in this memorandum. (A copy of Bank Leumi's Notice of Motion is annexed to the Kranis Aff. as Ex. B.) Coyne failed to serve any opposition to Bank Leumi's motion, and by a decision dated April 10, 1996 (Kranis Aff. Ex. C), the Supreme Court, Bronx County (Gonzalez, J.), granted Bank Leumi's motion in its entirety, on default. An Order and Judgment reflecting this decision, appointing a referee to compute, and dismissing Coyne's counterclaim with prejudice, has been submitted to the Court for settlement and signature. (Kranis Aff. Ex. D.) Once the judgment dismissing Coyne's counterclaim is entered, it will be *res judicata,* and will independently bar Coyne from pursuing its 31 U.S.C. §3713 claim -- or any other claim arising from the same alleged facts -- in the Actions before this Court.[FN6]

FN6. Because we recognize that the Court's decision dismissing Coyne's counterclaim in the Bronx Fore-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

closure Action is not technically preclusive until the appropriate Order is entered, when that event occurs we will supplement these motion papers with a copy of that Order, signed by the Court.

Thus, it is black-letter law that (1) "[u]nder *res judicata*, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action" (*Saud v. Bank of New York,*, 734 F.Supp. 628, 632 (S.D.N.Y. 1990), *aff'd,* 929 F.2d 916 (2d Cir. 1991)); (2) under the full faith and credit statute, 28 U.S.C. §1738, federal courts are bound "to give the same full faith and credit to state judgments as would be given by the courts" of that state, from which they are taken," both as to state law claims "and as to federal statutory and constitutional claims" (18 C.Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §4469 at 661, 669-70 (1981)); (3) under New York law, "[t]he grant of summary judgment ... results in a final judgment on the merits," and the doctrine of *res judicata* applies With full force based on such an order (*Collins v. Bertram Yacht Corp.,* 42 N.Y.2d 1033, 1034, 399 N.Y.S.2d 202, 202 (1977)); (4) "a final judgment is *res judicata* 'not only to all matters pleaded, but to all that might have been,' " as well as to "all relevant issues which could have been but were not raised,' " based on the same underlying facts or transactions (*Teltronics v. L.M. Ericsson Telecommunications, Inc.,* 642 F.2d 31, 35 (2d Cir.), *cert. denied,* 450 U.S. 978 (1981) (citation omitted)); and (5) "[j]udgment by default commands the full effects of claim and defense preclusion." 18 Wright, Miller & Cooper, *supra,* §4442 at 373.

The Second Circuit's decision in *Saud v. Bank of New York,*, 929 F.2d 916 (2d Cir. 1991), is squarely on point. There, after submitting an answer and advancing several affirmative defenses alleging fraud by the plaintiff bank in connection with the loan transaction the defendant had guaranteed, the defendant -- like Coyne in the Bronx Foreclosure Action -- "failed to respond to the [plaintiff] Bank's motion for summary judgment." (*Id.* at 919.) As in the Bronx Foreclosure Action, summary judgment was entered for the plaintiff by "default." The Second Circuit held that this judgment was *res judicata* and barred a subsequent RICO action by defendant claiming damages for fraud in connection with the identical transaction, since the "essential facts" pleaded by the defendant in the bank's action were the same as the facts it alleged in its later RICO action, with both "based on broad allegations of fraud in connection with the same loan transaction." (*Id.* at 919-920.) The fact that no RICO claim was pled in the first action was irrelevant, for " 'it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action' " barred by *res judicata,* " 'not the legal theory upon which a litigant relies.' " (Id. at 919 (citation omitted)). *Accord In re Teltronics Services, Inc.,* 762 F.2d 185, 193 (2d Cir. 1985) ("[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of *res judicata.* ")

Here, where both the facts and the legal theories pleaded by Coyne in its Complaints as against Bank Leumi are identical to those set forth in Coyne's dismissed counterclaim in the Bronx Foreclosure Action, *Saud* controls *a fortiori* and is dispositive. Even if Coyne's Section 3713 claim had any merit, even if there were any conceivable basis for an argument that Coyne has standing to pursue such a claim, and even if Coyne were somehow able to concoct another, more viable, legal theory supporting federal subject matter jurisdiction over the allegations in the Complaint, all such claims and arguments would be precluded by *res judicata.*

### POINT III

### BECAUSE COYNE LACKS STANDING TO ASSERT CLAIMS UNDER 31 U.S.C. § 3713, THERE IS NO BASIS FOR FEDERAL *JURISDICTION AS AGAINST BANK LEUMI.*

In the "Jurisdiction" section of each Complaint (¶¶ 1-3), Coyne cites five statutes as the purported basis for federal jurisdiction of the subject matter of this action: 31 U.S.C. § 3713, and 28 U.S.C. §§ 1331, 1340, 1210, and 1367. As set forth in Point I above, Coyne clearly lacks standing to sue under 31 U.S.C. § 3713, and its claims against Bank Leumi purportedly arising under that statute must be dismissed. A *fortiori,* 31 U.S.C. § 3713 cannot serve as a predicate for federal subject matter jurisdiction with respect to Coyne's remaining claim against Bank Leumi in each Complaint -- a State-law claim, purportedly arising under the New York Uniform Commercial Code (Complaint 1, ¶¶ 33-37, 165), seeking a declaratory judgment that Bank Leumi's security interest in Coyne's accounts receivable

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1996 WL 34306869 (S.D.N.Y.)                                                                          Page 7

was not properly perfected and/or continued.

The other federal statutes Coyne cites are equally unavailing; none applies to the claims against Bank Leumi and none can serve as a basis for federal jurisdiction over those claims.[FN7] Thus, 28 U.S.C. § 1331 is simply the basic "Federal question" statute, providing that the district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Obviously, Coyne's mere citation of this statute in the Complaints cannot by itself create federal question jurisdiction. See 5 C. Wright & A. Miller, _Federal Practice and Procedure_ § 1209 at 111 (1990) ("the general allegation of the existence of a federal question in the jurisdictional statement [of a complaint] must be supported by averments in the claim for relief demonstrating that the action actually does 'arise under' federal law").

> FN7. Coyne does not and cannot claim that diversity jurisdiction exists here. Bank Leumi is a New York banking corporation, and the Complaint itself explicitly alleges that Coyne is a New York corporation (Complaint 1, ¶ 6).

Nor may Coyne rely on 28 U.S.C. § 1340, which provides:
The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade.

As the Court explained in _Young v. Internal Revenue Service_, 596 F. Supp. 141, 145-46 (N.D. Ind. 1989),
[t]he very language of the statute indicates that _this section does not create jurisdiction in and of itself._ Section 1340 makes clear that the jurisdiction extends to civil actions arising under the Internal Revenue laws; as such, _the suit must be based on some cause of action which the Internal Revenue Code recognizes and allows the plaintiff to bring._ Absent some recognition of this kind of suit under the Internal Revenue Code, § 1340 will not create an independent basis for jurisdiction. As one court has noted, "given the limitations which Article III of the Constitution places on the jurisdiction of the federal courts, it is doubtful that the various jurisdictional statutes [like § 1340] could do more than waive the congressionally imposed jurisdictional amount requirement." (Emphasis supplied, citation omitted).

Here as well, where Coyne has no underlying "cause of action which the Internal Revenue Code recognizes and allows [it] to bring" (_see_ Point I, _supra_), 28 U.S.C. § 1340 cannot "create an independent basis for jurisdiction" for the claims against Bank Leumi.

28 U.S.C. § 2410 (a), also cited by Coyne, is similarly ineffective to confer subject matter jurisdiction. That statute provides:
(a) ...[T]he United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter --
(1) to quiet title to,
(2) to foreclose a mortgage or other lien upon,
(3) to condemn, or
(4) of interpleader or in the nature of interpleader with respect to,
real or personal property on which the United States has or claims a mortgage or other lien.

Just as with 28 U.S.C. § 1340, the law is clear that Section 2410 (a) " 'merely waives sovereign immunity, but does not authorize a suit unless there are jurisdictional grounds independent of the statute'," _Juniper Development Group v. United States_, 774 F. Supp. 56, 59 (D. Mass. 1990) (citations omitted). _Accord Pacific Mutual Life Insurance Co. v. American National Bank & Trust Co._, 642 F. Supp. 163, 166 (N.D. Ill. 1986) ("§ 2410 does not independently create jurisdiction over [a] suit against the United States; rather, it merely waives sovereign immunity, meaning that jurisdiction must be found elsewhere"); _Gutman v. United States_, 196 F. Supp. 384, 385 (E.D.N.Y. 1961) (Section

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2410 (a) is "a consent by the Government to submit to the jurisdiction of the Court in those cases where the Court already had jurisdiction over the subject matter").

Accordingly, even if this action fell within one of the five categories listed in 28 U.S.C. § 2410 (a) -- which it plainly does not[FN8] -- the statute would not apply, because there is no independent basis for federal subject matter jurisdiction over the claim in each Complaint alleging that Bank Leumi's security interest is invalid, and seeking a determination of relative lien priorities between Bank Leumi and the IRS.[FN9]

> FN8. Thus, this action is not, and does not purport to be, an action to foreclose a mortgage or other lien, to partition, or to condemn (28 U.S.C. §§ 2410 (a)(2)-(4)). Nor is this an interpleader action or an action in the nature of interpleader. Coyne does not allege that it is a "stakeholder" or otherwise in possession of the funds for which it seeks an adjudication of lien priorities -- all of which allegedly either were paid to Bank Leumi, or remain in the hands of Coyne's various account debtors (Complaint 1, ¶¶ 43, 165-168). It is well-settled that both strict interpleader and an action in the nature of interpleader -- the latter term referring to a situation in which the stakeholder claims a personal interest in the funds at issue -- require, by definition, a stakeholder in possession of such funds; where, as here, "[t]he property is not in the hands of the plaintiff and thus ... cannot be deposited in court," no interpleader lies. General Atomic Co. v. Duke Power Co., 553 F.2d 53, 56-57 (10th Cir. 1977). Accord Chase Manhattan Bank, N.A. v. Flexwatt Corp., 139 F.R.D. 573, 575 (D. Mass. 1991) (no interpleader available where plaintiff bank "is not now and has not, since instituting suit, been a stakeholder" because the funds in question were all withdrawn and/or paid out by the bank). Equally clearly, this is not an action to "quiet title" (28 U.S.C. § 2410), which similarly requires "plaintiff's title, possession, or constructive possession, with respect to the subject property," and "does not authorize ...th[e] Court's issuance of a declaratory and injunctive relief establishing the priorities of the tax liens against [plaintiff] vis-a-vis other alleged interests" in property not in plaintiff's possession. Felkel v. United States, 861 F. Supp. 507, 510 (D.S.C. 1994), aff'd, 1995 U.S. App. LEXIS 19682 (4th Cir. 1995).

> FN9. While Bank Leumi does not bring this motion on behalf of any other defendant, it should be noted that the claims asserted in the Complaints against Coyne's various alleged account debtors also purport to arise exclusively under State law, charging breach of contract, "quantum merit," and violations of the New York Lien Law, and claiming an attorney's lien under the New York Judiciary Law. See, eg., Complaint 1, pp. 68-74.

Finally, 28 U.S.C. § 1367(a) (cited in ¶ 3 of each Complaint) merely provides for supplemental jurisdiction, "in any action of which the district courts have original jurisdiction," over claims that "are so related to claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ..." (Emphasis supplied). Here, where there is no "original jurisdiction" over the claims against Bank Leumi, Coyne's assertion of "supplemental jurisdiction" necessarily fails as well. (See Point IV, infra).

*POINT IV*

BECAUSE THERE IS NO FEDERAL SUBJECT MATTER JURISDICTION AS TO BANK LEUMI, THE STATE-LAW CLAIMS AGAINST BANK LEUMI, BASED ON THE NEW YORK UNIFORM *COMMERCIAL CODE, MUST ALSO BE DISMISSED.*

In United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139 (1966), the United States Supreme Court established the fundamental principle that "if the federal claims [in a complaint] are dismissed before trial ... the state claims should be dismissed as well"; the Court emphasized that "[n]eedless decisions of State law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Courts in the Second Circuit have long interpreted the rule of *Gibbs* as mandatory absent unusual circumstances: "[e]ven if the federal claims are discovered to be patently meritless only after the trial begins, once that discovery is made the state claims *must* be dismissed along with the federal ones." *Dunton v. County of Suffolk*, 729 F.2d 903, 910 (2d Cir. 1984) (emphasis supplied). *Accord Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 254 (2d Cir. 1979):

Even where substantial time and resources have been expended in the trial of an action in federal court, pendent state claims *must* be dismissed if it later is determined that there never existed a federal claim sufficient to invoke the jurisdiction of the federal court.

(Emphasis supplied).

*A fortiori* here, where the eleven Actions have just been commenced, where *no* time or resources have been expended on discovery or trial, and where Coyne's purported "federal claims against [Bank Leumi] [a]re patently meritless and insubstantial" (*Dunton, supra*, 729 F.2d at 911), the absence of federal question jurisdiction requires dismissal of Coyne's State-law claims allegedly based on the New York Uniform Commercial Code. (Complaint 1, ¶¶ 165-66). *See also Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d Cir.), *cert. denied*, 423 U.S. 1034 (1975) (retention of jurisdiction over pendent state-law claim after dismissal of federal claim under Rule 12(b)(6) "would be an abuse of discretion absent unusual circumstances, not present here, suggesting some prejudice arising from relegating the case for trial in the state court"); *In re Union Carbide Corp. Consumer Products Bus. Sec. Lit.*, 666 F. Supp. 547, 574 (S.D.N.Y. 1987) (same); *Smith v. Weinstein*, 578 F. Supp. 1297, 1304 (S.D.N.Y.), *aff'd*, 738 F.2d 419 (2d Cir. 1984) (same).

This settled rule did not change when, in 1990, Congress adopted a statute granting federal courts "supplemental jurisdiction" (28 U.S.C. § 1367), "a collective term that encompasses what had been referred to as 'pendent jurisdiction' as well as what had been called 'ancillary jurisdiction' "; the statute "ratifies and incorporates the constitutional analysis the Supreme Court made in the Gibbs case." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §§ 3567.1,3567.3 at 24, 50 (Supp. 1995). Indeed, the statute specifically provides that a court may decline supplemental jurisdiction -- even when it would otherwise apply -- if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Thus, under Section 1367, the law remains the same as under the common-law pendent jurisdiction cases cited above. *See Leyh v. Property Clerk of City of New York Police Dept.*, 774 F. Supp. 742, 747 (E.D.N.Y. 1991) (*quoting Dunton, supra*, in ruling under 28 U.S.C. § 1367(c)(3) that where defendants were entitled to summary judgment dismissing plaintiff's federal claims, the remaining state law claim "should be relegated to the state court"); *Glaziers & Glassworkers Local 252 v. Newbridge Securities, Inc.*, 823 F. Supp. 1191, 1197 (E.D. Pa. 1993).

Under controlling Second Circuit and United States Supreme Court authority, then, because Coyne lacks standing to pursue its sole federal claim, alleging a violation of 31 U.S.C. § 3713 (Point I, *supra*), and because there is no other basis for asserting federal subject matter jurisdiction over Bank Leumi (Point III, *supra*), the State-law claim asserted against Bank Leumi in each Complaint must be dismissed as well.[FN10]

> FN10. In a letter to this Court dated April 25, 1996, Coyne's counsel has suggested that any motion by Bank Leumi to dismiss Coyne's claims against it for lack of subject matter jurisdiction should not be heard or considered until defendant IRS appears or answers, within 60 days after the Complaints were served upon it (*see* F.R.C.P. 12(a)(3)). Assuming the accuracy of Coyne's statement that such service was effected on March 29, 1996, the IRS' time to answer will not expire until May 28.
>
> Plainly, Coyne is trying to create federal jurisdiction over its own claims where none would otherwise exist -- and delay or avoid the dismissal of those claims -- by naming the IRS as a defendant, in the hope that at some future time the IRS will assert a cross-claim against Bank Leumi. Coyne's own lack of standing, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the absence of any basis for Coyne's assertion of claims against Bank Leumi in a federal court, cannot be circumvented by such transparent bootstrapping. Even if the IRS does assert a cross-claim against Bank Leumi or any other defendant, there is no known authority to support the proposition that the existence of an IRS cross-claim could retroactively support *supplemental* jurisdiction over Coyne's *main* State-law claim, purportedly arising under the New York UCC. Such a result would turn the concept of supplemental jurisdiction on its head: the statute (28 U.S.C. §1367) provides for supplemental jurisdiction over claims (including cross-claims) which are closely related to "claims in [an] action within [the district courts'] original jurisdiction" -- not for supplemental jurisdiction over a main action which itself is not within the Court's "original jurisdiction," simply because there may be subject-matter jurisdiction over a potentially laterasserted cross-claim. *Cf.* 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §1433 at 258 (1990 & Supp. 1985), pointing out that "the dismissal of the original suit ...for lack of subject matter jurisdiction will require the court also to dismiss the cross-claim, unless that claim is supported by an independent basis of federal jurisdiction." *Accord* 3 *Moore's Federal Practice* ¶13.36at 13-221-222 (2d ed. 1995). There is no suggestion in either treatise, or in any case cited, that dismissal of the main claim can itself be avoided under such circumstances, even if an independent basis for federal jurisdiction over the cross-claim does exist.

## CONCLUSION

For all the reasons set forth above, Bank Leumi's motion to dismiss the Complaints against it should be granted in its entirety.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit "C"

1  Drew E. Pomerance, Esq. (SBN 101239)
   Michael L. Phillips, Esq. (SBN 232978)
2  **ROXBOROUGH, POMERANCE, NYE, & ADREANI LLP**
   5820 Canoga Avenue, Suite 250
3  Woodland Hills, California 91367
   Telephone:  (818) 992-9999
4  Facsimile:  (818) 992-9991
   dep@rpnlaw.com
5  mlp@rpnlaw.com

6  Attorneys for Plaintiffs/Cross-Defendants, REAL TIME STAFFING, INC.,
   KOOSHAREM CORPORATION, NEW STAFF, INC.,
7  KT, INC., PAY SERVICES, INC. PBT, INC., and
   D. STEPHEN SORENSEN

8
                   UNITED STATES BANKRUPTCY COURT
9
            CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION
10

11  | IN RE: | |
12  | CONSOLIDATED EMPLOYER MANAGEMENT SOLUTIONS, A CALIFORNIA CORPORATION | Case No. 8:07-BK-10992 RK |
13  | | (Jointly administered with Case Nos.: 8:07-bk-10994 and 8:07-bk-10995) |
14  | DEBTOR AND DEBTOR-IN-POSSESSION | Chapter 7 Proceeding |

15  REAL TIME STAFFING, INC., a California
    corporation, KOOSHAREM CORPORATION,     Adv. No. 8:07-ap-01105 RK
16  a California corporation, NEW STAFF, INC., a
    California corporation, KT, INC., a California     **DECLARATION OF IAN KINDBERG**
17  corporation, PAY SERVICES, INC., a               **PURSUANT TO NOVEMBER 11, 2009**
    California corporation, PBT, INC., a California   **DISCOVERY STIPULATION**
18  corporation, and D. STEPHEN SORENSEN, an
    individual,
19
              Plaintiffs,
20
          v.
21
    COASTAL EMPLOYERS, INC., a California
22  corporation, ROBERT J. ANDERSON, an
    individual, and Does 1 through 100, inclusive,
23
              Defendants.
24

25

26

27

28

Exhibit "C"
Page 56

1
2  KAREN S. NAYLOR, Chapter 7 Trustee (In
   Place of COASTAL EMPLOYERS, INC., a
3  California corporation),

4              Counter-Claimant.

5          v.

6  KOOSHAREM CORPORATION,
   PROFESSIONAL BUSINESS
7  TECHNOLOGIES, INC., aka PBT, INC; NEW
   STAFF, INC., KT, INC., PAY SERVICES,
8  CORP., REAL TIME STAFFING SERVICES,
   INC., D. STEPHEN SORENSEN, an individual,
9  and ROES 1 through 100, inclusive,

10             Counter-Defendants.

11            **DECLARATION OF IAN KINDBERG**

12  I, IAN KINDBERG, declare:

13      1.     I am the Assistant Controller of Plaintiff/Cross-Defendant KOOSHAREM

14  COPORATION, A.K.A NEW STAFF, INC., K.T., INC., PAY SERVICES INC., PBT, INC., and

15  REAL TIME STAFFING SERVICES, INC. (referred to collectively as "Plaintiffs" or "Select"

16  unless specified otherwise). I have been an employee of Select since 1994. Over the last 15 years,

17  my positions within Select have ranged from Accounting Systems Manager to my current position,

18  Assistant Controller. I have personal knowledge of the following facts, and if called to testify as a

19  witness, I could and would competently testify thereto.

20      2.     I am familiar with the series of Staff Servicing Agreements entered into between

21  Select and Coastal Employers, Inc. (hereinafter referred to herein as "Coastal") with inception dates

22  of June 14, 2004, May 1, 2005, and May 1, 2006 (collectively referred to herein as "Staff Servicing

23  Agreements").

24      3.     During the time frame in which the Staff Servicing Agreements were entered into

25  and throughout the course of the parties' relationship, I held the position of Accounting Systems

26  Manager and in that capacity I was privy to the data flow of information to outside vendors,

27  including Coastal. In my current position, Assistant Controller, part of my duties include managing

28  the day to day operations of the accounting department.  I am privy to the information that is

2

DECLARATION OF IAN KINDBERG PURSUANT TO NOVEMBER 11, 2009 DISCOVERY STIPULATION

1   maintained in Select's databases, as well as the queries that will be necessary to create reports that

2   contain certain information extracted from these databases.

3        4.      I have reviewed Exhibit "1" to the Discovery Stipulation entered into by the parties

4   at mediation on November 11, 2009 (hereinafter "Information Request").

5        5.      In conjunction with this declaration, I am providing the information requested in

6   paragraph 1 of the Information Request.

7        6.      Pursuant to the Staff Servicing Agreements, Select provided Coastal with the

8   information, in summary form, on a quarterly basis, identified in paragraphs 2(a), 2(b), 2(e), 2(f),

9   2(k), 2(l), 2(m), 2(o), 2(p), 2(t), 2(u), and 2(v) of the Information Request. This information, on a

10  per-employee basis, was not required to be provided to Coastal pursuant to the Staff Servicing

11  Agreements, nor was it requested by Coastal in such a format during the course of the parties'

12  relationship. While the data does exist to provide the information on a per-employee basis, a report

13  query will need to be created and ran through multiple extensive databases that contain the

14  requested information.

15       7.      The information requested in paragraphs 2(c), 2(g), 2(h), 2(i), 2(j), 2(n), 2(q), 2(r),

16  and 2(s) of the Information Request was not required to be provided to Coastal pursuant to the Staff

17  Servicing Agreements, nor was it requested by Coastal during the course of the parties' relationship.

18  While the data does exist to provide the information, a report query will need to be created and ran

19  through multiple extensive databases that contain the requested information.

20       8.      The information requested in paragraph 2(d) of the Information Request is not

21  available. Given the transient nature of temporary employees, employees' termination dates were

22  not tracked by Select.

23       9.      In order to prepare the report queries referenced herein under paragraphs three and

24  four, Select will need to dedicate the full attention of at least one individual familiar with the Staff

25  Servicing Agreements, the databases that contain the requested information, and the programming

26  necessary to create the required queries. As of the date of this declaration, I have assigned that task

27  to an employee of Select and estimate that it will take approximately 7-14 majority days to prepare

28  reports that contain the information referenced herein under paragraphs three and four. I intend to

3

DECLARATION OF IAN KINDBERG PURSUANT TO NOVEMBER 11, 2009 DISCOVERY STIPULATION

1    put forth my best effort to assure that the information referenced herein under paragraphs three and

2    four is produced by November 30, 2009, however, in light of the substantial time and dedication

3    preparing the necessary programming, required queries, and resulting reports is going to take and

4    the intervening Thanksgiving Holiday, it may take me and my staff until December 4, 2009 to

5    gather, prepare, and produce the requested information.

6         I declare under penalty of perjury under the laws of the State of California that the foregoing

7    is true and correct. Executed this 20TH day of November, 2009 at Santa Barbara, California.

8

9                                                    _____

10                                                        IAN KINDBERG

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

DECLARATION OF IAN KINDBERG PURSUANT TO NOVEMBER 11, 2009 DISCOVERY STIPULATION

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 5820 Canoga Avenue, Suite 250, Woodland Hills, California 91367.

On November 23, 2009, I served the foregoing document described as **DECLARATION OF IAN KINDBERG PURSUANT TO NOVEMBER 11, 2009 DISCOVERY STIPULATION**, on the interested parties in this action who are identified below, using the following means of service as indicated below:

**SEE ATTACHED SERVICE LIST.**

☐   **BY U.S. MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Woodland Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   **BY OVERNIGHT MAIL (OVERNITE EXPRESS OVERNIGHT DELIVERY):** I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be served, at the office address as last given by that person on any document filed in the cause and served on the party making service.

☐   **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the offices of the each addressee(s).

☒   **BY ELECTRONIC MAIL:** I caused such documents listed above to be transmitted via e-mail to each of the parties on the attached service list at the e-mail address as last given by that person on any document which he or she has filed in this action and served upon this office.

☒   **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 23, 2009 at Woodland Hills, California.


_____
ELIA RAMIREZ

5

DECLARATION OF IAN KINDBERG PURSUANT TO NOVEMBER 11, 2009 DISCOVERY STIPULATION

1

## SERVICE LIST

2

**Counsel for Trustee**
3      Ed Hays, Esq.
Marshack Hays LLP
4      5410 Trabuco Rd. Ste 130
Irvine, CA  92620
5      Office:  949-333-7777
Fax: 949-333-7778
6      Email: J.Hays@MarshackHays.com

7

8      **Counsel for Robert J. Anderson**
Richard P. Gerber, Esq.
9      HART, KING & COLDREN, LLP
200 SandPointe Drive, Fourth Floor
10     Santa Ana, CA 92707
Email: rgerber@hkclaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF IAN KINDBERG PURSUANT TO NOVEMBER 11, 2009 DISCOVERY STIPULATION

Exhibit "C"
Page 61

## Coastal Trust Account activity

|  |  |
|---:|:---|
| 944,240.29 | 4th qtr 2006 FUI/SUI payment |
| 644,275.53 | Temp EE withholdings for taxes (fed, fica, fica med, state and sdi) |
| 1,588,515.82 | Initial funding to escrow account |
| (5,923.78) | subsequent voided checks replaced with Koosh check stock TW |
| (20.76) | subsequent voided checks replaced with Koosh check stock TW3 |
| 1,582,571.28 | Amount placed into trust around 4/6/07 |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 870 Roosevelt Avenue, Irvine, CA 92620

A true and correct copy of the foregoing document described as ***DECLARATION OF RICHARD P. GERBER IN SUPPORT OF OPPOSITION TO PLAINTIFFS' AND COUNTER-DEFENDANTS MOTION IN LIMINE NO. 2 TO PRECLUDE RECOVERY OF ANY MONIES ALLEGEDLY OWED TO THE U.S. INTERNAL REVENUE SERVICE OR THE STATE OF CALIFORNIA; REQUEST FOR SANCTIONS PURSUANT TO FRCP 11*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***August 11, 2011,*** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Evan C Borges    eborges@irell.com, bblythe@irell.com
- Evan C Borges    , bblythe@irell.com
- Rebecca J Callahan    rcallahan@callahanlaw.biz
- Cynthia S Conners    cconners@marshackhays.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- D Edward Hays    ehays@marshackhays.com
- Karen S Naylor (TR)    acanzone@burd-naylor.com, knaylor@ecf.epiqsystems.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***August 11, 2011,*** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.
Via Personal Delivery:

| | |
|---|---|
| Honorable Robert N. Kwan | Via Email Pursuant to Written Agreement: |
| United States Bankruptcy Court | John W. Hurney    jwh@rpnalaw.com |
| 411 West Fourth Street, Suite 5165 | Drew Pomerance    dep@rpnalaw.com |
| Santa Ana, CA 92701-4593 | Richard Gerber    rgerber@hkclaw.com |

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 11, 2011 | Chanel Mendoza | *Chanel Mendoza* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
56381v1/1005-001.1

**F 9013-3.1.PROOF.SERVICE**