1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  CYNTHIA S. CONNERS, 117460
   cconners@marshackhays.com
3  MARSHACK HAYS LLP
   870 Roosevelt Avenue
4  Irvine, California 92620
   Telephone: (949) 333-7777
5  Facsimile: (949) 333-7778

6  Attorneys for Defendant and CounterClaimant,
   KAREN S. NAYLOR, Chapter 7 Trustee
7

8  William R. Hart, Esq., Bar No. 71127
   Richard P. Gerber, Esq., Bar No. 59395
9  rgerber@hkclaw.com
   HART, KING & COLDREN
10 A PROFESSIONAL LAW CORPORATION
   200 Sandpointe, Fourth Floor
11 Santa Ana, California 92707
   Telephone: (714) 432-8700
12 Facsimile: (714) 546-7457

13 Attorneys for Defendant,
   ROBERT J. ANDERSON, JR.

14                    UNITED STATES BANKRUPTCY COURT

15            CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>CONSOLIDATED EMPLOYER MANAGEMENT SOLUTIONS, a California corporation,<br><br>    Debtor and Debtor-in-Possession. | Case No. 8:07-bk-10992-RK<br><br>(Jointly administered with Case Nos.: 8:07-bk-10994 and 8:07-bk-10995)<br><br>Chapter 7<br><br>Adv. No. 8:07-ap-01105-RK |
| REAL TIME STAFFING, INC., a California corporation, KOOSHAREM CORPORATION, a California corporation, NEW STAFF, INC., a California corporation, KT, INC., a California corporation, PAY SERVICES, INC., a California corporation, PBT, INC. a California corporation, and D. STEPHEN SORENSEN, an individual,<br><br>    Plaintiffs,<br><br>vs.<br><br>COASTAL EMPLOYERS, INC. a California corporation, ROBERT J. ANDERSON, an | DECLARATION OF ROBERT J. ANDERSON, JR. IN SUPPORT OF OPPOSITION OF TRUSTEE AND ANDERSON'S OPPOSITION TO PLAINTIFFS' AND COUNTERDEFENDANTS' MOTION IN LIMINE NO. 3 TO PRECLUDE EVIDENCE REGARDING ANY CLAIM THAT SELECT OWES FURTHER MONEYS AS COLLATERAL AND/OR PRECLUDE RECOVERY OF DAMAGES ON A CLAIM<br><br><u>Trial Date</u><br>Date: August 25, 2011<br>Time: 9:00 a.m.<br>Ctrm: 5D |

1

DECLARATION OF ROBERT J. ANDERSON, JR.

56381v1/1005-001.1

| | |
|---|---|
| 1 | individual, and Does 1 through 100, inclusive, |
| 2 | Defendants. |
| 3 | KAREN S. NAYLOR, Chapter 7 Trustee (In Place of COASTAL EMPLOYERS, INC., a California corporation), |
| 4 | |
| 5 | Counter-Claimant, |
| 6 | vs. |
| 7 | KOOSHAREM CORPORATION, PROFESSIONAL BUSINESS TECHNOLOGIES, INC., aka PBT, INC.; NEW STAFF, INC., K.T., INC., PAY SERVICES CORP., and REAL TIME STAFFING SERVICES, INC., |
| 8 | |
| 9 | |
| 10 | D. STEPHEN SORENSEN, an individual, and ROES 1 through 100, inclusive, |
| 11 | |
| 12 | Counter-Defendants. |

14  Attached hereto as Exhibit "1" is the Declaration of Robert J. Anderson, Jr. in

15 Support of Opposition of Trustee and Anderson's Opposition to Plaintiffs' and Counterdefendants'

16 Motion in Limine No. 3 to Preclude Evidence Regarding any Claim That Select Owes Further

17 Moneys as Collateral and/or Preclude Recovery of Damages on a Claim.

19 Dated:  August 11, 2011                    MARSHACK HAYS LLP

                                              By: /s/ D. Edward Hays
                                                  _____
                                                  D. EDWARD HAYS
                                                  CYNTHIA S. CONNERS
                                                  Attorneys for Counter-Claimant,
                                                  KAREN S. NAYLOR, Chapter 7 Trustee

# Exhibit "1"

# DECLARATION OF ROBERT J. ANDERSON, JR.

I, ROBERT J. ANDERSON, JR., am over 21 years of age, am a named Defendant in this adversary proceeding, and state the following to be true and correct:

1. I am submitting this declaration in opposition to the Motion in Limine No. 3 of the Select Companies and Sorensen filed to preclude evidence regarding any claim that Select owes additional monies as collateral and/or preclude the recovery of damages on said claim.

2. The facts set forth in this declaration are personally known to me and if called as a witness I could and would competently testify thereto under oath.

3. At all times relevant, I was the President, Chief Operating Officer, sole shareholder and an employee of the three debtor companies in the underlying bankruptcy proceeding, to wit: Consolidated Employer Management Solutions, a California corporation ("CEMS"), Coastal Employers, Inc., a California Corporation ("Coastal CA"), and Coastal Employers, Inc., a New York corporation, ("Coastal NY"), (collectively, the "Debtors" or ("Coastal"). As the President and Chief Operating Officer of Coastal CA, I was a hands-on officer of said company, and as such, I was involved in the day-to-day operations of the company and was intimately familiar with and involved in Coastal CA's business relationship with the Select Companies, including all of the financial aspects of that business relationship. I was also involved in the day-to-day operations of the company as it involves the Workers' Compensation obligations and relationships with the Workers' Compensation carriers for Coastal involved in the Select Agreements. Those insurance companies were Reinsurance Company of America ("RCA") that provided the Workers' Compensation coverage during the 2004 Agreement (the "2004 Agreement") and the American Insurance Group Company National Union Fire Insurance Company of Pittsburgh, PA ("AIG") who provided the Workers' Compensation coverage during the 2005 and 2006 Agreements.

///
///
///

4. CEMS was the parent corporation of Coastal CA and Coastal NY.

5. Coastal CA was exclusively dedicated to providing staffing services to the Plaintiffs Koosharem Corporation, Inc., PBT, Inc., KT, Inc., Pay Services, Inc., New Staff, Inc., and Real Time Staffing, Inc., (collectively, the "Select Companies" or "Select").

6. I have read Select's Motion in Limine No. 3. In the motion Select's counsel asserts that no "collateral" was paid by Coastal. Further, I have read and am familiar with the proposition put forward in the motion suggesting this purported nonpayment of collateral excuses Select's collateral obligation to Coastal.

7. This assertion is false. Coastal indeed paid collateral to both RCA and AIG as follows.

8. Coastal in fact paid RCA a total of $4,699,488 to cover collateral and claims incurred by Select under the 2004 Agreement. As evidenced on the account statement received from RCA as an attachment to an email from Mirsod Hodzic, an employee of RCA [and its parent Oriska Insurance Co.] attached and labeled Exhibit "A", the funds were allocated on the books of RCA as follows: $120,000 in a segregated loss fund, $1,777,240.38 in prepaid claims administration costs, $626,429.95 in collateral, $1,649,587.07 in surplus and finally $526,230.75 in unallocated claims costs. These categories combined are for the functional equivalent of "collateral" and are dedicated to cover the costs of Workers' Compensation claims handling, adjustment, expenses, and paid benefits undertaken by RCA on Coastal CA's program, and therefore on Select's behalf, separate and apart from the Workers' Compensation premium payment which is redacted from the spreadsheet (Exhibit "A"). I have personal knowledge of the fact that this collateral was paid to RCA by Coastal and/or CEMS, Coastal's parent, as I handled the issuance of the payments personally.

9. In May 2005 through January 2007, Coastal maintained two consecutive policies for Workers' Compensation insurance with AIG that provided the Workers' Compensation coverage for employees placed in the program by Select under the Coastal/Select 2005 and 2006 Agreements, covering the period May 1, 2005 through the January 2007 termination date. These policies also covered non-Select employees who were employed by Coastal NY separate and apart

4
DECLARATION OF ROBERT J. ANDERSON, JR.
56381v1/1005-001.1

from and in addition to the Select arrangement. As with the RCA policy, Coastal paid AIG "collateral". However, unlike the RCA policy the collateral was not broken down into various components, but was paid as an unsegregated revolving fund separate and apart from the premium. The collateral paid to AIG was $20,462,000 for both policy years, plus an additional deposit of $750,000 for a grand total of collateral payments of $21,212,000. Attached and labeled Exhibit "B" is an Account Summary prepared by AIG on September 30, 2007. This account summary, consisting of two pages, documents three separate payments; $10,500,000 for the first year policy [April 30, 2005 through April 30, 2006] and $9,962,000 for the second policy year [April 30, 2006 through January 2007]. The second page of Exhibit "B" also documents a separate $750,000 collateral payment for the first year policy. These collateral payments therefore total $21,212,000.

10. I am utterly dumbfounded as to how counsel for Select and Sorensen made a determination that Coastal paid no collateral to either AIG or RCA.

11. As a second argument for not paying its collateral obligations under the three Agreements counsel for Select and Sorensen has taken an additional position regarding the use of an actuary as provided for in the following provision from Para. 3.c of the 2005 & 2006 agreements:

> Six (6) months after the one-year anniversary of this Agreement, the collateral account will be reviewed by an outside, independent actuary agreed to by the parties. Such review will be made in good faith and after consulting with Client Companies. Based on the independent determination of the actuary, any excess in the collateral account will be reimbursed to the Client Companies within ten (10) days subject to the approval of CEI's workers compensation insurance carrier (currently AIG). Likewise, any shortfalls in the collateral account will be paid by the Client Companies upon ten (10) days' written notice. Thereafter, the collateral account will be reviewed every six months, with a final settling of the collateral account five (5) years from the one-year anniversary of the commencement of this Agreement subject to the approval of CEI's workers compensation insurance carrier

       (currently AIG) and receipt of excess collateral from the carrier by
CEI. Client Companies will be reimbursed for any excesses subject to
the approval of CEI's workers compensation insurance carrier
(currently AIG) and receipt from the carrier by CEI, and will pay any
shortfalls in the collateral account as determined at each review upon
ten (10) days' written notice. The amounts to be reimbursed to the
Client Companies or paid in as additional collateral by the Client
Companies shall be mutually agreed upon by the parties and approved
by AIG.

The 2004 Agreement had a similar less intricate provision for actuarial review of the "collateral account". The collateral account obligation of Select to Coastal relates to the requirement on the part of Select to pay to Coastal an initial default collateral payment based on a percentage of payroll to cover the deductible position of the claims associated with the Select portion of the Coastal business. As these collateral payments were received from Select, Coastal would immediately segregate and pay over the funds to the respective insurance carrier. This collateral account was used by the carrier to fund the deductible portion of the claims as payments became necessary. Any unused collateral funding paid by Select to Coastal would be subject to reimbursement to Select after the closing of all the claims.  The above cited actuarial provision and the one referenced for the 2004 Agreement provided a mechanism that was never utilized by the parties, nor ever requested by Select, to adjust the collateral account based on actual development of losses. Since the collateral account was insufficient to satisfy the losses, Select was never harmed by the lack of adjustment or actuarial analysis of the collateral account. Because Select had exceeded the payrolls provided for in all of the Agreements without paying for the overage, essentially the collateral account was rendered insufficient to cover the increase in losses associated by the increase in exposure associated with Select mobilizing more workers into Select/Coastal arrangement without paying the initial minimum default collateral payments on a per payroll dollar basis as required by the agreement. As part of its policy with the insurance carriers, Coastal was required to fund, and did fund, the collateral accounts

even when Select failed to timely remit these payments to Coastal under the terms of the three Agreements.

12. The issue of an actuarial review of the collateral account provided for in the Agreements is therefore moot. Actuarial analysis is used to estimate future losses above and beyond the actual claims exposures including the paid and reserved losses and the paid and reserved loss adjustment expenses referred to as the "incurred" losses for a claim or a group of claims. To the extent that reimbursement is claimed against Select under the agreements for actual paid and reserved losses, actuarial analysis is unnecessary. Actuarial analysis is only a useful tool to determine the estimate of unknown and/or unreported claims referred to as "incurred but not reported" ["IBNR"]. Also, actuarial analysis is useful to estimate upward development of existing reserved claims. However, as the claims become "seasoned" as a result of aging, the reserves become more accurate. Actuarial analysis could have been used to determine if the collateral account was excessive (referred to in the insurance industry as "redundant"). However, there was no possibility of such redundancy on the part of Select, since the actual claim costs exceeded the collateral account payments remitted by Select. As a result of Select defaulting in their payments of the excess usage, beyond the amounts anticipated in each of the Agreements, the collateral accounts were clearly underfunded. The issue came to a head when AIG demanded more collateral from Coastal in December of 2006. Naturally, Coastal approached Select for payment of the 2004 and 2005 Agreement shortfalls. Select took advantage of the vulnerable position of Coastal and lowballed Coastal on Select's obligation as evidenced by the ill-fated 2007 Settlement Agreement.

13. I have thoroughly reviewed and am familiar with all three Agreements. Nothing in the Agreements requires as a condition of collateral payment to Coastal that Coastal pay or be current on any collateral obligations that Coastal may have with any of its Workers' Compensation carriers. In short, Select's obligation to pay Coastal collateral is independent and separate and apart of any extra contractual obligations that Coastal may have with respect to either of the Workers' Compensation carriers involved.

///

///

7
DECLARATION OF ROBERT J. ANDERSON, JR.
56381v1/1005-001.1

14. The obligation to pay collateral on the part of Select is not conditioned upon or in any way dependent upon the parties participating in an actuarial review. Attached as Exhibits "C", "D", & "E" are copies of the three Agreements 2004, 2005 and 2006, respectively.

15. Section 14 of the 2004 Agreement requires the Select Companies to pay $2,000,000 (or 4% of total annual gross employee earnings) into a Loss Fund to collateralize their obligations to Coastal. This section also sets forth the manner in which that $2,000,000 was to be paid. Additionally, and of importance, this provision also states in pertinent part that:

> "If the cumulative total of monthly collateral payments is less than 4% of cumulative actual reported payroll, **Client Companies agree to pay CEI [Coastal] the additional collateral in accordance with paragraph 5 above. CEI shall have the exclusive right to determine the amount of money that shall be paid to the Loss Fund by Client Companies to adequately collateralize Client Companies' obligations under the Staff Subcontracting Agreement**. Client Companies agree to pay CEI the additional Loss Fund payments within five days of receiving notice of CEI. The collateral obligation under this agreement is based on annual payroll of $50,000,000 and initial submission of Client Companies. The collateral requirements will be adjusted monthly above the initial **amount based proportionately on payroll and/or class code changes from the initial submission."** (Emphasis added).

Of importance, Section 14 additionally states:

> **"Client Companies [The Select Companies] further agree to pay losses as the claim payments are made by CEI [Coastal] in addition to the collateral obligation.** These losses will either be paid directly by the Client Companies or paid by the Client Companies into a funding account used by the insurance carrier or a licensed third-

8
DECLARATION OF ROBERT J. ANDERSON, JR.
56381v1/1005-001.1

party administrator within ten days of invoicing for reimbursement."

16. Select prepaid under the 2004 Agreement collateral in the amount of $2,000,000, the Select Companies paid an additional $660,207 towards their deductible position during the course of the Agreement. However, the total payments and outstanding reserves subject to the deductible obligation of Select to Coastal is $4,523,973. Even with crediting Select with the $2,660,207 in collateral that has been paid thus far, Select owes a balance to Coastal in the amount of $1,863,766. Coastal has paid this amount to RCA and now is entitled to reimbursement by Select. Since the claims have now been determined as a result of claims development and the passage of time, Select's final obligation can be accurately determined without the help of an actuary by simply requiring Select to pay the $500,000 deductible per claim required under Paragraph 8 of the 2004 Agreement in lieu of the unpaid collateral funding originally required.

17. In pertinent part, Section 3 of 2005 Agreement states:

> For purposes of calculating program fees, collateral and other costs, Client Companies [The Select Companies] has estimated and agree to be charged a minimum of at least $104,000,000 and workers' comp ratable payroll ("Payroll") that shall be provided CEI [Debtor] over the course of the year commencing May 1, 2005. Client Companies shall be charged at the rate of 7.5% of this amount of payroll, or $7.8 Million for the year, broken down as follows: 1.75% ($1,820,000) shall be a minimum program fee payable to CEI for providing staffing services…**should Client Companies surpass the original estimated minimum payroll amount, Client Companies agree to pay additional program fees and collateral consistent with the rates per hundred dollars of payroll stated above.** The 7.5% blended amount being charged to the Client Companies pursuant to this paragraph is based on a Client Companies' original underwriting submission to CEI. (Emphasis added).

9
DECLARATION OF ROBERT J. ANDERSON, JR.
56381v1/1005-001.1

18.     Select prepaid under the 2005 Agreement collateral in the amount of $5,980,000, the Select Companies paid nothing additional towards their deductible position during the course of the Agreement. The total payments and outstanding reserves subject to the $1,000,000 per claim deductible Select assumed under the Paragraph 7 of the 2005 Agreement is $9,209,254. Even with crediting Select with the $5,980,000 in collateral that has been paid thus far, Select owes a balance to Coastal in the amount of $3,229,254. Coastal has paid this amount to AIG and now is entitled to reimbursement by Select. Since the claims have now been determined as a result of claim development and the passage of time, Select's final obligation can be accurately determined without the help of an actuary by simply requiring Select to pay the $1,000,000 deductible per claim required under Paragraph 7 of the 2005 Agreement in lieu of the unpaid collateral funding originally required.

19.     Select prepaid under the 2006 Agreement collateral in the amount of $6,400,000, the Select Companies paid nothing additional towards their deductible position during the course of the Agreement. The total payments and outstanding reserves subject to the $1,000,000 per claim deductible Select assumed under the Paragraph 7 of the 2006 Agreement is $6,880,807. Even with crediting Select with the $6,400,000 in collateral that has been paid thus far, Select owes a balance to Coastal in the amount of $480,807. Coastal has paid this amount to AIG and now is entitled to reimbursement by Select. Since the claims have now been determined as a result of claim development and the passage of time, Select's final obligation can be accurately determined without the help of an actuary by simply requiring Select to pay the $1,000,000 deductible per claim required under Paragraph 7 of the 2006 Agreement in lieu of the unpaid collateral funding originally required.

20.     Select owes additional monies for minimum program fees, taxes, adjustments based on misreporting of class codes and pre-judgment interest in addition to the deductible reimbursements discussed here, however, these issues are not pertinent to the Motion in Limine which is focused on the attempt to create an argument to avoid Select's unpaid collateral [deductible reimbursement] obligations.

21.     Please note there is a slight variance in the figures as stated in this declaration as compared to my earlier declaration submitted in lieu of testimony for the trial. This variance is the

///

10
DECLARATION OF ROBERT J. ANDERSON, JR.
56381v1/1005-001.1

result of my subsequent review of more recent claims reports from AIG and RCA which created slight adjustments (both upward and downward) for the 2004, 2005 and 2006 Agreements.

22. Lastly, counsel for Select and Sorensen asserts that Coastal claims the AIG program is over collateralized and requires no further collateral under the terms of Coastal's insurance policies with AIG. This assertion is based on a declaration I submitted in 2007. In preparing that declaration, over four years ago, I relied on an actuarial opinion/estimate that was prepared by a highly respected actuarial firm experienced in the field. As the passage of time has shown, that actuarial opinion was not accurate and the claims have settled out at a higher value than was stated in that report. This proves that even highly trained actuaries can be wrong and that nothing is better than having the actual claims experience to rely upon. We now have that actual experience. The best actuarial opinion money can buy is not better than that actual experience. With that said, whether or not Coastal owes AIG, or RCA for that matter, any additional collateral is immaterial to Select's performance under their contracts with Coastal. It may turn out that Coastal owes one or both of the insurance companies involved additional collateral at the end of the day, but that is for Coastal and the insurance carriers to hash out. On the other hand, it cannot be disputed that Select owes Coastal a large reimbursement for amounts paid to the insurance companies to cover the claims liability Select assumed under the deductible provisions of each of the Agreements. In essence and in the simplest sense, Coastal has paid the insurance companies but Select has not paid Coastal. Coastal is seeking reimbursement of the funds long ago dispensed to the insurance companies on behalf of Select and their claims obligations.

23. For the foregoing reasons Select should not be able to avoid its agreed-upon collateral obligations since that obligation is necessary to fund Select's shortfall in its deductible obligations for the 2004, 2005 and 2006 Agreements.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my belief, and if called and sworn as a witness, I could and would competently testify thereto. Executed this 11TH day of August, 2011, at SANTA ANA, California.

_____
ROBERT J. ANDERSON, JR.

NOTE: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 870 Roosevelt Avenue, Irvine, CA 92620

A true and correct copy of the foregoing document described as **DECLARATION OF ROBERT J. ANDERSON, JR. IN SUPPORT OF OPPOSITION OF TRUSTEE AND ANDERSON'S OPPOSITION TO PLAINTIFFS' AND COUNTERDEFENDANTS' MOTION IN LIMINE NO. 3 TO PRECLUDE EVIDENCE REGARDING ANY CLAIM THAT SELECT OWES FURTHER MONEYS AS COLLATERAL AND/OR PRECLUDE RECOVERY OF DAMAGES ON A CLAIM** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 11, 2011,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:
- Evan C Borges    eborges@irell.com, bblythe@irell.com
- Evan C Borges    , bblythe@irell.com
- Rebecca J Callahan    rcallahan@callahanlaw.biz
- Cynthia S Conners    cconners@marshackhays.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- D Edward Hays    ehays@marshackhays.com
- Karen S Naylor (TR)    acanzone@burd-naylor.com, knaylor@ecf.epiqsystems.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 11, 2011,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Via Personal Delivery:
Honorable Robert N. Kwan
United States Bankruptcy Court
411 West Fourth Street, Suite 5165
Santa Ana, CA 92701-4593

Via Email Pursuant to Written Agreement:
John W. Hurney    jwh@rpnalaw.com
Drew Pomerance    dep@rpnalaw.com
Richard Gerber    rgerber@hkclaw.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 11, 2011 | Chanel Mendoza | *Chanel Mendoza* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                                          **F 9013-3.1.PROOF.SERVICE**
56381v1/1005-001.1